R. M. Brown
3/29/2013
1:15 p.m

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
*TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA*
**OFFICE OF THE JUDGE-IN-CHAMBERS**
*OFICINA DEL JUEZ DE TURNO*

SHANNON MARIE SMITH et al
_____
Plaintiff / *Demandante*

vs.

Case No. / *No. de caso* 2013 CA 2308

VINCENT C. GRAY, MAYOR
_____
Defendant / *Demanddado*

### NOTICE OF HEARING / *AVISO DE AUDIENCIA*

You are hereby notified that Plaintiff has filed a/an/ *Por el presente, se le notifica que el/la Demandante ha presentado un/a:*

☒ Application for a Temporary Restraining Order (T.R.O.) / *Solicitud para una Orden de Restricción Temporal (T.R.O por sus siglas en inglés)*

☐ Motion for a Preliminary Injunction / *Petición para un Mandato Judicial Preliminar*

☐ Other / *Otro:* _____

The following Hearing has been scheduled for/has been continued to / *Se ha programado/aplazado la siguiente audiencia para:*

☒ 04/04/13 at / *a la(s)* 2:30 ~~a.m./p.m.~~/p.m / *para*
  (date / *fecha*)        (time / *hora*)

☒ Hearing on the Application for Temporary Restraining Order / *una audiencia sobre la solicitud para una Orden de Restricción Temporal*

☐ Status Hearing on the Motion for Preliminary Injunction / *una audiencia sobre la petición para un Mandato Judicial Preliminar*

☐ Other / *Otro:* _____

will be heard by / *se ventilará ante:*

☒ Judge-in-Chambers / *el juez de turno*

☐ the calendar Judge / *el juez asignado*, Judge / *Juez* _____, calendar / *calendario* _____

at the following location / *en el siguiente lugar:*

☒ Judge-in-Chambers Room 4220 (4th Floor)/ *Juez de turno, Oficina 4220 (4to Piso)* – 500 Indiana Ave. NW

☐ 500 Indiana Ave. NW, Courtroom / *Sala* _____

☐ Building / *Edificio* A: 515 5th St. NW, Courtroom / *Sala* _____

☐ Building / *Edificio* B: 510 4th St. NW, Courtroom / *Sala* _____

**If you wish to be heard, your presence is required / Si desea hablar ante el juez, se requerirá su presencia.**



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

SHANNON MARIE SMITH
    Vs.
KAYA HENDERSON et al

C.A. No.    2013 CA 002308 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to:  Judge NATALIA COMBS GREENE
Date:  March 29, 2013
Initial Conference: 9:00 am, Friday, June 28, 2013
Location:  Courtroom 317
      500 Indiana Avenue N.W.
      WASHINGTON, DC  20001

Caio.doc

# ADDENDUM TO INITIAL ORDER AFFECTING
# ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Telephone: (202) 879-1133**

SHANNON MARIE SMITH ET AL.
_____
Plaintiff

vs.

VINCENT C. Gray
_____
Defendant

**13 - 0 0 0 2 3 0 8**

Case Number _____

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

JOHNNY BARNES  212985
_____
Name of Plaintiff's Attorney

201 "G" Street SW
_____
Address
Ste. B101

WASHINGTON, D.C. 20004
_____
Telephone
(202) 660-8858

_Clerk of the Court_

By _____
Deputy Clerk

Date  3/29/13

如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**Shannon Marie Smith,**                           :
808 Chesapeake Street, S.E. – Apartment 304        :
Washington, D.C.,  20020                           :
                                                   :
**Karlene Armstead,**                              :
559 Foxhall Place, S.E.                             :
Washington, D.C., 20020                            :
                                                   :
**Marlece Turner,**                                :
711 Varnum Street, N.W.                            :
Washington, D.C.,    and                           :
                                                   :
**Brenda Williams,**                               :
5744 Blaine Street, N.E.                           :
Washington, D.C. 20019.                            :
                                                   :
**Ericka S. Black**                                :
4231 Eads Street, N.E.                             :
Washington, D.C. 20019.                            :
                                                   :
            Plaintiffs,                            :
                                                   :
vs.                                                :
                                                   :
**KAYA HENDERSON, CHANCELLOR,**                    :
                                                   :
**VINCENT C. GRAY, MAYOR,** and                    :
                                                   :
**THE DISTRICT OF COLUMBIA**                       :
                                                   :
            Defendants.                            :
                                                   :
**Serve: Irvin B. Nathan**                         :
**D.C. Attorney General**                          :
441 – 4th Street, N.W.                             :
Washington, D.C. 20001 _____     :

RECEIVED
Civil Clerk's Office
MAR 29 2013
Superior Court of the
District of Columbia
Washington, D.C.

13 - 0002308

Civil Action No. No. 2013 CA _____ B

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs bring this action against Defendants Kaya Henderson, Chancellor of the District of

Columbia Public Schools, Vincent C. Gray, Mayor of the District of Columbia, individually and in their official capacities, and the District of Columbia (collectively "Defendants"). Plaintiffs seek Declaratory and Injunctive Relief, compelling Defendants to cease in the execution of a School Closings Plan submitted by Defendant Henderson on 13 January 2013; endorsed and promoted by Defendant Gray and presented as official policy of Defendant District of Columbia. The allegations herein are based on Plaintiffs' knowledge as to themselves, and on information and belief. Plaintiffs also seek damages.

### INTRODUCTION

The 2013-2014 "DCPS Consolidation and Reorganization Plan" ("The Plan") will have a startlingly disparate impact on students of color, special education students and students who live in low income communities; and that disparate impact violates the United States Constitution, the D.C. Human Rights Law and applicable federal laws. There is a striking juxtaposition between how the Plan treats students "East of the Park," those in predominantly minority, low income communities, and yet spares students "West of the Park," those in predominantly Caucasian, affluent communities. The same is true with respect to how the Plan treats schools housing special education students. School Closures are not immune to judicial scrutiny.

### PARTIES

1. Plaintiff Shannon Marie Smith is an African American, residing at 808 Chesapeake Street, in Southeast Washington, D.C., East of the Park, whose children will be displaced if the School Closure Plan is allowed to stand.

2. Plaintiff Karlene Armstead is an African American, residing at 559 Foxhall Place, in Southeast Washington, D.C., East of the Park, and an Advisory Neighborhood Commissioner with a school scheduled for closing within her Advisory Neighborhood Commission, 8C.

3. Plaintiff Marlece Turner is an African American residing at 711 Varnum Street, in Northwest

Washington, D.C., East of the Park, whose child, an IEP student (Individualized Education Program) will be displaced if the School Closure Plan is allowed to stand.

4. Plaintiff Brenda Williams is an African American, residing at 5744 Blaine Street, in Northeast Washington, D.C., East of the Park, and is the parent of a Special Education student whose child will be displaced if the School Closure Plan is allowed to stand.

5. Plaintiff Ericka S. Black is an African American, residing at 4231 Eads Street, in Northeast Washington, D.C., East of the Park, and an Advisory Neighborhood Commissioner with a school scheduled for closing within her Advisory Neighborhood Commission, 7D.

6. Defendant Kaya Henderson is the Chancellor of the D.C. Public School System and at most of the time relevant to this action was responsible for the acts and omissions of employees and agents of the District of Columbia. For those times that he was not Mayor, under law, he inherits the acts and omissions of those employees and agents.

7. Defendant Vincent C. Gray is the Mayor of the District of Columbia and at most of the time relevant to this action was responsible for the acts and omissions of employees and agents of the District of Columbia. For those times that he was not Mayor, under law, he inherits the acts and omissions of those employees and agents.

8. The District of Columbia is a municipal entity comprised of its agencies, departments, and divisions, and the officers and managers of those agencies, departments and divisions, including the D.C. Public School System, the Chancellor, the Mayor and other administrators. Plaintiffs assert *respondeat superior*, where appropriate.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to the D.C. Code §§ 1 1-921.

10. Defendant Kaya Henderson has sufficient minimum contacts with the District of Columbia to be sued in this jurisdiction and has intentionally availed herself of the markets and services of the District of Columbia by serving as an appointed local government official.

11. Defendant Gray has sufficient contacts with the District of Columbia to be sued in this jurisdiction and has intentionally availed himself of the markets and services of the District of Columbia by serving as an elected official.

12. Both Defendants have sufficient minimum contacts with the District of Columbia to be sued in this jurisdiction and have intentionally availed themselves of the markets and services of the District of Columbia by serving as an elected or appointed official. Venue is appropriate in the District of Columbia given that all of the events and omissions giving rise to this action took place in the District of Columbia.

**FACTUAL ALLEGATIONS**

13. According to the Plan, the defendants will close schools in two phases: First, 13 schools will close near the end of the 2012-2013 academic school year ("2013 Closings"); and Second, 2 additional schools will close at the conclusion of the 2013-2014 academic school year ("2014 Closings").

14. The 2013 Closings would result in the closure of public schools attended by 2,571 local students. Of those, in both years, an overwhelmingly disproportionate number are minorities, students with disabilities, and low-income students.

15. The 2013 Closings will result in the closure of the public schools attended by 2,402 black students, 159 Latino students, 12 students of Asian or other ethnicity, and only 1 white student; 2,104 of the students in the affected schools are low-income, and 596 are special education students.

16. As a group, black students make up 93.4% of students enrolled in schools that will be closed by the Plan in 2013; Latinos are 6.2%, Asian and other are 0.5%, and whites are 0.0%. Special education students make up 33.8% of students in those schools, and 81.9% of students in those schools are low income.

17. The DCPS Plan to close schools affecting special education students and move them to another school was done without providing the parents the opportunity to participate in the decision making process.

18. Moreover, when the Plan was submitted on 13 January 2013, Defendants did not and yet do not have an existing program in place when the decision was made to close the schools and move the children.

19. The 2014 Closings would result in the closure of public schools attended by 2,792 local students. Of those, a disproportionate number are minorities, students with disabilities, and low-income students.

20. The 2014 Closings would result in the closure of the public schools attended by 2,600 black students, 180 Latino students, 13 students of Asian or other ethnicity, and only 2 white students; 2,295 of the students in the affected schools are low-income, and 778 are special education students.

21. As a group, African American students make up 93.1% of students enrolled in schools that will be closed by the 2013 Closings; Latinos are 6.4%, Asian and other are 0.5%, and whites are 0.1%.

22. Special education students make up 27.9% of students in those schools.

23. And, 82.2% of students in those schools are low income, residing East of the Park.

24. Contrary to the assertions from the Plan, schools with smaller enrollments do not cost much more, if more at all, than schools with larger enrollments.

25. Contrary to the assertions from the Plan, the proposed closures will not result in substantial

savings and likely will result in no savings at all, indeed likely will result in losses.

26. Contrary to the assertions from the Plan, the proposed closures will not likely result in more and better resources for the receiving schools.

## NATURE OF THE ACTION

27. At all times relevant to this action, Plaintiffs Smith, Armstead, Turner and Williams have been residents of the District of Columbia and, except Plaintiff Armstead, parents or legal custodian of children who attend D.C. Public Schools.

28. Each Plaintiff and each Plaintiff's child, among those who have children, is an individual of color, of African American, Hispanic or Latino descent.

29. Plaintiff Karlene Armstead is an Advisory Neighborhood Commissioner representing at least one school that is scheduled for closure.

30. Each of the Plaintiffs and all of the parents and students affected by the proposed school closures reside in areas of the District of Columbia commonly referred to as "East of the Park," predominantly African American and significantly low income communities.

31. No parent or student residing "West of the Park" (predominantly Caucasian and affluent communities) is affected by the proposed school closures.

32. Students in the neighborhoods with closed schools, including the children of Plaintiffs, will be forced to travel longer distances to schools than other students.

33. Students in the neighborhoods with closed schools, including the children of Plaintiffs, will be required to walk or travel through unfamiliar and even dangerous neighborhoods, putting their safety at risk.

34. By the District's own measurements, students previously dislocated by the 2008 school closures are performing no better than they had at their closed neighborhood schools

35. The consolidated schools will be overwhelmed with the sudden influx of greater percentages of

new students and students with disabilities.

36. Any delay in the provision of special education services to affected students will have a compounding adverse impact on students with disabilities from both the closed schools and the new transferring schools and likely lead to greater failures of the District to provide a free and appropriate public education.

37. The school closures also promote what has been described by a recent, credible study as "churn and instability." Turnover of teachers in the District of Columbia has been unusually high since 2009.

38. The kind of "churn" being experienced results in instability. The study's results, "How Teacher Turnover Harms Students' Achievements," indicate that students in grade-levels with higher turnover score lower in both ELA and math and that this effect is particularly strong in schools with more low-performing and African American students.

39. Moreover, the results of the Study suggest that there is a disruptive effect of turnover beyond changing the distribution in teacher quality.

40. The District cannot demonstrate a "substantial legitimate justification" because it cannot show how the proposed closings will provide any educational benefit.

41. The proposed plan to close fifteen D.C. Public Schools (DCPS) must be educationally necessary to meet its goal of improving the educational prospects of displaced students.

42. However, the Plan will only continue to disproportionately and adversely impact students of color, those with disabilities and those who live in certain neighborhoods.

43. The Plan is extreme, and it will continue to be counterproductive, therefore it does not meet the educational necessity test required.

44. Indeed, the Plan goes against Chancellor Kaya Henderson's goals to improve achievement for all students, to invest in struggling schools, to increase graduation rates, to improve student satisfaction, and to increase enrollment.

45. Based on past closures, the only result that emerged is a significant disparate impact on students of color, those with disabilities and those residing in certain neighborhoods (the protected groups).

46. In addition, the District has failed to show how the 2008 school closures have made significant improvements or positive changes to help it move closer to meeting its educational goals.

47. In fact, the 2008 school closures were counterproductive to the District's educational goals. The closures did not improve student performance, increase enrollment or improve achievement for all students, but instead hindered student performance.

48. The 2008 closures did not promote equal educational opportunity for the protected groups, but instead created less opportunity for those groups by removing educational resources from their communities while stretching resources at the receiving schools.

49. The 2008 closures did not help the District invest in the struggling schools, but instead completely ended any chance of investments when it shut down those schools.

50. The 2008 closures did not properly allocate money to DCPS, but instead it lost millions of dollars due to the enormous expenses related to closing schools and accommodating displaced students at receiving schools.

51. The District cannot demonstrate a "substantial legitimate justification" for the disparate impact because it cannot show that its drastic plan to close schools is an educationally necessary action that relates to meeting its educational goals.

52. When schools are closed, students' learning habits are disrupted and they are faced with a multitude of adjustments that come from enrolling in the receiving schools.

53. Low-income families will have difficulty finding transportation for their children transferring to new schools.

54. Neighborhoods lose a central institution of learning and activity, and communities that have invested in their local schools, will no longer have a focal point where one can feel safe,

promote citizenship, or maintain a sense of community.

55. For these reasons, the District has not demonstrated a convincing educational necessity for why it is making decisions in the way that it has, especially when those decisions are having disparate impacts on racial minorities and students with disabilities.

### FIRST CAUSE OF ACTION

56. Plaintiffs are informed and believe, and on that basis allege, that at all times herein mentioned each of the Defendants was an agent, servant, employee, and/or joint venture of the remaining Defendant, and was at all times acting within the course and scope of such agency, service, employment, and/or joint venture, and each Defendant has ratified, approved, and authorized the acts of the remaining Defendant with full knowledge of the facts.

57. There is a unity of interest between Defendants, and each acts as the alter ego of the other.

### Violation of the D.C. Human Rights Act, D.C. Code § 2-1402.73, § 2-1402.68 and § 2-1402.41

58. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 54.

59. The D.C. Human Rights Act protects citizens from discrimination based on race, disability and residency among other classifications.

60. The proposed closure of the public schools is an unjustifiable discriminatory practice because it intentionally discriminates on the basis of race, disability and residency and it disproportionately affects African American, Hispanic, Latino, and disabled students all who live in certain parts of the District of Columbia, "East of the Park."

61. The proposed closures shockingly affect 2,570 people of color, while sparing all but one Caucasian student.

62. The legal arguments concerning these violations are more fully explored in the Memorandum of

Points and Authorities accompanying Plaintiffs' Application for a Temporary Restraining Order and Motion for a Preliminary Injunction, contemporaneously filed.

63. As a consequence of Defendants' acts or omissions, Plaintiffs have been injured in an amount to be proven.

**Failure to provide Notice to the appropriate ANCs; give "Great Weight" to the views of those ANCs; and make decisions in open and public meetings**

64. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 60.

65. Notice of pending governmental action and an opportunity to express views about that pending action are fundamental, inescapable statutory due process requirements when it comes to the role of ANCs. In the instant case, no notice was given to the subject ANCs and thus no opportunity to express its views was provided.

66. The views of the ANCs concerning the proposed school closures were not given any weight, let alone great weight, as required by law.

67. Defendants Chancellor Kaya Henderson and Mayor Vincent Gray in executing and issuing the proposed School Closure Plan issued on 13 January 2013, and on all actions pertaining to the proposed School Closure Plan, failed and continue to fail to comply with the provisions of the Sunshine Amendment in the D.C. Self-Government Act which mandates transparency in local government decision-making, requiring that all such decisions be done in open, public meetings. The decisions regarding the school closures were done in the dark.

68. Plaintiffs have been injured as a result of Defendants' acts or omissions in an amount to be proven.

**SECOND CAUSE OF ACTION**

**Violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12132**

69. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 65.

70. The decision to close 15 schools, although facially neutral, will have a disproportionately adverse effect on students with disabilities.

71. While special education students comprise only 14.4% of all students, they make up 23.2% of students in schools scheduled for 2013 Closings. When looking at the 2014 Closings, special education students make up 27.9% of students in those schools.

72. Plaintiffs have been injured as a result of Defendants' acts or omissions in an amount to be proven.

**Violation of Section 504 of the Rehabilitation Act of 1973**

73. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 69.

74. The school closings are in violation of Section 504 of the Rehabilitation Act of 1973.

75. Plaintiffs Brenda Williams and Marlece Turner is a qualified individual with a child with a disability under the Rehabilitation Act.

76. Defendant District of Columbia receives Federal financial assistance.

77. Defendants' failure to maintain a free and appropriate education in the plaintiffs' neighborhood schools slated for closure, considering the relevant and unnecessary burdens thrust upon plaintiffs by closing these schools, demonstrate both bad faith and a gross departure of accepted standards among educational professionals. Such treatment of special needs students rises to the level of discrimination based solely on the plaintiffs' disabilities.

78. Taking into account the outcome of the 2008 school closings, the defendant's plan to close fifteen additional schools is a demonstration of bad faith. Of the 2,792 students expected to be impacted by these closures, a full 27.9% are special needs.

79. Plaintiffs have been injured as a result of Defendants' acts or omissions in an amount to be proven.

**Violation of the Individuals with Disabilities Education Act (IDEA)**

80. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 76.

81. The Individuals with Disabilities Education Act (IDEA) funds special education programs. Under the Individuals with Disabilities Education Act, each school district shall ensure that the educational placement of each student with a disability is determined at least annually, is based on his or her Individualized Education Program (IEP) and is as close as possible to their home.

82. Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if not disabled. In selecting the least restrictive environment, consideration is to be given to any potential harmful effect on the child or on the quality of services that he or she needs, 34 C.F.R. 300.116.

83. The children of Plaintiffs Marlece Turner and Brenda Williams have not been afforded the protections of IDEA.

84. Plaintiffs have been injured as a result of Defendants' acts or omissions in an amount to be proven.

### THIRD CAUSE OF ACTION

**Violation of Title 42, U.S.C. § 1983.**

85. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 81.

86. Title 42 U.S.C. § 1983 provides, "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress."

87. Defendants' Plan denies students of color, those with disabilities and those residing in low income neighborhoods equal protection in violation of the United States Constitution.

88. Plaintiffs have been injured as a result of Defendants' acts or omissions in an amount to be proven.

**FOURTH CAUSE OF ACTION**

**Violation of Title VI of the 1964 Civil Rights Act**

89. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 85.

90. Title VI of the 1964 Civil Rights Act and the Department of Education regulations implementing that Act, like the D.C. Human Rights Law, prohibit recipients of federal funding from discriminating based on race, color, or national origin, 42 U.S.C.A §§ 2000d-2000d-7.

91. Under Department of Education regulations, schools and districts violate federal law when they adopt and implement facially neutral policies, and the policies nonetheless have an unjustified effect on students on the basis of race or disability.

92. Any fair analysis of the facts in the instant situation clearly demonstrates the presence of a *prima facie* case of disparate impact.

93. As a consequence, it is within the jurisdiction of this Honorable Court to mandate that appropriate District of Columbia Government authorities take steps to ensure compliance with Title VI.

94. Plaintiffs have been injured as a result of Defendants' acts or omissions in an amount to be proven.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment and permanent relief against Defendants as follows:

1. Finding that defendants, the Chancellor and the Mayor violated provisions of the D.C. Human

Rights Act.

2. Finding that the Advisory Neighborhood Commissions were not legally notified of the proposed school closures and that the views of the Advisory Neighborhood Commissions were not given great weight.

3. Finding that Defendants violated the Americans with Disabilities Act.

4. Finding that Defendants violated Section 504 of the Rehabilitation Act of 1973.

5. Finding that Defendants violated the Individuals with Disabilities Act (IDEA).

6. Finding that Defendants violated Title 42 U.S.C. § 1983.

7. Finding that Defendants violated Title VI of the 1964 Civil Rights Act and mandating that Defendant Mayor Gray take action to overcome the violations of that Act.

8. Finding that both defendants, through their acts and omissions, have harmed the education of the children of Plaintiffs.

9. Awarding Plaintiffs appropriate compensatory damages, treble damages and punitive damages.

10. Granting a Temporary Restraining Order and a Permanent Injunction, preventing Defendants from further taking action to implement the proposed school closures.

11. Awarding Plaintiffs appropriate other injunctive relief, including mandating that the Chancellor, Mayor and District of Columbia Government design and implement a plan to improve the performance of all students in the District of Columbia including those attending those schools that are proposed to be closed.

12. Granting a Temporary Restraining Order and Permanent Injunctive relief suspending the implementation of the D.C. Public Schools Consolidation and Reorganization Plan.

13. Awarding Plaintiffs the costs and expenses of this action, including reasonable attorneys' and experts' fees.

14. Granting injunctive relief against Defendants to prevent future wrongful conduct.

15. Awarding Plaintiffs such other and further relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of twelve persons of each and every claim so triable.

_____
**Johnny Barnes, D.C. Bar Number 212985**
Counsel for Plaintiffs
301 "G" Street, S.W, Suite B101
Washington, D.C.    20024
AttorneyJB7@gmail.com
Telephone (202) 882-2828
Kevin Chavous, of Counsel
D.C. Bar Number 1008965
Counsel for Democracy


Destiny Aigbe, of Counsel
Counsel for Democracy
Pro Hac Vice


Anitra Ash-Shakoor, of Counsel
D.C. Bar Number 1008693


Ann Wilcox, of Counsel
D.C. Bar Number 421908


Julianne King, of Counsel
D.C. Bar Number 433741


Joel Lawson, of Counsel

Counsel for Democracy
Pro Hac Vice

Fatmata Barrie, of Counsel
D.C. Bar Number 485122

Karl R. Tetzlaff, of Counsel
D.C. Bar Number 1001022

Esau Venzen
Pro Hac Vice

**DATED: 29 March 2013**

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **Shannon Marie Smith,** | : |
| 808 Chesapeake Street, S.E. – Apartment 304 | : |
| Washington, D.C.,  20020 | : |
| | : |
| **Karlene Armstead,** | : |
| 559 Foxhall Place, S.E. | : |
| Washington, D.C, 20020 | : |
| | : |
| **Marlece Turner,** | : |
| 711 Varnum Street, N.W. | : |
| Washington, D.C.,    and | : |
| | : |
| **Brenda Williams,** | : |
| 5744 Blaine Street, N.E. | : |
| Washington, D.C. 20019. | : |
| | : |
| **Ericka S. Black** | : |
| 4231 Eads Street, N.E. | : |
| Washington, D.C. 20019. | : |

1 3 - 0 0 0 2 3 0 8

Plaintiffs,                      :

vs.                                  :            Civil Action No. No. 2013 CA _____ B

**KAYA HENDERSON, CHANCELLOR,**            :

**VINCENT C. GRAY, MAYOR,** and            :

**THE DISTRICT OF COLUMBIA**            :

Defendants.                      :

Serve: Irvin B. Nathan            :
**D.C. Attorney General**            :
441 – 4th Street, N.W.            :
Washington, D.C. 20001 _____ _____:

## APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Pursuant to D.C. Superior Court Rule 65(a), Plaintiffs' Move this Honorable Court for a

Temporary Restraining Order ; immediately restraining Defendants their agents, employees and other

personnel from implementing the DCPS Consolidation and Reorganization Plan submitted by defendant

Chancellor Kaya Henderson on 13 January 2013.In support of this Application, Plaintiffs respectfully

refer the Court to the Memorandum of Points and Authorities and accompanying material filed herewith.


A proposed Order is annexed.

Johnny Barnes, D.C. Bar Number 212985

Counsel for PlaintiffS
301 "G" Street, S.W. Suite B101
Washington, D.C.      20024
AttorneyJB7@gmail.com
Telephone (202) 882-2828


**DATED: 29 March 2013**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

**Shannon Marie Smith,**
808 Chesapeake Street, S.E. – Apartment 304
Washington, D.C.,  20020                              :

                                                      :

**Karlene Armstead,**                                 :
559 Foxhall Place, S.E.                               :
Washington, D.C., 20020                               :

                                                      :

**Marlece Turner,**                                   :
711 Varnum Street, N.W.                               :
Washington, D.C.,    and                              :

                                                      :

**Brenda Williams,**                                  :
5744 Blaine Street, N.E.                              :
Washington, D.C. 20019.                               :

                                                      :

**Ericka S. Black**                                   :
4231 Eads Street, N.E.                                :
Washington, D.C. 20019.                               :

                                                      :

                                                      :

          Plaintiffs,                                 :        **13 - 0 0 0 2 3 0 8**

                                                      :

vs.                                                   :        Civil Action No. No. 2013 CA _____ B

                                                      :

**KAYA HENDERSON, CHANCELLOR,**                       :

                                                      :

**VINCENT C. GRAY, MAYOR,** and                       :

                                                      :

**THE DISTRICT OF COLUMBIA**                          :

                                                      :

          Defendants.                                 :

                                                      :

**Serve: Irvin B. Nathan**                            :
**D.C. Attorney General**                             :
441 – 4th Street, N.W.                      :
<u>Washington, D.C. 20001</u>_____   :

## <u>MOTION FOR A PRELIMINARY INJUNCTION</u>

Pursuant to D.C. Superior Court Rule 65(a), Plaintiffs' Move this Honorable Court for a

Preliminary Injunction; permanently restraining Defendants their agents, employees and other personnel

from implementing the DCPS Consolidation and Reorganization Plan submitted by defendant

Chancellor Kaya Henderson on 13 January 2013.In support of this Motion, Plaintiffs respectfully refer

the Court to the Memorandum of Points and Authorities and accompanying material filed herewith.

A proposed Order is annexed.

Johnny Barnes, D.C. Bar Number 212985

Counsel for Plaintiffs
301 "G" Street, S.W, Suite B10
Washington, D.C.      20024
AttorneyJB7@gmail.com
Telephone (202) 882-2828

**DATED: 29 March 2013**

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **Shannon Marie Smith,** :<br>808 Chesapeake Street, S.E. – Apartment 304 :<br>Washington, D.C.,  20020 :<br> :<br>**Karlene Armstead,** :<br>559 Foxhall Place, S.E. :<br>Washington, D.C., 20020 :<br> :<br>**Marlece Turner,** :<br>711 Varnum Street, N.W. :<br>Washington, D.C.,    and :<br> :<br>**Brenda Williams,** :<br>5744 Blaine Street, N.E. :<br>Washington, D.C. 20019. :<br> :<br>**Ericka S. Black** :<br>4231 Eads Street, N.E. :<br>Washington, D.C. 20019. :<br> :<br> :<br>                 Plaintiffs, :<br> :<br>vs. :<br> :<br>**KAYA HENDERSON, CHANCELLOR,** :<br> :<br>**VINCENT C. GRAY, MAYOR, and** :<br> :<br>**THE DISTRICT OF COLUMBIA** :<br> :<br>                 Defendants. :<br> :<br>**Serve: Irvin B. Nathan** :<br>**D.C. Attorney General** :<br>441 – 4th Street, N.W. :<br><u>Washington, D.C. 20001</u>                 <u> </u>: | Civil Action No. No. 2013 CA _____ B |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER**
<u>**AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**</u>

Plaintiffs move for a Temporary Restraining Order and Preliminary Injunction,

prohibiting Defendants Kaya Henderson, Chancellor of the District of Columbia Public Schools,

Vincent C. Gray, Mayor of the District of Columbia and the District of Columbia, (collectively

"Defendants") from executing a School Closings Plan (The DCPS Consolidation and

Reorganization Plan) submitted by Defendant Henderson on 13 January 2013, embraced and

promoted by Defendant Mayor Gray and presented as policy of Defendant District of Columbia.

## INTRODUCTION

*The public schools may not be closed to avoid the effect of the law of the land ... An order of this kind is within the court's power if required to assure these petitioners that their constitutional rights will no longer be denied them.*

*Griffin v. School Board of Prince Edward County*, 377 U.S. 218 (1964).

The 2013-2014 "DCPS Consolidation and Reorganization Plan" ("The Plan") will have a

startlingly disparate impact on students of color, special education students and students who live

in low income communities; and that disparate impact violates the United States Constitution,

the D.C. Human Rights Law and applicable federal laws.  There is a striking juxtaposition

between how the Plan treats students "East of the Park," those in predominantly minority, low

income communities, and yet spares students "West of the Park," those in predominantly

Caucasian, affluent communities.  The same is true with respect to how the Plan treats schools

housing special education students.  School Closures are not immune to judicial scrutiny.

A local government may not, when it comes to equal access to education, treat some

classes of its citizens different than it treats another class.  On its face, the impact of the proposed

closings treat students of color, those with disabilities and those who live in low income

neighborhoods disproportionately and disparately.  *See the Affidavit of Attorney Mary Levy,*

*Exhibit A, annexed.*

The Supreme Court in a 1964 *per curiam* decision unanimously ordered the schools

reopened in Prince Edward County Virginia when the local government had closed them in order

to avoid integrating them.  The Supreme Court ruled that 1) the district court was empowered to enjoin further use of grants and credits, 2) the court could superintend the board's taxing and appropriation powers, and 3) moreover it could order the public schools reopened.  "For the same reasons the District Court may, if necessary to prevent further racial discrimination, require the Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system in Prince Edward County like that operated in other counties in Virginia," *Griffin v. School Board of Prince Edward County*, 377 US 218 (1964).

Defendant Kaya Henderson in a proposed action endorsed and embraced by Defendant Mayor Vincent Gray and presented as policy by Defendant District of Columbia, unless enjoined, will close ten percent of the District's public schools, implicating the Constitution and various local and federal laws; bringing the proposed action on four squares with the prohibited action in the *Griffin* case.  The Court in *Griffin* did not allow such action, and this Court should not allow such action.

In 2008 the District closed 23 public schools.  Those closures followed the closing of some 55 public schools, beginning in 1976.  On 13 January 2013, Defendant Chancellor Kaya Henderson announced yet another round of closings, 15 in total, an incredible ten percent of all remaining D.C. Public Schools, including 13 at the end of this school year and two additional schools at the end of next school year.  For close to four decades Defendants and their predecessors have shaped a pattern and practice of closing schools that has overwhelmingly and disproportionately only affected children of color, those with disabilities and those who live in low income neighborhoods.  This pattern and practice of discretionary discrimination is in violation of the United States Constitution, implicates a number of federal and local statutes and regulations and has had significant and severe educational, social and even physical impacts on

these otherwise protected classes of individuals.

It is clear and undisputable that the closings since 1976, those in 2008 and those scheduled for 2013 and 2014 have had and will have a disproportionate impact on students of color, individuals with disabilities and those who live in low income communities. These school closings have been and are being undertaken by these Defendants and their predecessors without demonstrating educational necessity and without considering other, equally and perhaps more effective measures to reduce costs at a lesser burden on the affected classes.

The courts in the District of Columbia have established a long and rich tradition, *One Standard,* when it comes to public education. As Judge J. Skelley Wright stated in a storied opinion, "[T]he minimum the Constitution will require and guarantee is that for their objectively measurable aspects these schools be run on the basis of real equality," *Hobson v. Hansen*, 269 F. Supp. 491 (D.D.C. 1967), affirmed sub nom., *Smuck v. Hobson*, 408 F.2d 175 (D.C. Cir. 1969). The *Hobson* case followed the case of *Bolling v. Sharpe*, 347 U.S. 497 (1954) --- a companion case to *Brown v. Board of Education*, 347 U.S. 483 (1954) --- which outlawed the segregated school system in Washington, D.C. that existed prior to 1954. And in 1972, Judge Cornelius Waddy ruled that "Constitutional rights must be afforded citizens despite the greater expense involved . . . the District of Columbia's interest in educating the excluded children clearly must outweigh its interest in preserving its financial resources, *Mills v. Board of Education of the District of Columbia,* 348 F. Supp. 866 (D. DC 1972).

The Chancellor's Plan, if allowed to stand, would return the District of Columbia School System back to a time before the 1954 *Brown* decision inasmuch as it promotes a dual system denying the same and equal access to education for some school children based upon their race, disability and where they live, when it should not. And, the Plan does so under the guise of sparing expense, when it does not. The *Griffin* case is particularly instructive on this point.

In 2008 the District of Columbia Government proposed a similar plan, targeting 23 public schools for closure. Ultimately a total of 28 schools were closed, all primarily affecting students of color, those with disabilities and those in low income communities. In the wake of those closings, achievement test scores have not improved, performance among those students affected by the closings has declined and instead of saving $23 million as projected, the closings resulted in losses of $40 million. Nothing good or positive educationally has come from those 2008 closings and money has been lost rather than saved. Yet instead of following a different course, one that might put the School System on the path to better schools and equal access to education for all its students, the Chancellor's current Plan repeats the mistakes of the past. Similarly to the 2008 closings, the proposed 2013-2014 closings will not save a significant amount of money, if any; may well result in financial losses rather than gains; will not likely result in improvements in performance or achievement; and runs counter to the evidence that smaller public schools are only slightly more costly than larger schools. *See Affidavit of Financial Analyst Soumya Bhat,* *Exhibit B, annexed, and the March 2013 Report by Ms. Bhat, Exhibit C, annexed.* And while repeating those mistakes of the past, the current Plan does so in a prohibited, discriminatory manner that is causing imminent, particularized, irreparable harm to Plaintiffs. Worse, the Plan lacks vision in that, according to the Chancellor's own published data, some 30,000 additional students will enter the public school system within the next decade. Closing more schools will make it difficult to place those students in the future who by law must attend school.

**BACKGROUND**

While the United States Constitution requires colorblind policies and practices to promote equal educational opportunity these proposed school closings do not. Indeed, these school closings promote less educational opportunity for students of color, individuals with disabilities and those who live in certain parts of the District. At the same time, these proposed

closings continue to promote a dual and disparate school system within the D.C. Public Schools.

Of the 6,375 students affected by the 2008 school closings, 5,818 or 91.3% were Black; 509 or 8.0% were Latino or Hispanic; 33 or 0.5% were other people of color; 880 or 13.8% were special education; and only 15 or 0.2% were White. Of those, 4,895 or 76.8% were low income. The disparate and discriminatory effect of those closings is so clear and so obvious that the data speaks, without more.

Worse, there has been no examination by the District Government of the impact of the 2008 closings, despite a requirement in the Public Education Reform Act of 2007, a law that transferred the D.C. Public Schools to the authority of the Mayor, the so-called Mayoral Takeover Law. Under that Law, such an examination must take place at the end of five years, twice each decade. Moreover, as indicated, rather than saving resources, a recent Report indicates that the 2008 closings actually lost resources.

This pattern and practice of discretionary discrimination is even worse with the proposed 2013-2014 school closings. Of the 2,792 students affected, 2,600 or 93.1% are Black; 180 or 6.4% are Latino or Hispanic; 13 or 0.5% are Asian or other people of color; both schools serving special education students will be closed; and only 2 or 0.1% are White. Of the total, 2,295 or 82.2% are low income, living in certain parts of the District. Moreover, the Chancellor's Plan fails to explore less drastic measures (*i.e.*: proven, effective community-based turnaround models with adequate time for implementation; and fails to provide an adequate relocation plan ensuring that relocated students will be better served and have access to higher performing schools. Again, Judge Waddy's words in the *Mills* case are as instructive today as they were when the commonly called *Waddy Decree* was declared, "If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such a manner that no child is entirely excluded

from a publicly supported education consistent with his needs and ability to benefit therefrom. The inadequacies of the District of Columbia Public School System whether occasioned by insufficient funding or administrative inefficiency, certainly cannot be permitted to bear more heavily on the "exceptional" or handicapped child than on the normal child. Plaintiffs' entitlement to relief in this case is clear. The applicable statutes and regulations and the Constitution of the United States require it."

Similarly, the words of the United States Supreme Court in *Brown v. Board of Education* resonate today as surely as they did more than a half century ago, "… today education is perhaps the most important function of state and local governments . . . In these days it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity to an education."

The following Chart created by Mary Levy, an Attorney and Education Expert, also speaks, without more. The Chart is also embodied in Exhibit A, annexed.

The Chart was prepared using Defendant Chancellor Kaya Henderson's own, recent, published data:

| | Number of group in closed schools | Group as % of all students in closed schools | Total number of group | Group as % of all students | Percent of group in closed schools |
|---|---|---|---|---|---|
| **School Closings 2013** | | | | | |
| All students Fall 2011 | 2,832 | 100.0% | 45,191 | 100.0% | 6.3% |
| Blacks | 2,663 | 94.0% | 30,889 | 71.5% | 8.6% |
| Hispanic | 159 | 5.6% | 6,230 | 14.0% | 2.6% |
| White | 1 | 0.0% | 4,175 | 9.2% | 0.0% |
| Asian/Other/unknown | 12 | 0.4% | 1,661 | 3.7% | 0.7% |

| | Number of group in closed schools | Group as % of all students in closed schools | Total number of group | Group as % of all students | Percent of group in closed schools |
|---|---|---|---|---|---|
| All students Fall 2012 | 2,495 | 100.0% | 45,557 | 100.0% | 5.5% |
| Low-income | 2,393 | 82.3% | 34,354 | 75.4% | 5.3% |
| ELL | 86 | 3.4% | 4,533 | 10.0% | 1.9% |
| All levels spec ed | 565 | 22.6% | 6,484 | 14.2% | 8.8% |
| Levels 3 & 4 spec ed | 248 | 9.9% | 1,983 | 4.2% | 12.8% |
| **School closing 2013 and 2014** | | | | | |
| All students SY 2012 | 3,053 | 100.0% | 45,191 | 100.0% | 6.8% |
| Blacks | 2,861 | 93.7% | 30,889 | 68.4% | 9.3% |
| Hispanic | 180 | 5.9% | 6,230 | 13.8% | 2.9% |
| White | 2 | 0.1% | 4,175 | 9.2% | 0.0% |
| Asian/Other/unknown | 13 | 0.4% | 1,661 | 3.7% | 0.8% |
| All students SY 2013 | 2,686 | 100.0% | 45,557 | 100.0% | 5.9% |
| Low-income | 2,596 | 96.6% | 34,354 | 75.4% | 7.6% |
| ELL | 99 | 3.7% | 4,533 | 10.0% | 2.2% |
| All levels spec ed | 743 | 27.7% | 6,426 | 14.2% | 11.6% |
| Levels 3 & 4 spec ed | 425 | 15.8% | 1,935 | 4.2% | 22.0% |

Race/ethnic numbers based on School Year 2011-12 reports; ELL and special education based on School Year 2012-13 reports.

As is evident from this 2013-2014 School Closings Plan, these ordinarily protected classes of students will no longer have neighborhood schools; will have to negotiate longer

distances to attend school at costs to safety and personal resources when they are already

disproportionately exposed in those regards; and as the 2008 experiment demonstrates, will

likely have less resources and fewer educational tools in their new school environments.

Moreover, the closings do not take into account the irrefutable value of educational continuity

that neighborhood schools allow.  Librarians, art and music teachers and enhanced recreation and

after school programs now absent are not likely to magically appear when saving money rather

than educating children is the driving force.

Poverty is the most accurate predictor of poor performance.  Failing to understand this widely

recognized view, the Chancellor by these closings disproportionately punishes Black, Brown and

poor people and students with disabilities in ways that the law does not permit.

## BACKGROUND

These school closings clearly have a negative impact on the protected classes.  *See Affidavits of*

*Shannon Marie Smith, Marlece Turner and Brenda Williams, Exhibits D, E and F, annexed.*

Students in the neighborhoods with closed schools will be forced to travel longer distances to schools

than other students.  This will often require walking through unfamiliar and even dangerous

neighborhoods.  In other cases it will require car or public transportation at a burdensome cost to

families.

In addition, in some cases students will be transferred to schools that, by the District's own

measurements, are performing no better than their closed neighborhood school had been.  These

consolidated schools will be overwhelmed with the sudden influx of greater percentages of new students

and students with disabilities.  Any delay in the provision of special education services to affected

students will have a compounding adverse impact on students with disabilities from both the closed

schools and the new transferring schools and likely lead to greater failures of the District to provide a

free and appropriate public education.

The school closures also promote what has been described by a recent, credible study as "churn and instability." Turnover of teachers in the District of Columbia has been unusually high since 2009. With the kind of "churn" being experienced comes instability. The study's results, "How Teacher Turnover Harms Students' Achievements," indicate that students in grade-levels with higher turnover score lower in both ELA and math and that this effect is particularly strong in schools with more low-performing and Black students. Moreover, the results suggest that there is a disruptive effect of turnover beyond changing the distribution in teacher quality

Given the pervasive racial and special education disparities in the school closures, it is incumbent upon the School District to demonstrate that the closures are educationally necessary. However, to date, the District has made no real effort to show that, in the face of significant disparities, the closures were nevertheless educationally or financially necessary. Indeed, the credible evidence supports the view that school closings are not a legitimate means of school turnaround and that they do not raise student achievement. There is no evidence of school closings resulting in any substantial long-term improvement on student performance. Additionally, respectable academic studies suggest that student achievement often falls during the final months of a closing school's existence. Moreover, the proposed closures are not financially necessary. There is no way of knowing at this point the true financial impact of school closures in the District of Columbia. Past reports indicate that the 2008 school closings resulted in a loss of $40 million rather than the expected gain of $23 million. In addition, at least one national study of the financial impact of closing schools has raised serious questions about the financial savings that result from closing schools, in part because the savings associated with closing schools are offset with enormous expenses, including maintaining the sites for resale or future use, transporting school property like computers and desks, and making improvements at the schools slated to receive the displaced students. Selling or leasing the surplus buildings also tends to be difficult.

Finally, to explain that these schools were slated for closure primarily because they happened to

be the schools with the oldest buildings that had fallen into disrepair and thus costly to maintain, is no

answer.   If that is indeed true, then it is only evidence of long term disparate treatment of these

protected classes.  One cannot remedy decades of discrimination in the form of  neglect of schools in

certain neighborhoods by choosing to close the schools in those neighborhoods in their entirety.

**FACTS**

According to the Plan, the defendants will close schools in two phases: First, 13 schools will

close near the end of the 2012-2013 academic school year ("2013 Closings"); and Second, 2 additional

schools will close at the conclusion of the 2013-2014 academic school year ("2014 Closings").

The 2013 Closings would result in the closure of public schools attended by 2,571 local students.  Of

those, in both years, a disproportionate number are minorities, students with disabilities, and low-income

students.

The 2013 Closings will result in the closure of the public schools attended by 2,402 black

students, 159 Latino students, 12 students of Asian or other ethnicity, and only 1 white student; 2,104 of

the students in the affected schools are low-income, and 596 are special education students.

As a group, black students make up 93.4% of students enrolled in schools that will be closed by the Plan

in 2013; Latinos are 6.2%, Asian and other are 0.5%, and whites are 0.0%.  Special education students

make up 33.8% of students in those schools, and 81.9% of students in those schools are low income.

The 2014 Closings would result in the closure of public schools attended by 2,792 local students.  Of

those, a disproportionate number are minorities, students with disabilities, and low-income students.

The 2014 Closings would result in the closure of the public schools attended by 2,600 black students,

180 Latino students, 13 students of Asian or other ethnicity, and only 2 white students; 2,295 of the

students in the affected schools are low-income, and 778 are special education students.

As a group, black students make up 93.1% of students enrolled in schools that will be closed by the

2013 Closings; Latinos are 6.4%, Asian and other are 0.5%, and whites are 0.1%. Special education

students make up 27.9% of students in those schools, and 82.2% of students in those schools are low

income.

Contrary to the assertions from the Plan, schools with smaller enrollments do not cost much more, if more at all, than schools with larger enrollments. Contrary to the assertions from the Plan, the proposed closures will not result in substantial savings and likely will result in no savings at all, indeed likely will result in losses. Contrary to the assertions from the Plan, the proposed closures will not likely result in more and better resources for the receiving schools.

## ARGUMENT

A plaintiff may demonstrate its entitlement to temporary and preliminary injunctive relief by showing that (1) it has a substantial likelihood of success on the merits, (2) it would suffer irreparable injury if injunctive relief is denied; (3) injunctive relief would not substantially injure the opposing party or other third parties; and (4) injunctive relief would further the public interest. *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921 (D.C. Cir. 1958) and *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999). Thus, "[a]n injunction may be justified ... where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *City Fed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995). The purpose of temporary injunctive relief "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The instant matter satisfies all four prongs of this standard.

### Plaintiffs are likely to succeed on the merits

The proposed actions of the Defendants violate the United States Constitution and implicate numerous Local and Federal laws and Regulations and if those proposed actions are allowed to stand, a court will surely find that Defendants have violated the law. "Substantial likelihood of success" does not necessarily imply that a party needs to demonstrate a 50% chance or better of

prevailing on appeal. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d

841, 844 (D.C. Cir. 1977). Instead, a party can satisfy that element by raising a "serious legal

question . . . whether or not the [party] has shown a mathematical probability of success." *Id.* Put

another way, "it will ordinarily be enough that the [party] has raised questions going to the merits

so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus

for more deliberative investigation." *Id.* (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206

F.2d 738, 740 (2d Cir.1953)); *Jewish War Veterans v. Gates*, 522 F. Supp. 2d 73, 76 (D.D.C. 2007).

And see *People for the American Way Foundation v. U.S. Dep't of Ed.*, 518 F. Supp. 2d 174

(D.D.C. 2007).

### The District of Columbia Human Rights Act

D.C. Code § 2-1402.73 provides, "Except as otherwise provided for by District law or when

otherwise lawfully and reasonably permitted, it shall be an unlawful discriminatory practice for a

District government agency or office to limit or refuse to provide any facility, service, program, or

benefit to any individual on the basis of an individual's actual or perceived: race... disability... or

place of residence..." It is clear that the proposed school closures are inconsistent with this

mandate.

Under D.C. Code§ 2-1402.68, otherwise known as the "Effects Clause," the D.C. Human Rights

Act provides for claims against unintentional discrimination which have a discriminatory effect.

The Act was enacted to "secure an end in the District of Columbia for any reason other than that of

individual merit, including, but not limited to, discrimination by reason of race...disability...and

place of residence or business." To that end, the Effects Clause prohibits facially neutral practices

which "bear disproportionately on a protected class and are not independently justified for some

nondiscriminatory reason." *Gay Rights Coalition of Georgetown Univ. Law Ctr. V. Georgetown

Univ.*, 536 A.2d 1, 29 (D.C. 1987). the school closures will have a disproportionate adverse effect

in terms of race, disability and place of residence.

Under D.C. Code § 2-1402.41 it is unlawful for an education institution, "to deny, restrict or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived: race...and disability of any individual."

With respect to race, over 93% of the students who will be affected by the school closings are African American versus .05% white. This gives rise to the claim that the proposed closing of 15 schools is racially discriminatory in nature. To support this claim, plaintiffs must establish a prima facie case of discrimination by introducing either direct or indirect evidence of intentional discrimination. Where no direct evidence exists, "plaintiffs can use statistical evidence to establish the type of intentional discrimination that is necessary to prove a disparate treatment case...," *Forman v. Small*, 271 F.3d 285, 292 (D.C. Cir. 2001). In D.C., "a statistical disparity measuring 1.96 standard deviations or greater is statistically significant enough that the disparity alone can establish a prima facie case of discrimination." See *Palmer v. Shultz*, 815 F.2d 84, 90-91 (D.C. Cir. 1987). Here, the school closings will affect over 90% of African American students compared to .05% of white students. The school closings will have a much more significant impact on African-American students in comparison to their white counterparts. Defendants cannot articulate a legitimate, nondiscriminatory justification for their actions. The DCHRA carves out a narrow exception based on "business necessity."

The proposed school closings will only affect neighborhoods East of Rock Creek Park. Over 80% of the students in these neighborhoods come from low-income households. As such, the proposed school closings will leave the students in these underserved communities void of the types of educational opportunities that are available to students from other areas of D.C., specifically West of the Park. Over 90% of the displaced students from these neighborhoods are African-Americans who will now have to pay more and travel further to attend a school that is more populated than their former school. The impact of these factors is magnified for students with

disabilities.

### *The absence of compliance with ANC Notice and Great Weight and the Sunshine Amendment*

Notice to ANCs of certain actions or proposed action by the District government is governed by

sections 13(b) and (c) of the *Advisory Commissions Act of 1975*, effective October 10, 1975, D.C.

Law 1-21, as amended by the *Comprehensive Advisory Neighborhood Commissions Reform*

*Amendment Act of 2000*, effective June 27, 2000, D.C. Law 13-135, D.C. Official Code §1-309.10

(b) and (c) (2004 Supp.) (collectively, the ANC Act)

ANCs "occupy a special position in the District of Columbia." *Bakers Local Union No. 118 v.*

*District of Columbia Board of Zoning Adjustment*, 437 A.2d 176, 179 (D.C. 1981). The issues and

concerns raised by ANC officials "shall be given great weight during the deliberations by the

governmental agency and those issues shall be discussed in the written rationale for the

governmental decision taken." *D.C. Code Section 1-309.10(d)(3)(A)* (2001 Edition, as amended).

That Section of the Code actually states, "The issues and concerns raised in the recommendations of

the [Advisory Neighborhood] Commission shall be given great weight during the deliberations by

the government entity.   Great weight requires acknowledgment of the Commission as the source

of the recommendations and explicit reference to each of the Commission's issues and concerns."

"[G]reat weight" implies explicit reference to each ANC issue and concern as such, as well as

specific findings and conclusions with respect to each, *Kopff v. District of Columbia Alcoholic*

*Beverage Control Board*, 381 A.2d 1372, 1384 (D.C. 1977).   However, section 1-261(d) "does not

require special deference to the views of an ANC but, rather, that an agency address its concerns

with particularity." *Committee for Washington's Riverfront Parks v. Thompson*, 451 A.2d 1177

(D.C. 1982).

Notice of pending governmental action and an opportunity to express views about that pending

action are fundamental, inescapable statutory due process requirements when it comes to the role of

ANCs. In the instant case, no notice was given to the subject ANCs and thus no opportunity to

express their views was provided.  Notice to ANCs of certain actions or proposed action by the

District Government is governed by sections 13(b) and (c) of the *Advisory Commissions Act of*

*1975*, effective October 10, 1975, D.C. Law 1-21, as amended by the *Comprehensive Advisory*

*Neighborhood Commissions Reform Amendment Act of 2000*, effective June 27, 2000, D.C. Law

13-135, D.C. Official Code §1-309.10 (b) and (c) (2004 Supp.) (collectively the "ANC Act").

Subsection (b) states:

"Thirty days written notice, excluding Saturdays, Sundays and legal holidays of such District
government actions or proposed actions shall be given by first-class mail to the Office of Advisory
Neighborhood Commissions, each affected Commission, the Commissioner representing a single
member district affected by said actions, and to each affected Ward Councilmember, except where
shorter notice on good cause made and published with the notice may be provided or in the case of
an emergency and such notice shall be published in the District of Columbia Register.  In cases in
which the 30-day written notice requirement is not satisfied, notification of such proposed
government action or actions to the Commissioner representing the affected single member district
shall be made by mail.  The Register shall be made available, without cost, to each Commission.  A
central record of all such notices shall be held by the Office of Advisory Neighborhood
Commissions."

Notice of actions regarding planning, streets, recreation, social services programs, education, health,

safety, budget, and sanitation, must be given to each affected Commission area.  See *D.C. Official*

*Code § 1-309.10 (a) and (b) (2004 Supp.)*.  Notice must also be given to each affected Commission

"before the award of any grant funds to a citizen organization or group, or before the formulation of

any final policy decision or guideline with respect to grant applications, comprehensive plans,

requested or proposed zoning changes, variances, public improvements, licenses, or permits

affecting said Commission area, the District budget and city goals and priorities, proposed changes

in District government service delivery, and the opening of any proposed facility systems."  See

*D.C. Official Code § 1-309.10(c)(1) (2004 Supp.)*.  (Emphasis supplied).  The District of Columbia

Court of Appeals has interpreted the ANC notice provisions to require written notice of every

proposed government decision affecting neighborhood planning and development for which a prior

hearing is required by law, *Kopff v. District of Columbia ABC Board*, 381 A.2d 1372, 1381 (D.C.

1977).

The Sunshine Amendment of the D.C. Self Government and Governmental Reorganization Act

states, "(a) all meetings (including hearings) of any department, agency, board or commission of the

District government, including meetings of the District Council, at which official action of any kind

is taken shall be open to the public. *No resolution, rule, act, regulation or other official action shall*

*be effective unless taken, made, or enacted at such meeting.*" The District of Columbia Self

Government and Governmental Reorganization Act, Section 742, 87 Stat. 831 (1973). All final,

relevant decisions regarding the proposed school closings were done in the dark.

### *Violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12132*

The Americans with Disabilities Act (ADA) prohibits any public entity from discriminating

based on disability. The Act provides that no person shall "by reason of such a disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of a

public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132.

A claim for intentional discrimination under the ADA can be sustained by showing that: 1) the

plaintiff is a qualified individual with a disability; 2) the plaintiff was denied the benefits of or

prohibited from participating in the services, programs or activities of a public entity; and 3) the

denial or prohibition was "by reason of" her disability. The ADA also makes cognizable claims

stemming from a disparate impact on qualified individuals with a disability. The decision to close

15 schools, although facially neutral, will have a disproportionately adverse effect on students with

disabilities. While special education students comprise only 14.4% of all students, they make up

23.2% of students in schools scheduled for 2013 Closings. When looking at the 2014 Closings,

special education students make up 27.9% of students in those schools.

### *Violation of the Rehabilitation Act of 1973*

The school closings are in violation of Section 504 of the Rehabilitation Act of 1973, as

amended, 29 U.S.C. § 794(a) which provides that "No otherwise qualified individual with a

disability in the United States...shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." The regulations relating to Section 504 of the Rehabilitation Act provide that "a recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped" child in its jurisdiction. 34 C.F.R. 104.33. Plaintiff Brenda Williams is a qualified individual with a child with a disability under the Rehabilitation Act. Defendant District of Columbia receives Federal financial assistance. The operations of Defendant District of Columbia are a "program or activity" within the meaning of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(b)(1)(A).

Defendants' failure to maintain a free and appropriate education in Plaintiff's neighborhood schools slated for closure, considering the relevant and unnecessary burdens thrust upon Plaintiff by closing these schools, demonstrate both bad faith and a gross departure of accepted standards. Such treatment of special needs students rises to the level of discrimination based solely on the disabilities of Plaintiff's child. Taking into account the outcome of the 2008 school closings, the proposed Plan to close fifteen additional schools is a demonstration of bad faith. Of the 2,792 students expected to be impacted by these closures, a full 27.9% are special needs.

### Violation of the IDEA Act

Defendants violated IDEA by significantly impeding the parents' right to participate in the decision-making process by issuing a written notice of their intent to close certain schools and move the special education children without parental involvement. Defendants further violated IDEA by failing to identify an appropriate educational program for the special education students because they have failed to identify an existing program that could meet the needs of the severely disabled special education students

### Violation of Title 42, U.S.C. § 1983

Title 42 U.S.C. § 1983 provides, "Every person who under color of any statute,

ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress."

A claim under § 1983 can be sustained because Defendants' Plan denies students of color, those with disabilities and those residing in low income neighborhoods equal protection in violation of the 14th Amendment to the United States Constitution as applied to the District of Columbia through the 5th Amendment to the United States Constitution.

### *Violation of Title VI of the 1964 Civil Rights Act*

Title VI of the 1964 Civil Rights Act and the Department of Education regulations implementing that Act, like the D.C. Human Rights Law, prohibit recipients of federal funding from discriminating based on race, color, or national origin, 42 U.S.C.A §§ 2000d-2000d-7. Under Department of Education regulations, schools and districts violate federal law when they adopt and implement facially neutral policies, and the policies nonetheless have an unjustified effect on students on the basis of race or disability. Any fair analysis of the facts in the instant situation clearly demonstrates the presence of a prima facie case of disparate impact. As a consequence, it is within the jurisdiction of this Honorable Court to mandate that appropriate District of Columbia Government authorities take steps to ensure compliance with Title VI. In addition to the likelihood of success on the merits, which Plaintiffs have shown, Plaintiffs also must demonstrate that: (1) that there is an imminent threat of irreparable harm should the relief be denied; (2) that more harm will result to plaintiffs from the denial of the injunction than will result to the defendant from its grant; and (3) that the public interest will not be disserved by the issuance of the requested order. *Id.*; *Zirkle v. District of Columbia*, 830 A.2d 1250, 1255-56 (D.C. 2003);

*District of Columbia v. Eastern Trans-Waste of Maryland, Inc.*, 758 A.2d 1, 14 (D.C. 2000). While the factors are typically evaluated on a sliding scale, and "a strong showing of one factor may excuse a relatively weaker showing on another," *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 97 (D.D.C. 2011).

**Plaintiffs will suffer irreparable injury if Defendants are not enjoined**

Since the goal is to minimize the risk of harm, if the moving party can demonstrate both that the requested relief is necessary to prevent irreparable harm to it and that granting the injunction poses no substantial risk of such harm to the opposing party, a substantial possibility of success on the merits warrants issuing the injunction. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). Plaintiffs have shown that the harms they allege are "certain," rather than speculative, or that the "alleged harm[s] will directly result from the action[s] which the movant[s] seeks to enjoin," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

The Mayor has submitted his Budget. The D.C. Council will soon take a final vote on that Budget. Activities are already taking place to implement the proposed Plan. Once the D.C. Council votes on the Budget, the Plan will become operational, and we will have arrived at a point of no return; final preparations to close schools will begin, teachers and administrators will be terminated; students will be forced to scramble to secure places in new schools; parents, i9ncluding these Plaintiffs will be lost in a swirl of closure activity. The irreparable harm is palatable.

**Defendants will not suffer substantial harm if the requested relief is issued**

A court's "first step" is to balance the likelihood of irreparable harm to the plaintiff with the likelihood of harm to the defendant, *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991). "If a decided imbalance of hardship should appear in plaintiff's favor," a lesser demonstration of likelihood of success would be required," *Blackwelder Furniture Company v.*

20

*Selig Manufacturing, Inc.*, 550 F.2d 189, 195 (4th Cir. 1977). "The plaintiff need only raise

questions going to the merits … as to make them fair ground for litigation and thus more

deliberate investigation," *Id.* Defendants claim to expect savings of roughly $8 million as a result

of the proposed closures. Against the backdrop of the District's $417 million surplus, that is a

small amount when compared to the harm the closures will cause. Moreover, according to the

Bhat Affidavit and Report, Exhibits B ands C, annexed, the likelihood of any savings by the

District as a result of the closures is dubious. Indeed, it is more likely, as with the 2008 closures,

that the District will lose money. Defendants will suffer no harm if the planned closures are

halted and certainly will not suffer substantial harm.

## The public interest favors granting relief

The movant must provide proof that the harm has occurred in the past and is likely to

occur again, or proof indicating that the harm is certain to occur in the near future. See generally

*Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90 (D.D.C. 2011). At the

same time, it is always in the public interest to insure that … regulations and policies [laws] are

properly followed, *Air Terminal Services, Inc. v. Department of Transportation, 400 F.Supp.*

*1029 (D.D.C. 1973) aff'd 515 F.2d 1014 (D.C. Cir.1975).* It is by now Black Letter Law that

courts sitting in equity have the discretion to weigh the public interest in granting or denying

injunctive relief, *Oakland Cannabis*, 532 U.S. at 496 (citing *Hecht Co. v. Bowles*, 321 U.S. 321,

329–30 (1944) and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). The public

interest favors granting declaratory and injunctive relief when an Agency fails to competitively

secure services as required, *Aero Corporation v. Department of the Navy*, 558 F. Supp. 404

(D.D.C. 1983). Here, the public interest is best served by ensuring as little disruption as possible

in the education process, particularly when the Plan would save little or no money. Measured

against the serious and significant disruption to the educational process, the public interest is best

served by halting the Plan.

**A Permanent Injunction is appropriate**

Temporary relief in this case is urgently needed however such relief would be both illusory and inadequate. So long as this litigation continues, Plaintiffs can only be protected and made whole by the granting of the relief sought, on a permanent basis. For the reasons given, Plaintiffs' Application for a Temporary Restraining Order and their Motion for a Preliminary and Permanent Injunction should be granted, without delay. Proposed orders are filed herewith.

Respectfully submitted,

*Johnny Barnes*

Johnny Barnes, D.C. Bar Number 212985
Counsel for Plaintiffs
301 "G" Street, S.W., Suite B101
Washington, D.C.     20024
AttorneyJB7@gmail.com
Telephone (202) 882-2828

Kevin Chavous, of Counsel
D.C. Bar Number 1008965
Counsel for Democracy


Destiny Aigbe, of Counsel
Counsel for Democracy
Pro Hac Vice


Anitra Ash-Shakoor, of Counsel
D.C. Bar Number 1008693


Ann Wilcox, of Counsel
D.C. Bar Number 421908

Julianne King, of Counsel
D.C. Bar Number 433741


Joel Lawson, of Counsel
Counsel for Democracy


Fatmata Barrie, of Counsel
D.C. Bar Number 485122


Karl R. Tetzlaff, of Counsel
D.C. Bar Number 1001022


**DATED: 29 March 2013**                    Esau Venzen, of Counsel
Pro Hac Vice

# Exhibit A

## AFFIDAVIT OF MARY LEVY

**DISTRICT OF COLUMBIA, ss:**

I, Mary Levy, being first duly sworn on oath, do hereby depose and say:

1) I am a licensed attorney in the District of Columbia. I have served as counsel in civil rights, civil liberties, labor, and school finance litigation.

2) I am the author of a number of published studies regarding District of Columbia school finance, per pupil spending, special education finance, school adequacy, and school demographics including: "Separate and Unequal:  The State of the District of Columbia Public Schools Fifty Years After *Brown* and *Bolling* (principal contributor), Parents United for DC Public Schools, March 2005.

3) I served as a consultant to D.C. State Education Office and its successor Office of the State Superintendent of Education, from 2000 through 2008, on the Uniform Per Student Funding Formula, residency verification, and D.C. education data including drafting of regulations and major studies on costing out general education practice and special education legal compliance.

4) I have been employed as a research analyst on District of Columbia public education by the Committee of the Whole of the District of Columbia Council and the Chief Financial Officer of the District of Columbia.

5) While employed by the Washington Lawyers' Committee for Civil Rights & Urban Affairs, I served from 2003 through 2009 as a pro bono consultant to D.C. Public Schools assisting with the preparation of Schedule A and annual financial submissions to the National Center on Education Statistics.

6) I served as a consultant to the D.C. Committee on Public Education from 1988 – 1998, preparing statistics and descriptive material on the District of Columbia Public Schools.

7) I have been an active participant in major school reform planning since 1988, including the D.C. Committee on Public Education (Our Children, Our Future), America 2000, the Inter-Agency Council on Education, the D.C. School Reform Act of 1995, the D.C. Goals 2000 Community Plan for Educational Improvement, and the Business Plan for Strategic Reform.

8) I served, at the request of the Mayor, on the Mayor's Advisory Committee on Board of Education Appointments, from 2000 until 2006.

9) I am a frequent pro bono consultant for organizations such as: DC Kids Count, the DC Fiscal Policy Institute, the 21st Century School Fund, Senior High Alliance of Principals, Parents & Educators, DC VOICE, the Public Charter School Coalition, and Friends of Choice in Urban Schools (FOCUS).

10) As a professional whose expertise has been relied upon by the District of Columbia government, I have analyzed the DCPS Consolidation and Reorganization Plan, submitted by Chancellor Kaya Henderson on January 13 2013.

11) Using the Chancellor's own recent and published data, I have measured the population of students at the schools to be closed against the population of D.C. Public School students as a whole.  I can attest that African-American Students, special education students, and students from low income families will be disproportionately affected if the schools on the list are closed.

12) Virtually all the children now enrolled in schools proposed for closing are members of minority groups and over 90% are low-income.

13) These schools, as of School Year 2011-12, enroll a total of 2 white students.  Of the students in the schools announced for closing, 94% of students are black and 6% are Hispanic, while of the total enrollment in 2012, 72% are black, 14% Hispanic, and 9% white.

14) Low-income students constitute 96% of the students in schools announced for closing, as of School Year 2012-13, while of total enrollment, 75% are low-income.

15) Special education students make up 27.7% of students in schools announced for closing, while they are 11.6% of the total student enrollment.  Students needing the most intensive level of services (levels 3 and 4, half-time or more in specialized services) constitute 15.8% of students in schools announced for closing, while they represent 4.2% of the total student enrollment.

16) I prepared the following Chart, again using Chancellor Henderson's own, recent, published data:

| | Number of group in closed schools | Group as % of all students in closed schools | Total number of group | Group as % of all students | Percent of group in closed schools |
|---|---|---|---|---|---|
| **School Closings 2013** | | | | | |
| All students Fall 2011 | 2,832 | 100.0% | 45,191 | 100.0% | 6.3% |
| Blacks | 2,663 | 94.0% | 30,889 | 71.5% | 8.6% |
| Hispanic | 159 | 5.6% | 6,230 | 14.0% | 2.6% |
| White | 1 | 0.0% | 4,175 | 9.2% | 0.0% |
| Asian/Other/unknown | 12 | 0.4% | 1,661 | 3.7% | 0.7% |
| All students Fall 2012 | 2,495 | 100.0% | 45,557 | 100.0% | 5.5% |
| Low-income | 2,393 | 82.3% | 34,354 | 75.4% | 5.3% |
| ELL | 86 | 3.4% | 4,533 | 10.0% | 1.9% |
| All levels spec ed | 565 | 22.6% | 6,484 | 14.2% | 8.8% |
| Levels 3 & 4 spec ed | 248 | 9.9% | 1,983 | 4.2% | 12.8% |

|  | Number of group in closed schools | Group as % of all students in closed schools | Total number of group | Group as % of all students | Percent of group in closed schools |
|---|---|---|---|---|---|
| School closing 2013 and 2014 | | | | | |
| All students SY 2012 | 3,053 | 100.0% | 45,191 | 100.0% | 6.8% |
| Blacks | 2,861 | 93.7% | 30,889 | 68.4% | 9.3% |
| Hispanic | 180 | 5.9% | 6,230 | 13.8% | 2.9% |
| White | 2 | 0.1% | 4,175 | 9.2% | 0.0% |
| Asian/Other/unknown | 13 | 0.4% | 1,661 | 3.7% | 0.8% |
| All students SY 2013 | 2,686 | 100.0% | 45,557 | 100.0% | 5.9% |
| Low-income | 2,596 | 96.6% | 34,354 | 75.4% | 7.6% |
| ELL | 99 | 3.7% | 4,533 | 10.0% | 2.2% |
| All levels spec ed | 743 | 27.7% | 6,426 | 14.2% | 11.6% |
| Levels 3 & 4 spec ed | 425 | 15.8% | 1,935 | 4.2% | 22.0% |

Race/ethnic numbers based on School Year 2011-12 reports; ELL and special education based on School Year 2012-13 reports.

17) The statements contained herein are true to the best of my information, knowledge and

belief.

_Mary Levy_

Mary Levy

**SUBSCRIBED and SWORN** to before me this ___27___ day of March 2013.

**Notary Public, D.C.**

My Commission Expires:

District of Columbia: SS
Subscribed and Sworn to before me
This __27__ day of __March__ 20 _13_

Radu Bujoreanu
Notary Public, D.C
My Commission Expires __June 30, 2014__

# Exhibit B

**AFFIDAVIT OF SOUMYA BHAT**

**DISTRICT OF COLUMBIA, ss:**

I, Soumya Bhat, being first duly sworn on oath, do hereby depose and say:

1) I am the Education Finance and Policy Analyst for the D.C. Fiscal Policy Institute.

2) As such, I work to ensure that programs serving low- and moderate-income residents in the District of Columbia are well designed, effective, and adequately funded.

3) It is my responsibility to conduct independent research and prepare policy reports on fiscal transparency and equity issues facing public education in the District.

4) I provide technical assistance in response to requests from D.C. policy makers and advocates.

5) Prior to my role at the D.C. Fiscal Policy Institute, I worked for the Finance Project from 2006-2011 where I:

6) Supported public and non-profit sector clients in developing strategies to finance and sustain services for children, youth and families.

7) Produced technical assistance tools, written publications, and web events to share best practices and inform decisions of state and program leaders.

8) Conducted state fiscal mapping studies of youth and early childhood services, including cross-agency data collection and systems level recommendations for policy makers.

9) Provided resources and technical assistance to independent charter school leaders on issues related to financing and governance.

10) Collaborated with national partners to convene peer-learning opportunities for states and grantees.

11) Prior to this, I worked at the New America Foundation, from 2005-2006 where I contributed research and analysis towards publications on early education, K-12, and higher education reform and co-created a school district database for statistical analysis related to school finance called the Federal Education Budget Project.

12)  I have authored a number of reports analyzing education financing including: "Adding It Up: What Do We Already Know About Next Year's D.C. Public Schools Budget?" (blog post), D.C. Fiscal Policy Institute, March 21st, 2013; and "Will Closing Schools Pay Off?" DCPS Closure Plan Unlikely to Produce Significant Savings or Better Resourced Schools".

13) As an analyst on school finance in the District of Columbia, I have analyzed the DCPS Consolidation and Reorganization Plan, submitted by Chancellor Kaya Henderson on January 13, 2013; and, the Initial School Budget Allocations recently released by DCPS in March, 2013.

14) Using information from the school consolidation plan and the transition costs seen from the 2008 school closings, I have determined that the school closures will not save much money in the long-run and will be budget neutral in the first year.  Based on the DCPS final school consolidation plan, DCPS estimates the tcost savings from closing the proposed schools will likely be $8.5 million. However, this figure does not take into account the costs of relocation, inventory, storage, and transportation for the first year, which will essentially erase the potential savings. Beyond the first year, the savings might be minimal, less than 1% of the entire DCPS budget. The potential costs of reopening schools have also not been taken into account when looking at long-term costs/savings.

15) Smaller DCPS schools are only slightly more costly than larger schools when it comes to general education spending. Smaller DCPS elementary schools typically received only slightly more per-pupil funding this year than larger schools — the difference is about four percent — and have teacher-student ratios that are roughly the same as in larger schools. A number of schools on the closing list also have lower per pupil budgets than larger schools.

16) For the second year in a row, the definition of small schools has increased, which means more schools will get the reduced staffing associated with smaller schools. Smaller schools were defined this year as those with fewer than 300. Next year, schools enrolling fewer than 400 students will qualify as a small school. This will mean small elementary schools between 300 and 400 students that previously qualified for full-time staffing allocations will receive fewer administrative staff, PE, art, music, and world language instructors at these schools next year.

17) Furthermore, although the FY 2014 budget purports to place a librarian in every school, "small schools" are only funded to fill a half-time position.

18) Children need a safe place to go where they can continue to learn and be nurtured outside of the traditional school day. Yet, out-of-school time programming (OSTP) within DCPS was cut for the current school year, and it appears that those cuts will remain in place next year under current plans. These programs provide out-of-school time services for the city's neediest children and youth, through a combination of organized school-based services and intentional coordination with community partners.

19) DCPS' Proving What's Possible program, which provided over $10 million in competitive grant funding for innovative programs (such as extending the school day) in

many of the lowest-performing schools in the current year will be reduced to $6.5 million for Fiscal Year 2014.

20) Furthermore, unemployment rates among families affected by the closures have doubled since 2006 and are some of the highest in the District.  This is particularly true for single parents. According to a recent DCFPI report, unemployment among Black DC residents remains nearly twice as high as in 2008, before the recession, when the Black unemployment rate was 10%. Hispanic residents have the second highest unemployment rate. Single parent households have the highest unemployment rate among all groups, with nearly one in four single parents unemployed in 2012. Unemployment has risen virtually every year since 2006 for DC single parents with children. 23.5% of single parents were unemployed in 2012, nearly twice as high as in 2006, when 12% of single parents were unemployed.

21) The statements contained herein are true to the best of my information, knowledge and belief.

**Soumya Bhat**

**SUBSCRIBED and SWORN to before me this** 27 **day of March 2013.**

**Notary Public, D.C.**

**My Commission Expires:** December 14, 2013

DEBORAH PATTERSON
My Commission Expires
December 14, 2013

# Exhibit C

# *The District's Dime*
## Going Beyond the Budget Book

*The DC Fiscal Policy Institute blog*
*www.dcfpi.org*

March 21, 2013

# Adding It Up: What Do We Already Know About Next Year's DC Public Schools Budget?

### By Soumya Bhat

While most District agencies are eagerly awaiting the Mayor's budget to be released on March 28th, leaders at DC Public Schools have already received their initial budget allocations for the next school year. As in years past, principals and Local School Advisory Teams (LSATs) were given only about a week to digest the changes in the FY 2014 Budget Development Guide and make decisions about how best to staff their school, with their final school budgets submitted to DCPS last Thursday.

Here is our summary of the major changes schools will see next year, based on the DCPS FY 14 budget guide and initial school allocations. Note that these figures are preliminary and may change when the Mayor's budget is released, so, check back with DCFPI for updated analyses in the coming weeks.

### School Funding Will Decrease from FY 2013 to FY 2014

Mayor Gray announced that the new Uniform Per Student Funding Formula foundation level, which is used to fund both DCPS and public charter schools, will increase by two percent in FY 2014, to $9,306. Despite this increase, analysis of the preliminary allocations by DCPS to local schools shows an $8 million reduction in general education funding, from $358 million to $349 million. (See DCPS General Education Spending Tables)  General education spending per pupil — which excludes federal funds and funds for special education, Title I and ELL — will increase for elementary schools and education campuses but will fall for secondary schools, particularly magnet high schools, saw the steepest decline in average per pupil spending.

### Increased investments at the primary school level

The local school allocations reflect an increased emphasis on literacy and language at the elementary school and education campus levels. Small elementary schools serving fewer than 250 students will receive at least a 0.5 staff position for art, music, and world language, while elementary schools between 250 and 400 students will receive a full-time allocation of each of these staff. Schools serving over 400 students will be allocated 1.5 of each of these positions.

**Change in Small School Size**
DCPS allocates staff different to schools defined as "small." For FY 2014, the enrollment level used
to define a small school increased, which means more schools will get the reduced staffing
associated with smaller schools. Smaller schools were defined this year as those with fewer than
300. Next year, schools enrolling at least 400 students will qualify as a small school. This is the
second year in a row that this definition has been changed.

Small schools, under this new definition, get less funding for administrative staff. For example,
schools serving fewer than 400 are only funded for a half-time business manager and do not receive
a clerk allocation, while larger schools get full-time staff for these positions. Small elementary
schools (serving less than 400) are provided half or full-time allocations for the required art, music,
and world language teachers and do not face less funding for this staffing.

**Special Education Student-Teacher Ratios**
The student-teacher ratio for some special education classrooms appears to have increased. This
year, students with learning disabilities who needed full-time specialized instruction had student-
teacher ratios of 12:1 at the high school level and 10:1 at the elementary and middle school level.
Those have both increased to 15:1 this year. Early childhood autism classrooms have also increased
from 3:1 ratios to 8:1 ratios.

**School Librarians**
Last year, schools enrolling fewer than 300 students were not funded for a librarian position. In the
FY 2014 initial budget allocations, every school is funded a librarian, with small schools (under 400
students) receiving a half-time position and large schools receiving a full-time position. However,
because the new definition of a "large school" is enrollment of at least 400 students, schools serving
between 300 and 400 students that had funding for a full-time librarian this year will get funding
only for a half-time librarian next year.

**Out-of-School Time Programs**
There is a change in how out-of-school time funding will be distributed to schools next year –
funding for afterschool program staff now appears within individual school budget allocations to
ease the hiring process for schools. The new line item, which encompasses Afterschool Programs,
Evening Credit Recovery (ECR), and Proving What's Possible extended-day grants, amounts to less
than $5 million across DCPS schools. DCFPI was informed that some additional funding for
curriculum, security, supplies, field trips and other support is expected to be available again from the
Out of School Time Program (OSTP) central office, and should appear in the Mayor's budget. Total
funding for OSTP is $6.7 million total (including what is in school budgets), which keeps in place
the cuts that were made for the current year. According to the budget guide, 15 schools will receive
ECR funding and 59 schools will receive Title I and TANF funded afterschool programs.

**Proving What's Possible Funding**
Last summer, DCPS announced that $10.4 million in grants would go to 59 schools to implement
innovative programming. For next year, the total Proving What's Possible (PWP) funding totals
$6.5 million, which will go towards continuation grants (which will be specified in the Mayor's
budget next week), staff positions focused on literacy, and the extended day programs mentioned
above. According to the budget guide, the PWP funding distributed to schools in FY 2013 were
mostly one-time awards. However, 9 schools that began implementing extended-day programs in
2013 will be funded again next year to continue their programs. Eleven of the 40 lowest performing

schools will receive PWP funds to focus on literacy, including an assistant principal and reading specialist positions.

Looking for even more budget information? See below for a few handouts that were passed out by DCFPI at last night's DCPS budget briefing:

- **Budget Timeline for Education**
- **DCPS Budgeting Basics**
- **DCPS General Education Spending Tables**

There will be more information to analyze when the Mayor's budget does come out later this month, providing the full funding picture for DCPS and Public Charter Schools. DCPS staff have also committed to another budget briefing prior to the April 17th budget hearing, so keep checking the District's Dime for updates this budget season!

# Exhibit D

# AFFIDAVIT OF SHANNON MARIE SMITH

**DISTRICT OF COLUMBIA, ss:**

I, **SHANNON MARIE SMITH**, being first duly sworn on oath, do hereby depose and say:

1) I am the grandmother and custodial guardian of Mychelle, and Michael age ten.

2) Mychelle and Michael attend Ferebee Hope Elementary, where I am also a parent advocate and coach of the school's cheer squad.

3) Michael and Mychelle are thriving at Ferebee-Hope. They are both reading at the highest reading level. They are provided access to school computers every day. They have a beautiful pool with a great aquatics classes, a new library donated by the First Lady Michele Obama, a new computer lab, a school garden, and ample outdoor recreational space. We offer a number of extracurricular programs including a family aerobics class before school, science and rocketry contests, cooking classes, and an on-site school nurse. We have a newly renovated auditorium, gymnasium and dedicated cafeteria room.

4) Our school is cornerstone of the community. It is a source of pride for the community. Our children receive a lot, but they also give back. Our fifth graders participate in the Anacostia Earth Day River clean-up. My grandchildren will lose all of this if they are sent to Henley.

5) Henley is falling apart. It does not have central heating or central air. The facilities and teaching materials are outdated. It is not set up very well for students with disabilities.

22) Class sizes will significantly increase thereby making it more difficult to provide closer attention to my children, and this is especially harmful to those students at Ferebee-Hope already experiencing some challenges in navigating the school environment.

23) Truancy, now a problem in many of our schools, is likely to get worse when these students are forced to travel greater distances, out of their neighborhoods, through dangerous streets and environments.

24) It is also very troubling to me that the Chancellor and others made the decisions to close the schools out of the public eye, behind closed doors and without following the District's laws on transparency and openness.

25) All of the plans we had made regarding Ferebee-Hope will be derailed and disrupted if my children are forced to attend a new school.

26) The statements contained herein are true to the best of my information, knowledge and belief.

*Shannon Smith*

**Shannon Marie ~~Hill~~ Smith**

**SUBSCRIBED and SWORN** to before me this 28th day of March 2013.

_____

**Notary Public, D.C.**

My Commission Expires:

# Exhibit E

**AFFIDAVIT OF MARLECE TURNER**

**DISTRICT OF COLUMBIA, ss:**

I, MARLECE TURNER, being first duly sworn on oath, do hereby depose and say:

1) I am the parent of Ellington, a student at McFarland Middle School.  Ellington is
   thirteen-years-old and has attended McFarland since fifth grade.

2) When my son found out that McFarland would be closing he cried.  After he told me, I
   cried too.

3) Ellington would like to be a scientist or a football player when he grows up.  He
   participates in extra-curricular activities, including photography, computers and
   afterschool tutoring program.

4) He has a perfect attendance record this year, he has not been late and has not missed a
   day of class this year.  Last year he only missed one.

5) Ellington has been diagnosed with a combination of ADHD and Asperger's.  He was
   not able to speak at the age of three.  Because of this, he was eligible for pre-K at
   Barnard.  He now has a 504 plan to ensure that his disabilities are accommodated.

6) Thanks to wonderful teachers, and a great principal, he has been able to thrive and
   become more confident.  There are a number of male teachers at the school and
   Ellington looks up to them as role models.  Dr. Hall wears bow ties, and now Ellington
   wants to wear bow ties when we go to church.  He did not care for science until he had
   Ms. Hildebrand for science.  Now he wants to be a scientist.

7) When Ellington had a minor crisis, he felt comfortable enough to go to the school
   librarian, Ms. Moore.  Ms. Moore called me and I was able to be at the school within

two minutes to resolve the problem.  Everything was fine.  He may not feel comfortable doing that in a new school.

8) McFarland is like a family.  Some of my son's classmates have attended school with him since Pre-K.  If McFarland closes, his classmates will be dispersed to at least three area public schools.

9) Ellington does well when he has a stable routine.  However, because of his disability, he is more vulnerable to the disruption the closure will cause.  It takes him at least three or four months to establish routines, and he is less adaptable to a change in routine than other children are.  Part of the reason we sent him to Barnard was because we knew that we could depend on the continuity and stability of our neighborhood school.  If McFarland closes, he will have to attend three schools in three years.  This will cause a significant setback to his educational achievements.

10) Furthermore, I am concerned that he will not be safe if he has to travel to a school farther away, through an area he does not know and where people do not know him.  In October of 2012, two students attacked Ellington while he was on the way home from school.  Although this was traumatic, it was not as bad as it could have been because one of my neighbors was able to intervene –making sure he was okay, and calling me to let me know what had happened and who the students were so that I could report the incident to the school to take proper action.  I am not sure what would have happened if something like this had occurred in an unfamiliar neighborhood.

11) The principal is doing a great job of leveraging community partnerships.  Our family appreciates the Wednesday evening Learning Tree events.  The afterschool and

summer programs work that the L.A.Y.C. and Rita Brite Center have been involved with have been great for Ellington.

12) I feel like parent's voices have not been heard during this process. We have asked the Chancellor to meet with us, but Ms. Henderson refuses to visit McFarland.  It was clear that the decision was made prior to the community meetings late last year.

13) If McFarland closes, I am not sure what my family will do next year.  Although someone from DCPS called me to help navigate the school choices available, there is no real choice. None of the charter schools close-by are likely to have spaces. We have not been told to which DC public school we will be assigned.  Although this uncertainty is stressful for all McFarland families, it is particularly harmful to children with disabilities.

14) On top of the additional stress of having to move to a new school, it seems likely that the education Ellington would receive at a new school will be inferior to what he receives now.

15) The statements contained herein are true to the best of my information, knowledge and Belief.

_Marlece Turner_   **Marlece Turner**

**SUBSCRIBED and SWORN** to before me this _27_ day of March 2013.

_____ Notary Public, D.C.

My Commission Expires:

District of Columbia: SS
Subscribed and Sworn to before me
This _27_ day of _March_ 20 _13_

_____
Radu Bujoreanu
Notary Public, D.C
My Commission Expires _June 30 2014_

# Exhibit G

## AFFIDAVIT OF BRENDA WILLIAMS

**DISTRICT OF COLUMBIA, ss:**

I, BRENDA WILLIAMS, being first duly sworn on oath, do hereby depose and say:

1) I am the parent of Bre-yah, a student at Sharpe Health Elementary. Bre-yah is eight-years-old and has attended Sharpe since the age of four. Bre-yah cannot walk or talk and requires someone to push her in her wheelchair.

2) My daughter suffers from frequent seizures. When a seizure hits, she must be given a shot of the drug Ativan as soon as possible. Because ambulances do not carry Ativan, it is very important that Bre-yah reach the hospital quickly after a seizure hits. The closest hospital to River Terrace is across the river, requiring crossing a congested highway. I am concerned that Bre-yah may not make it to the hospital in time.

3) Parents were not given any opportunity for a meaningful hearing. Chief of Special Education, Dr. Nathaniel Beers met with parents at Sharpe earlier this year and told them "Get on board or don't get on board".

4) The parents at Sharpe worked to raise money to build an accessible playground. We will lose that if the school moves.

5) Sharpe Health is located near a metro stop, and other schools. Students are taken on outings and field trips. They are not isolated from other students and the community as a whole. Grandmothers from the neighborhood volunteer at the school. All of this will be lost if the children move to River Terrace. I am afraid my daughter will be isolated and ignored at River Terrace.

6) Sharpe Health has a swimming pool. The plans for River Terrace, discussed at the March 21 S.I.T. meeting, do not include a swimming pool.

7) My daughter has a respiratory condition. I am concerned about the levels of pollution at River Terrace, which is located near a Pepco plant, a taxicab repair station, a rental car establishment, and a gas station. If the plan goes forward, the area will be even more polluted because of the diesel fumes from additional bus traffic.

8) I am concerned for my daughter's safety at River Terrace. There have been several murders since we were informed of the move.

9) Metro does not provide equal access to accessible public transportation. I stood with my daughter at a Benning Ave. bus stop nearby. I waited for four buses to pass by before one had a wheel chair lift so that we could board the bus. At a Georgia Ave. bus stop. I waited for five buses to see how many had chair lifts. All but one had a chair lift.

10) DCPS plans to give Sharpe Health to a charter school. They want to give that beautiful view of the city to someone else. They do not think our kids can appreciate it because many are in wheelchairs. What they do not realize is that the teachers push their chairs so that they can see the view. I am worried that my daughters teachers will not be rehired and that the new teachers will not know what to do. DCPS has done these kids wrong. We need to fight for our children, if we do not who will. They have been doing this too long and getting away with it.

11) Closing Sharpe Health would significantly impact my daughter's IEP, yet I was given no notice of the closure, and no meaningful opportunity for a hearing.

12) The statements contained herein are true to the best of my information, knowledge and belief.

**Brenda Williams**

**SUBSCRIBED and SWORN** to before me this _28_ day of March 2013.

**Notary Public, D.C.**

My Commission Expires:

**Aster Tekle**
Notary Public, District of Columbia
My Commission Expires 1/31/2014

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**Shannon Marie Smith,**                          :
808 Chesapeake Street, S.E. – Apartment 304        :
Washington, D.C.,  20020                           :
                                                   :
**Karlene Armstead,**                             :
559 Foxhall Place, S.E.                             :
Washington, D.C., 20020                            :
                                                   :
**Marlece Turner,**                               :
711 Varnum Street, N.W.                             :
Washington, D.C.,    and                            :
                                                   :
**Brenda Williams,**                              :
5744 Blaine Street, N.E.                            :
Washington, D.C. 20019.                             :
                                                   :
**Ericka S. Black**                               :
4231 Eads Street, N.E.                              :
Washington, D.C. 20019.                             :
                                                   :
       Plaintiffs,                  :
                                                   :
vs.                                                :   Civil Action No. No. 2013 CA _____ B
                                                   :
**KAYA HENDERSON, CHANCELLOR,**                   :
                                                   :
**VINCENT C. GRAY, MAYOR, and**                   :
                                                   :
**THE DISTRICT OF COLUMBIA**                      :
                                                   :
       Defendants.                  :
                                                   :
**Serve: Irvin B. Nathan**                        :
**D.C. Attorney General**                         :
441 – 4th Street, N.W.                            :
Washington, D.C. 20001 _____ :

## ORDER FOR TEMPORARY RESTRAINING ORDER

Upon consideration of Plaintiffs' Application for a Temporary Restraining Order; temporarily

restraining Defendants their agents, employees and other personnel from implementing the DCPS

Consolidation and Reorganization Plan submitted by defendant Chancellor Kaya Henderson on 13

January 2013.  In support of this Application, the Memorandum of Points and Authorities and

Accompanying Materials filed in support thereof and any opposition thereto, of the arguments of

counsel and of the entire record in this action;

It appearing to the Court that the Plaintiffs are likely to succeed on the merits of this action; that

they will suffer irreparable injury if the requested relief is not issued; that the Defendants will not be

harmed if the requested relief is issued; and that the public interest favors the entry of such an order, it

is, therefore,

ORDERED that Plaintiff's Application for a Temporary Restraining Order  is hereby GRANTED; and it

is further

ORDERED, that the Defendants, their agents, employees and other personnel are temporarily prohibited

from implementing the DCPS Consolidation and Reorganization Plan submitted by defendant

Chancellor Kaya Henderson on 13 January 2013.


Dated: _____ March 2013

Time: _____ _____


_____

Judge, D.C. Superior Court


Copies of this Order are to be served upon:

**Johnny Barnes, D.C. Bar Number 212985**          **and**          **Irvin B. Nathan**
Counsel for Plaintiffs                                                **D.C. Attorney General**
301 "G" Street, S.W, Suite B101                                      441 – 4th Street, N.W.
Washington, D.C.     20024                                           Washington, D.C. 20001

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**Shannon Marie Smith,**          :
808 Chesapeake Street, S.E. – Apartment 304   :
Washington, D.C.,  20020          :
                                  :
**Karlene Armstead,**             :
559 Foxhall Place, S.E.           :
Washington, D.C., 20020           :
                                  :
**Marlece Turner,**               :
711 Varnum Street, N.W.           :
Washington, D.C.,     and         :
                                  :
**Brenda Williams,**              :
5744 Blaine Street, N.E.          :
Washington, D.C. 20019.           :
                                  :
**Ericka S. Black**               :
4231 Eads Street, N.E.            :
Washington, D.C. 20019.           :
                                  :
          Plaintiffs,             :
                                  :
vs.                               :          Civil Action No. No. 2013 CA _____ B
                                  :
**KAYA HENDERSON, CHANCELLOR,**   :
                                  :
**VINCENT C. GRAY, MAYOR,** and   :
                                  :
**THE DISTRICT OF COLUMBIA**      :
                                  :
          Defendants.             :
                                  :
**Serve: Irvin B. Nathan**        :
**D.C. Attorney General**         :
441 – 4th Street, N.W.            :
Washington, D.C. 20001 _____ _____ :

## ORDER FOR PRELIMINARY INJUNCTION

Upon consideration of Plaintiffs' Motion for a Preliminary Injunction; permanently restraining

Defendants their agents, employees and other personnel from implementing the DCPS Consolidation and Reorganization Plan submitted by defendant Chancellor Kaya Henderson on 13 January 2013.  In support of this Application, the Memorandum of Points and Authorities and Accompanying Materials filed in support thereof and any opposition thereto, of the arguments of counsel and of the entire record in this action;

It appearing to the Court that the Plaintiffs are likely to succeed on the merits of this action; that they will suffer irreparable injury if the requested relief is not issued; that the Defendants will not be harmed if the requested relief is issued; and that the public interest favors the entry of such an order, it is, therefore,

ORDERED that Plaintiff's Motion for a Preliminary Injunction is hereby GRANTED; and it is further ORDERED, that the Defendants, their agents, employees and other personnel are permanently prohibited from implementing the DCPS Consolidation and Reorganization Plan submitted by defendant Chancellor Kaya Henderson on 13 January 2013.

Dated: _____ March 29, 2013

Time: _____

_____

Judge, D.C. Superior Court

Copies of this Order are to be served upon:

**Johnny Barnes, D.C. Bar Number 212985**      **and**      **Irvin B. Nathan**
Counsel for Plaintiffs                                                          **D.C. Attorney General**
301 "G" Street, S.W, Suite B101                                        441 – 4th Street, N.W.
Washington, D.C.      20024                                             Washington, D.C. 20001