**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SHANNON MARIE SMITH, et al.** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| **KAYA HENDERSON, CHANCELLOR, et al.** | : | Civil Action No. 13-CV-420 |
| | : | Judge James E. Boasberg |
| | : | Jury Trial Demanded |
| Defendants. | : | Next Scheduled Event: |
| | : | Hearing on PI Motion, 10 May 2013 |
| _____ | : | |

**MEMORANDUM OF PLAINTIFFS IN REPLY TO DEFENDANTS' OPPOSITION**
**TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs through Counsel file this Reply Memorandum in response to Defendants'

Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

**PROCEDURAL BACKGROUND**

Plaintiffs adopt the Procedural Background as stated by Defendants.

**SUMMARY OF ARGUMENT**

The request for a Preliminary Injunction takes place against the background of a history

of profound racial inequality in public education in the District of Columbia from its creation in

the Nineteenth Century. Since passage of the Organic Act of 1801, black children in

Washington, D.C. have received no public education at all (1801-1862), segregated and inferior

public education (1862-1954), and formally "integrated" schooling with the reality of *de facto*

1

segregation, unlawful tracking, and consistently inferior educational outcomes for the vast majority (1954-present).[1]

The proposed school closures contained in Defendants' "Consolidation and Reorganization Plan" ("the Plan) would have a sharply disparate racial impact that would deepen the inequalities and hardships still experienced by non-white children in the District.[2]  More than 99% of the children and families facing school closure in the fall are African American or Hispanic; four-fifths of them poor.  *See*, Plaintiffs' Record at Exhibit B, Levy Affidavit ¶ 13. This means that many of the students least equipped to handle the dislocation of school closings will bear all of the academic and social burdens associated with them.[3]  Moreover, Defendants' Plan was adopted in naked violation of their express statutory duties to give notice to Advisory Neighborhood Commissions in the affected communities and to give the resulting recommendations "great weight" in the decision-making process.   Nothing in Defendants' Opposition contradicts this conclusion.

---

[1] This information for the period up to 1982 is found in two papers by Steven J. Diner: *The Governance of Education in the District of Columbia: An Historical Analysis of Current Issues* (1982) and *Crisis of Confidence: The Reputation of Washington's Public Schools in the Twentieth Century* (1982); and is summarized by Mary Levy, Washington Lawyers' Committee for Civil Rights, *History of Public School Governance in the District of Columbia: A Brief Summary* (Jan., 2004).  *See*, Pls.' Ex. A, graphs at pages 10-12.

[2] In 2011, the eleven-acre, seven-building Wilson High School Campus underwent a full $115 million modernization, adding underground parking and additional building space, making it more attractive to in-boundary families seeking refuge from the growing costs of private school education.  In 2012, for the first time in many years, Wilson, the only public high school serving Ward 3, the area west of Rock Creek Park, did not accept any students from outside its boundaries.  The "drawbridge" that opened a richly integrated Wilson ---at a time when it was *under-enrolled* --- to the rest of the District is being pulled up while schools populated by African American and Hispanic students are simultaneously being slated to close.  "No One Out of Bounds at Wilson High," Claire Parker and Maria Bresica-Weiler, June 26 2013 issue of *Forrest Hills Connection*, reprinted from June 5 Ed. of *Wilson High School Beacon*.

[3] *See*, Elaine Weiss & Don Long, *Market-Oriented Education Reforms' Rhetoric Trumps Reality, Report of the Broader Bolder Approach to Education* 12 (2013), excerpted in Pls.' Ex. C, (concluding from a study of school closures in the District of Columbia, New York City and Chicago that the policy of closing schools "does not improve student outcomes overall and may even exacerbate existing problems"); *and*, Ben Kirshner, Matthew Gaertner and Kristen Pozzoboni, *Tracing Transitions: The Effect of High School Closure on Displaced Students* Educational Evaluation and Policy Analysis, 407-415 (2010), excerpted in Pls.'Ex. D (finding that students affected by the closing of an urban majority-Hispanic and African American high school experienced dramatic test score declines in the two years afterwards and "negative trends in dropout and graduation rates" in comparison to other control-group students).

The Plan is part of a recent wave of school closings across the country associated with the "standards-based reform" movement which has fallen hard on poor minority communities.  See the Huffington Post, *School Closures Violate Civil Rights, Protestors Tell Arne Duncan*, Pls.' excerpted in Ex. E (describing a meeting of 220 "mostly African American community organizers, parents and students from 21 cities from New York to Oakland" called to protest racially imbalanced school closings and to seek a moratorium on them) (Jan. 2013).  These organized school closings, promoted by consultants favoring private school vouchers and charter schools, have accelerated the dynamics of racial "resegregation" that have been decried for more than a decade by educational and legal specialists.  See *Resegregation in American Schools*, Gary Orfield and John T. Yun, the Civil Rights Project at Harvard University, 1999.  So far no court has called a halt to school closings that have racially disparate effects.

Because of the Plan's dramatically unequal racial impact on an already educationally divided community, an impermissible official purpose is inferred and the Plan triggers strict scrutiny.  See *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977).  None of the multiple shifting rationales offered for the closings, which fall generally into arguments about fiscal savings and academic improvements, is remotely compelling given that both a growing body of literature and Affidavits in this case show that school closings are fiscally ineffectual and academically counter-productive and that, to the extent that legitimate motivations exist, there are far less drastic alternatives available.  A recent Report by the District of Columbia Auditor revealed that, instead of saving $23 million from the last round of closures in 2008, as had been projected by Defendants, the District actually lost $40 million from them.[4]

---

[4] Pls.' Ex. F, excerpted from Yolanda Branche, D.C. Auditor, Audit of the Closure and Consolidation of 23 D.C. Public Schools, 4, Sept. 6 2012.

The vision of high-quality and integrated public schools articulated in the *Brown v. Bd. of Educ.* and *Bolling v. Sharpe*[5] landmark decisions has been steadily replaced by a divided system in which certain, mostly white, students west of Rock Creek Park enjoy the benefit of serious investments in their traditional public schools, while certain, mostly African American students east of the Park see their public schools being closed and increasingly replaced by publically funded Charter Schools.[6]   As the Map produced by D.C. Public Schools known as Map 8 demonstrates, there are no charter schools west of the Park and very few students who reside west of the Park attend charter schools.[7]

Plaintiffs are likely to succeed on the merits of both their ANC claims and their Section 1983 Equal Protection Claims, and clearly face irreparable educational harm if the Court does not enjoin these school closures.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING

The parental Plaintiffs clearly meet the three-part test for standing: they will be concretely injured by the closing of their children's neighborhood schools, this injury is traceable directly to the Defendants' Plan, and the injury may be redressed by this Court,   *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  In deciding whether a party has standing, the court must accept as true the material allegations of fact contained in the complaint and the affidavits in support of the party's assertion of standing.  *Warth v. Seldin*, 422 U.S. 490, 501 (1974).

---

[5] 347 U.S. 483 (1954 and 347 U.S. 497 (1954) respectively.

[6] Plaintiffs adopt Defendants' statement in the Factual Background part of their Memorandum about the history of the emergence of Charter Schools in the District of Columbia; however Plaintiffs would assert that students residing east of the Park have often been forced into the publically funded Charter Schools by virtue of the school closures.

[7] Pls.' Ex. G.  Charter schools have become a dominant force in education for those living east of the Park, while rapidly improving traditional public schools are an ever stronger magnet for residents living west of the Park.  The overwhelming majority of residents living west of the Park are White, while the overwhelming majority of those living east of it are people of color.

Defendants seem to grudgingly concede the standing of the parental Plaintiffs but only for limited purposes.[8]   Although this concession is all that Plaintiffs need to proceed at the Preliminary Injunction stage, Defendants are clearly trying to have it both ways on the standing issue.   On the merits, they stress that the School Closing Plan is a unitary and indivisible course of public policy, not some piecemeal school-by-school hodge-podge.   But in attacking standing, they say that Plaintiffs only have standing to challenge the closing of their own individual neighborhood schools.   If the District is going to present the Plan as a unified public policy affecting all the closed schools as a group, it cannot try to break up the schools as if they were all separate and unrelated simply to deny consideration of the legality of their action.[9]

The ANC Commissioner Plaintiffs were independently injured by virtue of the fact that they did not receive official notice of the Plan and were thus prevented from having their official views, and the views of their neighborhood constituents, integrated in the decision-making process and accorded the statutory "great weight" consideration.   *See D.C. Code §1-309.10(g) (2001)*; *Kopff v. Dist. of Columbia ABC Bd.*, 381 A.2d 1372, 1376-77 (D.C. 1977).   The *Kopff Court* determined that ANC Commissioners as individuals have legal standing to sue in court to vindicate the essential statutory rights of their office, which they possess "[f]or the benefit of the neighborhood residents they represent.   If an ANC's statutory rights are violated and, as a consequence, the performance of its advisory duties is hindered, the actual injury is suffered by

---

[8] *See*, Defs.' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. at 8 ("This Court should not consider issuing an injunction that affects more than these three schools.").

[9] At any rate, the undersigned Counsel for Plaintiffs Johnny Barnes proffers to the Court that Plaintiffs will file a Motion for an Amended Complaint with the Court to add Plaintiff families who are directly injured by each and every single proposed school closure, thereby rendering Defendants' charge of lack of standing to challenge certain of the school closures moot.   If Defendants prefer to see challenges to the proposed closure of each school, there is plainly no shortage of families injured by these proposed closings --- as reflected in Pls. Ex. M through P and no shortage of ANC Commissioners aggrieved by the headlong rush to judgment that has run roughshod over their proper official role. Defendants will get the chance to face Plaintiffs from each and every affected school community.

the residents themselves; they are the ones harmed by the ANC's inadequate presentation of neighborhood views." *Id.*

In *Dupont Circle Citizens Ass'n v. Dist. of Columbia Bd. of Zoning Adjustment*, 403 A.2d 314, 318 (1979), the District of Columbia Court of Appeals strongly reaffirmed the holding in *Kopff* and emphasized that, "While injury in fact is generally required for standing, the very purpose of the notice provisions obviate the need for this requirement for standing to challenge compliance with notice specifications."   Defendants essentially concede that that the ANC Plaintiffs have standing to object to the Defendants' flouting of their obligation to give them legal notice, but insist that "while this might give them standing for an affirmative injunction *forcing the District to give them notice, or to consider their opinions*, it would *not* convey standing to enjoin *the closure of the schools*.   Notably, Plaintiffs' own cited authority demonstrates that the remedy for failure to give 'great weight' to ANC advice is remand to the agency to 'reissue a decision with explicit reference to each ANC issue and concern as such, as well as specific findings and conclusions with respect to each.'" Defs.' Mem. at 8, n.3 (emphasis in the original).

This argument is not only deeply revealing but entirely satisfactory to the Plaintiffs.  It is revealing because it signals that apparently nothing that the ANC Commissioners might actually come to say on behalf of their neighborhoods could alter the Defendants' preexisting determination to close the schools in their communities, despite the legal requirement that the Commissioners' expressed views be granted "great weight" in the decision-making process. This glimpse of the Defendants' blithe disregard for the ANC Commissioners' formal role in District governance only reaffirms the wise decision by Congress and the Council of the District of Columbia to compel official notice to the Commissioners and "great weight" consideration of

their views as essential legal requirements, alterable only in an "emergency" (something which the Defendants have not plead).  *See*, §§ 13(b) and (c) of the *Advisory Commissions Act of 1975*, effective October 10, 1975, D.C. Law 1-21, as amended by the *Comprehensive Advisory Neighborhood Commissions Reform Amendment Act of 2000*, effective June 27, 2000, D.C. Law 13-135, D.C. Official Code §1-309.10 (b) and (c) (2004 Supp.) (collectively, the ANC Act).

Nonetheless, Plaintiffs see Defendants' apparent concession of standing for the purposes of vindicating proper legal notice to the ANC Commissioners and consideration of their views as a constructive step forward in this case.  A remand, for purposes of Defendants giving affected ANC Commissioners proper notice; allowing the ANCs to solicit formal community input on the proposed closings; allowing the Commissioners to present their considered recommendations to Defendants;  and permitting Defendants, finally, to give the Commissioners' views "great weight" consideration, would be an acceptable outcome, as  one part of a Preliminary Injunction, to a messy situation brought about by Defendants.

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   Plaintiffs are likely to succeed on the merits of the ANC notice claims because Defendants violated the ANC act by failing to give proper statutory notice to the ANC Commissioners.

Defendants do not, and cannot, deny that they violated the express provisions of the ANC Act. They failed to give proper statutory thirty-day written notice by first-class mail to the ANC Commissioners of the Plan for closing schools in their neighborhoods.[10]  Indeed, *to this day*,

---

[10] Notice to ANCs of certain actions or proposed actions by the District Government is governed by §§13(b) and (c) of the *Advisory Commissions Act of 1975*, effective October 10, 1975, D.C. Law 1-21, as amended by the *Comprehensive Advisory Neighborhood Commissions Reform Amendment Act of 2000*, effective June 27, 2000, D.C. Law 13-135, D.C. Official Code §1-309.10 (b) and (c) (2004 Supp.) (collectively the ANC Act).  Subsection (b) states:

Thirty days written notice, excluding Saturdays, Sundays and legal holidays of such District government actions or proposed actions shall be given by first-class mail to the Office of Advisory Neighborhood Commissions, each affected Commission, the Commissioner representing a single member district affected

Defendants have not given the proper legal notice to the Commissioners.  Because of this failure

of notice, the ANC Commissioners did not call neighborhood meetings on the proposed school

closings, did not crystallize community views on the subject, submitted no statement of

recommendations to the Defendants, and essentially lost the opportunity to participate and

represent their constituents in this momentous decision.[11]

The statutory notice requirement defied by the defendants is no frivolous technicality, but

the launch of a process of community dialogue that is supposed to lead to the ANCs filing

"written recommendations" with the relevant Agency and culminate in the Agency considering

and giving "great weight" to all "issues and concerns" that are "raised by ANCs in all cases

where written notice to ANCs is required."   *Kopff, 381 A.2d 1372,* at 1383.[12]    The "great

weight" requirement means that "an agency must elaborate, with precision, its response to the

ANC issues and concerns.  *It is a statutory method of forcing an agency to come to grips with the*

*ANC view, to deal with it in detail, without slippage.*"   *Id.* at 1384 (emphasis added).   The

Agency must not only address the substance of the arguments made but the special institutional

role played in District government by the ANC itself:

In doing so an agency must focus particular attention not only on the issues and concerns as
pressed by an ANC, but also on the fact that the ANC, as a representative body, is the group

---

by said actions, and to each affected Ward Councilmember, except where shorter notice on good cause
made and published with the notice may be provided or in the case of an emergency and such notice shall
be published in the District of Columbia Register.  In cases in which the 30-day written notice requirement
is not satisfied, notification of such proposed government action or actions to the Commissioner
representing the affected single member district shall be made by mail.  The Register shall be made
available, without cost, to each Commission.  A central record of all such notices shall be held by the
Office of Advisory Neighborhood Commissions.

[11] *See*, Exhibit R, Pl's Aff of ANC Commissioner and Plaintiff Ericka S. Black, paragraphs 4 and 5.

[12] Section 13 of the ANC Act is perfectly clear on all of these points: (a)(d) Each Commission so notified (i.e., in
writing) . . . shall forward its recommendations . . .to the appropriate agency . . . . *The issues and concerns raised in
the recommendations of the Commission shall be given great weight during the deliberations by the governmental
agency and those issues shall be discussed in the written rationale for the governmental decision taken.*  (emphasis
added) .  Notice of actions regarding planning, streets, recreation, social services programs, **education**, health,
safety, budget, and sanitation, *must* be given to each affected Commission area.  *See*, *D.C. Official Code § 1-309.10
(a) and (b) (2004 Supp.).* (emphasis added) .

making the recommendation.  *That is, the agency must articulate why the particular ANC itself, given its vantage point, does or does not offer persuasive evidence under the circumstances. . . .we believe that 'great weight' implies explicit reference to each ANC issue and concern as such, as well as specific findings and conclusions with respect to each. . . .Without such attribution, there is a danger that an agency, while dealing with ANC issues and concerns, would not analyze the matter in a way that evidences serious attention to the ANC source itself*. *Id.* at 1384-85. (emphasis added)

The *Kopff* court found that the ABC Board failed to give "great weight" to the ANC's issues and concerns and "was not cognizant of its duty to give ANC issues great weight." *Id.* at 1385.  The court remanded for "explicit consideration of the ANC positions upon rehearing." *Id.* That is the situation here, where Defendants bypassed legal notice to the ANCs and thus assured that they would not be able to give "great weight" and detailed consideration to any, much less all, of the issues and concerns that the ANCs might have voiced had they been properly noticed in this important public process.  Defendants appear not to have been cognizant of their duty to accord great weight to the views of the ANCs and clearly failed to solicit them or make the Commissioners aware of the public process to which they had a formal right to participate.[13] Because a school closing plan is an unusual public action, unlike, for example, the routine ABC proceedings over liquor licenses which come frequently before ANCs, the ANC Commissioners had no reason even to be generally aware they had a right to participate in such an extraordinary process.

To escape the consequences of breaching their statutory duty, Defendants offer a series of irrelevant distractions that, if accepted, would reduce the legal requirements to empty words. Their first argument borders on the surreal: "First, beyond the conclusory allegation that '[i]n the

---

[13] Thus, one can only regard with amazement the Defendants' argument that "the ANC Plaintiffs have not shown they gave any advice or recommendations about the Consolidation Plan" and their stern admonition that such submissions "shall be in writing."  Defs.' Mem. at 11.  Advice and recommendations *follow* the sending of legal notice and this notice, too, shall be "written" and sent in the mail.  Notice of actions regarding planning, streets, recreation, social services programs, **education**, health, safety, budget, and sanitation, *must* be given to each affected Commission area.  See *D.C. Official Code § 1-309.10 (a) and (b) (2004 Supp.)*. (emphasis added) .

instant case, no notice was given to the subject ANCs,' the Plaintiffs offer no support for their

contention that notice was not given." Defs.' Mem. at 10.   This demand that Plaintiffs prove

more specifically how the Defendants failed to notify them is nothing short of humorous.   Since

statutory notice was never given, what more "support" *can* the Plaintiff Commissioners offer for

this undisputed fact in the case?   If the Defendants seek to be reminded of all of the dates upon

which they considered serving Plaintiffs notice and chose not to, they will have to be the ones to

provide them to the Court.

Switching tracks, Defendants then argue that "DCPS gave extensive notice to all

members of the public" by conducting six public hearings, sending out some mass emails to

advertise their meetings, and placing notes in "student backpacks."   *See Id*.   This argument,

which neatly dissolves the elected ANC Commissioners into "all members of the public"

(including schoolchildren), succeeds only in showing that the Defendants had the resources, if

not the will, to give proper notice to the ANC Commissioners.   As a matter of law, the argument

is deficient.   Defendants cannot substitute their orchestration of a sophisticated public relations

campaign promoting the virtues of their Plan for the mandatory provision of statutory written

notice to ANC Commissioners, nor can they substitute their own informal process of collecting

views from random audience members for the formalized consideration, with "great weight" and

specific analysis, of the views that elected ANC Commissioners come to express.   Defendants

obviously recognize the value of public outreach to sway public opinion, but these efforts can no

more replace their *statutory duty* to give written notice to ANC Commissioners than sending out

a press release can replace the legal duty to file a formal answer to a complaint in court.[14]

---

[14] In essence, Defendants invite the Court to treat their own carefully crafted form of "notice" to the people and public "participation" as a proxy for the ANC notice and participation rights that are actually compelled by law. Thus, when Defendants assert that the Plaintiffs' complaint about not receiving legal notice "elevates form over substance," *see id*., n.6, the truth is exactly the reverse.   If the Court accepts Defendants' argument and disregards

But Defendants argue that, "To the extent Plaintiffs are arguing that they did not receive written notice by mail (*see* D.C. Code § 1-309.10(b)), the case law is clear that *actual notice* is sufficient."[15]   *Id.*   This categorical statement, which does not even dare to assert the only theoretically relevant point--that the Plaintiffs themselves *had* actual notice, is plainly wrong as a matter of law.   Defendants cite *Kopff v. D.C. Alcoholic Bev. Control Bd.* for the proposition that actual notice suffices, but in *Kopff*, the court found  that actual notice worked (partially) in that case only because "the ANCs met and adopted resolutions expressing their positions on the matter, and that representatives attended the hearing and were prepared to present the ANC's views and recommendations.  We therefore can perceive no prejudice from the technical defect." 381 A.2d 1371.   However, in this case, the Plaintiff ANC Commissioners received no notice, held no special public meetings, and offered no written comments. The prejudice thus caused by the notice failure is substantial here because the processes of local democratic participation were effectively thwarted by the violation of law.[16]   In any event, the result in *Kopff* was a finding that the Board had committed reversible error through a series of notice failures and a failure to give

---

the legal requirements of notice and "great weight" consideration, it will prefer the mere "form" of notice and the mere "form" of participation over the "substance" of real notice and real participation as they exist under law in the District. Plaintiffs seek to defend both the formal law and the substance of public participation that it guarantees, while defendants would apparently abandon them both.

[15] This argument also appeared in a series of e-mail exchanges between representatives of Defendants and Ward 8 Advisory Neighborhood Commissioner Absalom Jordan beginning on 17 Jan. 2013, the very day the "final consolidation plan" was announced by Defendants.  See Pls.' Ex. H.

[16] Defendants' reliance on *Shiflett v. D.C. Bd. of Appeals and Review*, 431 A.2d 9 (D.C. 1981) is similarly misplaced because the relevant facts there differ so sharply from those in this case.  In *Shiflett*, the Agency in question suspended a building permit once it discovered that proper notice had not been provided to the ANC.  Here, Defendants simply ignored, and now seek to gloss over, the due process failures of several agencies, thus deepening the violation rather than mitigating it.  In *Shiflett*, the court reasoned that the ANC did not show that a building permit would likely not have issued had the technical violations of notice been cured.  Here, Defendants already admit that, "The Consolidation Plan was *drastically altered* as a direct result of public feedback . . . Notably, the original plan proposes consolidating twenty schools, while the final plan leaves five of those schools open," Defs.' Mem. Opp. at 11.  If this was the result of informal public "feedback," one can only imagine what *formal* notice and the *genuine* opportunity for the ANC Commissioners to participate would have produced on this momentous issue of public importance.

11

"great weight" consideration to the ANC's views, a finding that led to a remand for a new Board hearing.

In general, the courts have insisted fastidiously upon proper legal notice, rejecting various forms of non-conforming "actual notice" even when the most sympathetic parties seek forgiveness for failing to give legal notice.  *See, e.g., Blue v. Dist. of Columbia*, 850 F.Supp.2d 16, 36-37 (D.D.C. 2012) (dismissing an emotionally disturbed DCPS student's claims of, *inter alia*, negligent supervision and negligent hiring and retention against the District over a sexual relationship with her teacher because she did not comply with a six-month requirement of "notice in writing to the Mayor of the District of Columbia" of her injury).  In *Blue*, although the relevant statute, 12-309 of the D.C. Code, provided that "a report in writing by the Metropolitan Police Department" also constituted "sufficient notice," the Court rejected the legal sufficiency of a notice that the District of Columbia received within the six-month period because it appeared in the form of "an investigative report completed by DCPS's Division of School Security," as opposed to the MPD, *Id.* at 37.  The Court proceeded to reject a series of other kinds of "actual notice" that were substantial but simply did not conform to the letter of statute. *Id.* at 36-38.

Indeed, when the District is itself the beneficiary of a specific notice requirement, D.C. law is generally severe against its opponents and, of course, the District almost always demands strict application of the law.  *See*, *e.g*., *Owens v. Dist. of Columbia*, 993 A.2d 1087, 1089 (D.C. 2010) ("Ms. Owens's claims for damages under the DCHRA are barred because she failed to provide timely notice of her alleged injury to the Mayor, as required by § 12–309.  Although Ms. Owens completed the EEO form within six months of the most recent injury at issue (denial of her request for promotion), that administrative filing with the DMH did not satisfy the statutory

requirement of notice to the Mayor.  The only statutory exception to the requirement of formal

notice to the Mayor is an MPD report, and *we are 'not free to go beyond the express language of*

*the statute and authorize any additional documents to meet its requirements.'* *Doe by Fein v.*

*Dist. of Columbia*, 697 A.2d 23, 28 (D.C.1997) (emphasis added). *Whether the District of*

*Columbia had 'actual notice of a potential claim is not an appropriate consideration under*

*section 12–309.'* *Chidel v. Hubbard*, 840 A.2d 689, 695 (D.C.2004) (rejecting contention that

appellant 'substantially complied' with the notice requirement because the District had actual

notice of the injury) (emphasis added). We therefore reject appellant's argument that 'substantial

compliance with statutory notice requirements' is sufficient.").

B. **Plaintiffs are likely to succeed on the merits of the Section 1983 Equal Protection claims because the District's School Closing Plan has a starkly disparate racial impact and produces a clear pattern of discrimination in violation of Equal Protection.**

1. **School Closings Are a Matter of Constitutional Significance and must conform to Equal Protection Principles:** *Griffin v. School Board of Prince Edward County*.

The closing of public schools, even when accompanied by the provision of enrollment

alternatives to displaced students, is a matter not simply of administrative convenience but of

constitutional significance, and school closings must conform to Equal Protection principles.

See, *Griffin v. School Board of Prince Edward County*, 377 U.S. 218 (1964).  This is no less true

in the District of Columbia where Equal Protection principles apply with equal force to the rights

of local residents.  *Bolling v. Sharpe*, 347 U.S. 497 (1954).[17]  Students and their families have

---

[17] The *Bolling* decision, the companion case to *Brown v. Bd. of Educ.*, was decided on the same day, May 17, 1954, and struck down apartheid segregation in the District of Columbia's schools as a violation of Equal Protection principles.  Although citizens of the states have Fourteenth Amendment rights against their state governments that District residents do not have against Congress,  the Court held that the 5th Amendment Due Process Clause, which applies to District residents, incorporates the Equal Protection principles of the Fourteenth Amendment because "discrimination may be so unjustifiable as to be violative of due process." *Id.* at 499. In defining the rationale for what has come to be called a "reverse incorporation" doctrine, the Court stated that it would be "unthinkable that the

important interests at stake in the continued existence of their schools.[18]   In *Griffin*, the Prince Edward County Board of Supervisors, whose members were determined to prevent desegregation of the County's public schools, simply closed the schools down and gave all students, both white and African American, vouchers to go to private school instead.  Ruling a decade after *Brown v. Bd. of Educ.*, 347 U.S. 483, the Supreme Court found that closing down public schools in order to avoid desegregation violates Equal Protection.  *Griffin*, 377 U.S. at 231.

Significantly, the Court held that the school closings were unconstitutional even though there is no constitutional right to go to a neighborhood public school and even though all of the displaced children were given private school vouchers and thus the opportunity to continue to attend school at public expense. 377 U.S. at 221.  The Griffin Court held that:  "Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional."  377 U.S. at 231 (1964).  Thus, the Court has determined that, if an official decision to close schools is inconsistent with Equal Protection, the fact that the

---

same Constitution would impose a lesser duty on the Federal Government" than on the states when it comes to guaranteeing equal rights of children in public schooling.  *Id.*

[18] Like segregation itself, a racially tinged school closing can affect the "hearts and minds" of the students affected. *See Brown v. Board*, 347 U.S. 483 (1954) (Separating students from "others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.").  Shutting down a school uproots its students and disrupts their education.  When they are reassigned elsewhere, they lose what is familiar, routine, and intimate about their education and their neighborhood support systems; they often go into entirely new neighborhoods and are forced to adjust to different schedules, different modes of transportation, and different school cultures and bureaucracies. *See*, Ben Kirchner, Matthew Gaertner and Kristen Pozzoboni, *Tracing Transitions: The Effect of High School Closure on Displaced Students, Educational Evaluation and Policy Analysis* 2010, pages 407 to 415, Pls.' Ex. D (finding that students affected by the closing of an urban majority-Hispanic and African American high school experienced dramatic test score declines in the two years afterwards and "negative trends in dropout and graduation rates" in comparison to other control-group students).

government makes other arrangements to educate the displaced students does not cure the constitutional violation.

2.  **The District of Columbia's School Closing Plan has a Racially Discriminatory Impact because it overwhelmingly Burdens and Displaces, Almost Exclusively, African American, Hispanic and Asian-American Students.**

Defendants do not deny that the proposed school closings have a racially discriminatory impact and their implicit concession on this issue is wise given the starkness of the Plan's effects.   All of the schools targeted for closure by the Plan have an overwhelmingly or exclusively minority student population.  Of the 2,792 students whose schools are slated to close, 2,790 of them are African American, Hispanic or Asian-American.  This means that 99.9% of students affected by the Plan belong to minority groups that are suspect classes under Equal Protection.  At the same time, there are a total of *two* white students enrolled in all of the fifteen schools targeted for closure, meaning that white children make up less than .1% of the students forced to relocate.[19]   Those two students to the side, the entire burden of the Plan falls on the minority student population.

3.  **The Plan's Racially Discriminatory Purpose Can Be Inferred from its "Clear Pattern" of Stark Racially Discriminatory Effects:  *Village of Arlington Heights*.**

If it were enough to show an extremely disparate racial impact, an Equal Protection violation would be easily established here.   However, it is true, as Defendants emphasize, that to demonstrate violation of Equal Protection, Plaintiffs must show evidence of "racially discriminatory intent or purpose."   *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  However, Plaintiffs do not have to show that "the challenged action rested solely on racially discriminatory purposes" since multiple considerations, by definition,

---

[19] See, Pls.' Ex. I and J., Maps.

enter into any public decision-making process, and "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." Id.  The test is whether any impermissible discriminatory purpose entered as a motivating factor into the decision-making process as one of many motivating factors.  To determine "whether invidious discriminatory purpose was a motivating factor" in a particular policy is a complex challenge that "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Id. at 266.  While Defendants understandably stress that "disparate impact alone is not sufficient to establish a violation of equal protection," Defs'. Mem. at 20, disparate impact begins—but it does not end--the Equal Protection analysis in a case like this.

The Supreme Court has declared that the existence of an official action's  racially disparate impact—that is, "whether it 'bears more heavily on one race than another', may provide an important starting point" for the analysis of constitutional purpose.  *Arlington Heights*, 429 U.S. 252 at 266 (quoting *Washington v. Davis*, 426 U.S., 242 (1976)).  It is, in fact, a profoundly important starting point because proof of a clear racially disparate impact can often illuminate--in a way that bare professions of official neutrality and benevolence cannot--the underlying purposes and social meaning of a public policy: "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."  Id. (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)).  The Court in *Arlington Heights* went further to state that, when such a "clear pattern" of racial disparity, "unexplainable on grounds other than race," emerges, the appearance of such a pattern makes concluding the "evidentiary inquiry" of

discriminatory purpose "relatively easy." Id.   However, the Court cautioned that "such cases are rare.   Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative. . ." Id.

> **4.   The Pattern of Racially Disparate Effects Produced by the Plan is "Stark," like the Racial Effects of Official Actions Condemned in the past by the Supreme Court, implying a Discriminatory Purpose and Triggering Strict Scrutiny.**

As the Supreme Court clearly indicated, a pattern of racially disparate impact alone can be determinative of the purpose inquiry where there is "a pattern as stark as that in *Gomillion* or *Yick Wo*." *Id*.  In the case of the District's school-closing Plan, the proof of an extreme disparate impact should be read to infer an impermissible purpose and trigger strict scrutiny as in those cases.  It is hard to imagine the District coming up with a school closing plan that has a more vividly disparate racial impact.  Of the 2,642 of the District's schoolchildren who lose their home schools under the Plan, fully 2,642—or 99.9%--are African American, Hispanic or Asian-American.  Only two of the students affected, or fewer than *one in a thousand*, are white.[20]   In fact, the vast majority of the students displaced—93.1%--are black children, the figurative if not literal grandchildren of the population that was the target of segregation invalidated  in *Bolling v. Sharpe*, 347 U.S. 497 (1954).

This racialized effect is comparable to the policy invalidated in *Gomillion v. Lightfoot*, where the Alabama legislature changed the political boundaries of the City of Tuskegee in such a way as to remove from the city several hundred African American voters "while not removing a single white voter or resident," 364 U.S. 339, 341 (1960).  Although the displaced African Americans still had the statewide voting rights they began with, they alone suffered the dislocating local political effects of the boundary revisions.  Whatever differences may exist in

---

[20] Levy Aff.. at 2, No. 12 .

the racial dynamics of gerrymandering in the electoral and school closings contexts, we can see that, in both cases, a completely lopsided and unfair burden is placed on the backs of non-white citizens.[21]   Similarly, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court found an Equal Protection violation where a facially neutral and rationally defensible ordinance, which forbade operation of a laundry in a wooden structure without the special permission of the city's Board of Supervisors, was implemented in a radically unequal way, disfavoring Chinese laundry owners. See *Id.* at 374.   And, in *Shaw v. Reno*, 509 U.S. 630 (1993), the Court invoked *Arlington Heights* and *Gomillion* to find that, even without any other evidence of a discriminatory public purpose, "a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to 'segregate . . . voters' on the basis of race." *Id.* at 646-47.   *Shaw* thus spelled out an Equal Protection right against the infiltration of impermissible racial dynamics and appearances into the political process.[22]   The critical insight of the *Shaw* Court appeared in its statement that reapportionment is an area "in which appearances do matter." *Id.* at 647.   When government classes people together "who belong to the same race . . . [a]nd who may have little in common with one another but the color of their skin," and then treats them differently from others, the public regime comes to bear "an uncomfortable resemblance to political apartheid." *Id.*

---

[21] It is true that there are two white students who would be affected by the school closing Plan in the District, but this is a trivial detail that should not distract the Court from the fact that the overwhelming weight of the Plan's burden falls on the non-white population.  If Alabama had accidentally or even deliberately included two white voters in the class of people gerrymandered outside of Tuskegee's municipal boundaries, this footnote to the facts would have made no difference to the outcome of the constitutional analysis.  Therefore, one trusts that the court will not be moved by the Defendants' unconvincing attempt to wave off this fundamental issue by saying that, "Plaintiffs already admit that the Consolidation Plan, in fact, affects students of a variety of races (African American, Hispanic, Caucasian, and "Asian/Other/unknown.)"  Defs.' Mem. at 20.

[22] In *Shaw*, the challenged North Carolina congressional redistricting plan revealed nothing more shocking than irregularly drawn district lines and the existence of two majority-African American districts with roughly equal populations of African Americans and whites.  Yet, these innocuous facts, combined with the Court's recognition that "the legislature always is aware of race when it draws district lines," 509 U.S. at 660, were sufficient to justify the majority's holding that a valid Equal Protection claim will lie when  appearances suggest that the interests of citizens are being slighted or distorted on  the basis of race.

The dramatic numbers of racial disparity in this school closing case –99.9% racial minorities to .1% whites-- dwarf the rather close percentages of racial population in the districts that ended up being struck down in North Carolina: 53.4% African American and 45.5% percent white in one newly drawn congressional district and 53.3% African American and 45.2 % white in the other. *Shaw v. Reno*, 509 U.S. 630 (1993) (Brief for the Federal Appellees, Appendix D). The appearance of what the Court calls "political apartheid" is thus much more striking here, especially because the overwhelmingly African American communities bearing the brunt of the school closings are made up of poorer and less powerful citizens while the majority-white communities that have escaped hardship under the Plan are made up of wealthier and more politically connected citizens. See *Shaw*, 509 U.S. at 647. Here, the racial identity of the affected minority communities becomes an emblem of the residents' political vulnerability and their powerlessness to challenge the selective burden imposed upon them by the political process. Under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) and *Shaw v. Reno*, 509 U.S. 630 (1993), appearances do matter and a discriminatory purpose may be inferred here, triggering strict scrutiny for policies of racial discrimination.

### 5. Defendants Have Offered no Compelling Interests to Justify the Pattern of Extreme Discriminatory Effects Built into the Plan.

Defendants offer many different accounts of why the Plan is necessary. *See*, e.g., Defs.' Mem. at 2-3, 5, and 23 ("the Consolidation Plan is designed upon several rational bases: to consolidate schools that are under enrolled, to decrease money spent on maintenance of school buildings, to allow teachers to network more effectively, to allow more students to have access to librarians and elective classes, and otherwise to improve education for all students.")  It is hard to keep up with all of these moving and slippery targets, but they fall generally into two categories, those that claim the closings are necessary for *academic* improvements for the students being

dislocated or other students in the rest of the District, and those that claim they are necessary to accomplish *fiscal* savings.  Neither of these general interests is remotely compelling in context. The best and most recent evidence we have suggests that closing down children's schools and sending them to school elsewhere has a *detrimental* effect on their educational and personal development.  Professor Ben Kirshner's study of the effects of closing a high school on its students found substantial declines in test scores across content areas, a doubling of the chance of average students dropping out, and a pervasive sense of "social disruption and academic struggle."  *See*, Pls.' Ex. K Kirchner Statement., ¶¶ 10- 16.

Elaine Weiss and Don Long conclude in their very recent study of the issue that the policy of school closings "does not improve student outcomes overall and may even exacerbate existing problems."[23]   They also cite "a recent study of a district with declining enrollment that used student achievement to target schools for closure," which found "adverse effects on test scores and attendance, though the study noted that these effects could be minimized by transferring students to higher-performing schools (Engberg et al 2011)."  *Id.* at 13.  Of course, students whose schools are targeted by the Plan are not going to be switched to higher-performing schools but schools very similar to the ones targeted for closure.

The fiscal rationale for closures looks as bleak and un-compelling as the educational rationale.  Professor Derek Black studied states and school systems that "have undertaken systematic school consolidation and closure" in search of "economies of scale" and found that "a relatively small percentage of school systems have been able to show any significant savings as a

---

[23] They cite a 2009 study of students from eighteen Chicago elementary schools closed between 2001 and 2006 that "found no overall effect on those students' academic performance, but raised a concern that since most students transferred to very low-performing schools, while only 6% went to high-performing schools, the disruption offered no benefits."  Weiss, Supra, at 12, citing  Maria de la Torre and Julia Gwynne, When Schools Close: Effects on Displaced Students in Chicago Public Schools, Consortium on Chicago School Research at the University of Chicago, at 16 (2009).

result of consolidation."   Indeed, he found that, "It is not unusual for costs to increase after consolidation because larger schools tend to require more administrators, more safety precautions, and higher transportation costs."   *See*, Pls.' Ex. L.  Black Aff., ¶ 7.  This national pattern holds true in the District as is evident from the recent Report by the District Auditor, cited above, that found, instead of saving $23 million from the last round of closures in 2008, as had been projected, the District actually *lost* $40 million from the policy.  *Audit of the Closure and Consolidation of 23 D.C. Public Schools* at 4.  According to Elaine Weiss and Don Long, "DCPS's initial reported cost of $9.7 million to close 23 under-enrolled schools in 2009 grew to $39.5 million, roughly the same number found by the D.C. Auditor, with added moving expenses, demolitions, patrols, news transport costs, and other quadrupling the price tag." *Supra*, at 9.

Today, Soumya Bhat, the Education Finance and Policy Analyst for the D.C. Fiscal Policy Institute, states that the estimated $8.5 million in promised cost savings from the closings "does not take into account the costs of relocation, inventory, storage and transportation for the first year, which will essentially erase the potential savings.  Beyond the first year, the savings might be minimal, less than 1% of the entire DCPS budget."  See, Pls.' Ex. Q,  Bhat Aff. Soumya Bhat ¶ 14.  Whatever interests have been invoked by the Defendants can clearly be vindicated by other less discriminatory and burdensome means that will, in fact, be far more effective.  If the purpose is to improve the educational prospects of the students in the targeted schools, the money spent on closing down their schools and relocating them would be far better

invested *inside* their schools on educational assistance and tutoring programs that are known to work. [24]

## III.    PLAINTIFFS FACE IRREPARABLE INJURY AND A PRELIMINARY INJUNCTION WILL NOT SUBSTANTIALLY INJURE DEFENDANTS IN ANY WAY AND WILL SERVE THE PUBLIC INTEREST

The purpose of a preliminary injunction is to freeze the relative positions of the parties until a trial on the merits can be held. *Univ. of Tex. V. Camenisch*, 451 U.S. 390, 395 (1981).   Having demonstrated a good likelihood of success on the merits, Plaintiffs now refute the Defendants' arguments about the other prongs of the preliminary injunction test, those relating to the Plaintiffs' irreparable injury, any potential injury to the Defendants, and the public interest. *See, e.g., Mova Pharm. Corp.* 140 F.3d 1060, 1066 (D.C. Cir. 1998).   "A plaintiff's harm from denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network LLC v. Tenke Corp.*, 511 F.3d. 535, 550 (6th Cir. 2007).   Whenever a plaintiff's constitutional rights are being impaired or threatened, irreparable injury is presumed.  *See ACLU of Ky. V. McReary County, Ky*., 354 F. 3d 438, 445 (6th Cir. 2003).  Indeed, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006), the case that Defendants rely upon to flesh out preliminary injunction standards, stands for the proposition that, in the Establishment Clause context, constitutional infringement—and therefore irreparable harm—"occurs the moment the government action takes place" without any further proof of an individual tangible harm required.  *See also, Williams v.*

---

[24] While Plaintiffs assert that they are likely to succeed on the ANC notice issue as well as the Equal Protection and Section 1983 issue, Plaintiffs would also assert that exhaustion of administrative remedies is not required under IDEA, Section 504, ADA, or DCHRA.  It is widely accepted that exhaustion is not required if there is no adequate administrative remedy, *Ecology Center of Louisiana v. Coleman*, 515 F.2d 860 (5th Cir. 1975), because exhaustion would serve no purpose.  Seeking relief through administrative processes would be futile due to Defendants' failure to provide adequate notice of the School Closing Plan, as discussed above.  See 20 U.S.C.A. § 1400 et seq; *Honig v. Doe*, 484 U.S. 305, 327 (1988) (stating "…parents, may bypass administrative process where exhaustion would be futile or inadequate.") (citing *Smith v. Robinson*, 468 U.S. 992, 1014, n. 17 (1984).  Finally, Defendants are well aware that there is no exhaustion requirement for alleged violations under the D.C. Human Rights Act.

*Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (finding that denial of the right to vote is irreparable harm).  This is the case here too: government action impairing the Equal Protection rights of children to an equal education is, immediately, irreparable harm to the children affected.

Defendants seem to feel that closing the Plaintiffs' schools cannot be irreparable harm because the students "will continue to be educated at DCPS, *in a different location*." Defs.' Mem. in Opp'n at 26 (emphasis in the original).  Yet, if the racially discriminatory patterns built into the fabric of the Plan violate Equal Protection, then proceeding to close the Plaintiffs' schools and to relocate students, teachers and funding to other schools is not only, by definition, irreparable injury, but will impose tangible psychological, emotional and educational harms on the dislocated children.[25]  Moreover, the communities that are deeply invested in these fifteen schools, and whose rights to participate in District decision-making have been trampled by the failure of legal notice, also face imminent and irreparable harm in the non-compensable violation of their participatory ANC statutory rights and their rights to equal treatment.

But Defendants allege that a Preliminary Injunction would "burden" their school operations, pointing out that the "District began investing funds into this consolidation more than two years ago, when it first hired ERS."  *Id.* at 27.  Yet, the fifteen schools that they are in such a hurry to close --without meeting their statutory obligation to involve the District's ANCs --- have been operating continuously in the District for many decades.  How would it harm the Defendants for these schools to stay open until a full trial on the merits can take place?  The specific injuries enumerated by Defendants, *see id.*, are all complaints about slowing things down for the Fall semester of 2013, but that date is far enough away for justice to be done in the meantime without compromising the start of the next school year.

---

[25] See generally The Affidavit of Mark Simon, Pls. Ex. S.

Finally, in laying claim to "the public interest," Defendants say the Plaintiffs "propose to potentially burden the education of *tens of thousands* of other DCPS students . . . [and] Plaintiffs' narrow interests cannot outweigh the interest of all students in DCPS to obtain a quality education . . ." *Id.* at 28-29.  This argument is brazen.  The tens of thousands of other students to which Defendants refer will all be going back to their home schools in the fall.  The terrible threat invoked by the Defendants is that these students will not receive their tiny share of the (likely inflated) $8.5 million that the DCPS is estimating it will save and redistribute across the District by closing down the Plaintiffs' schools.  Yet, there is no clamor across the District to shut these schools down, no public interest being expressed in seeing thousands of poor African American and Hispanic children uprooted from their neighborhood schools, and no sense among fair-minded Washingtonians that it would be unjust to allow Plaintiffs to have their day in court.

The Court should grant the Preliminary Injunction Motion and compel the Defendants to 1) give proper notice to the Plaintiffs ANC Commissioners and accord their views "great weight," and 2) revise their Plan in accordance with the non-discrimination principles of Equal Protection.

Respectfully Submitted,

/s/ Johnny Barnes
_____

Johnny Barnes, D.C. Bar Number 212985
Counsel for Plaintiffs
301 "G" Street, S.W, Suite B101
Washington, D.C.      20024
AttorneyJB7@gmail.com
Telephone (202)-882-2828

Jamin Raskin, D.C. Bar Number 440155
Of Counsel for Plaintiffs

**DATED:** 2 May 2013

## <u>Certificate of Service</u>

      I hereby certify that a true copy of the foregoing Memorandum of Plaintiffs in reply to Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction was delivered  by electronic transmission on this 2nd day of May 2013, to the Court and to the following:

        Keith D. Parsons, D.C. Bar No. 1006935
        Assistant Attorney General
        Public Interest Division, Equity Section
        441 4th Street N.W., 6th Floor South
        Washington, D.C.   20001
        Keith.Parsons@dc.gov

               -and-

        Douglas S. Rosenbloom
        Assistant Attorney General
        Public Interest Division, Equity Section
        441 4th Street N.W., 6th Floor South
        Washington, D.C.   20001
        Douglas.Rosenbloom@dc.gov

                          /s/ Johnny Barnes
                       _____

                       Johnny Barnes, D.C. Bar Number 212985