**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**SHANNON MARIE SMITH,** *et al.*,

    **Plaintiffs,**

        **v.**

**KAYA HENDERSON, Chancellor of the
District of Columbia Public Schools,** *et al.*,

    **Defendants.**

                         **Civil Action No. 13-420 (JEB)**

---

## MEMORANDUM OPINION

The public-education landscape in the District of Columbia has changed. The advent of public charter schools, coupled with demographic shifts, has resulted in substantially decreased enrollment in certain neighborhoods over the last fifteen years. In response, the District of Columbia Public Schools has promulgated its Consolidation and Reorganization Plan, which closes fifteen under-utilized schools, reassigns those students, and reallocates the savings to other schools – all in an effort to maximize resources and improve education citywide. Plaintiffs – guardians of children who attend closing schools and Advisory Neighborhood Commission members whose districts allegedly comprise such schools – have brought this suit, claiming that the closures violate a host of constitutional, federal, and state provisions. They assert, in essence, that the closures discriminate against poor, minority, and disabled students and were enacted without sufficient ANC input. Hoping to block the implementation of the Plan, Plaintiffs now ask this Court for a preliminary injunction.

Few topics, understandably, incite our passions more than the education of our children. Toss into the mix the future of neighborhood institutions, whose familiarity and history may

resonate deeply, and quite a volatile brew emerges.  It is thus hardly surprising that assorted

constituencies may possess varied opinions on the wisdom and necessity of the Plan and Schools

Chancellor Kaya Henderson's strategy.  Yet every adverse policy decision does not yield a

constitutional claim.  In this case, there is no evidence whatsoever of any intent to discriminate

on the part of Defendants, who are actually transferring children <u>out of</u> weaker, more segregated,

and under-enrolled schools.  The remedy Plaintiffs seek – *i.e.*, to remain in such schools – seems

curious, given that these are the conditions most people typically endeavor to escape.  In any

event, as Plaintiffs have no likelihood of ultimate success on the merits of their suit, they cannot

prevail in this Motion here.

## I.      Background

        While the parties quarrel about the legal analysis, the underlying facts here are essentially

uncontested.

### A.  <u>Factual Background</u>

        The District of Columbia Public Schools runs the District's traditional, local public-

school system.  <u>See</u> D.C. Code §§ 38-171 to -172.  As Chancellor, Kaya Henderson acts as

DCPS's chief executive officer.  <u>See</u> D.C. Code § 38-174(a).  Not all D.C. public schools fall

within DCPS's sphere, however.  In 1996, Congress authorized the operation of charter schools

in the District, which exist as public schools outside of DCPS control.  <u>See</u> District of Columbia

School Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321-107 (1996).  Since then,

children in many parts of the city have flocked to charters; indeed, more than half of public-

school students in Wards 1, 5, and 7 and more than a third in Wards 4, 6, and 8 now attend

public charter schools instead of DCPS schools.  <u>See</u> Opp., Exh. B (Office of Chancellor, DCPS,

<u>DCPS Proposed Consolidations and Reorganization: Better Schools for All Students</u> ("<u>Proposed</u>

Consolidation Plan") (Nov. 15, 2012)) at 8.  By contrast, only 14% of students in Ward 2 attend

charters, and no Ward 3 student does.  See id.  The number of school-age children has likewise

fallen across the city, although – again – unevenly.  While the population of school-age children

in the last ten years has decreased by at least 1500 children in each of Wards 1, 4, 5, 6, 7, and 8

(including nearly 4000 in Ward 8), Ward 2 has lost only 761 children, and Ward 3 has actually

gained 272 children during that time.  See id. at 7.  As a result, many DCPS schools are only

partially full – particularly in certain parts of the city.

Responding to these demographic shifts and after obtaining recommendations from an

educational consulting company, see Opp., Exh. A (Memorandum from Educ. Res. Strategies to

Chancellor Henderson (Aug. 17, 2012)), in November 2012, Chancellor Henderson proposed

closing twenty under-enrolled DCPS schools over the next two years.  See Proposed

Consolidation Plan at 16.  Most of those slated for closure used less than half of their buildings'

capacities, and five schools had building-utilization rates under 25%.  See id. at 17-22.  DCPS

explained that closing these under-enrolled schools would decrease overhead, allowing schools

to spend less per pupil, while putting more students in modern facilities and giving more students

access to programs and staff that can be justified only for large schools, thereby improving the

overall quality of education.  See id. at 10-14.  Plaintiffs question whether the closings will

actually bring down spending, pointing out that similar benefits projected from DCPS closures in

2008 never materialized.  See Reply at 3 & n.4 (citing Exh. F (Yolanda Branche, D.C. Auditor,

Audit of the Closure and Consolidation of 23 Public Schools (Sept. 6, 2012))).  Fourteen of the

twenty schools proposed for closure were in Wards 5, 7, and 8, plus two schools each in Wards

2, 4, and 6.  See Proposed Consolidation Plan at 16.  The proposal suggested no changes in

Wards 1 or 3.  See id. at 23 (building-utilization rate is 74% in Ward 1 and 109% in Ward 3).

To promote its proposal and gather community feedback, DCPS took its show on the road. The City Council held two hearings on the closures. See Opp., Exh. D (Office of Chancellor, DCPS, Better Schools for All Students: DCPS' Consolidation and Reorganization Plan ("Final Consolidation Plan") (Jan. 2013)) at 2. DCPS itself convened meetings throughout the city, including four ward-based public meetings that drew 780 participants. See id. In addition, DCPS e-mailed ANC Commissioners with schools slated for closure in their districts, along with some of the incoming ANC Commissioners-elect, to ask for reactions. See Defs. Notice of Correction & Clarification, Exh. A (Decl. of Shanita Burney, Exh. 1 (E-mail from Josephine Robinson, DCPS, to ANC Commissioners (Nov. 13, 2012))). DCPS also sent a summary of the proposal home in the backpack of every child attending a school on the closure list. See Opp., Exh. C (Decl. of Peter Weber), ¶ 7.

This desire for community input was no charade. On the contrary, the feedback yielded real changes in DCPS's final Plan, released January 17, 2013. Five schools proposed for closure will now remain open: two in Ward 2, one in Ward 7, and two in Ward 8. See Final Consolidation Plan at 4-5. At five other schools, moreover, assignments for the departing students changed. See id. In choosing schools to receive the students, DCPS particularly focused on "safety and walkability." Id. at 7. DCPS estimated that savings from the revised proposal would total $8.5 million, see id. – an estimate that Plaintiffs, of course, contest – which sum would then be plowed back into schools throughout the city. See id. at 6.

All fifteen schools on the final closure list lie east of Rock Creek Park, a historical dividing line within the city. East of the Park, residents are generally poorer and overwhelmingly black and Hispanic; west of the Park, residents are wealthier and mostly white. The halls of the closing schools reflect those demographics. In DCPS schools as a whole, 68.4%

4

of students are black; 13.8% are Hispanic; 3.7% are Asian, other, or unknown; and 9.2% are

white.  See Mot., Exh. A (Aff. of Mary Levy), ¶ 16.  In the schools slated for closure, by

contrast, 93.7% of students are black; 5.9% are Hispanic; 0.4% are Asian, other, or unknown;

and less than 0.1% (2 out of 3053) are white.  See id.  The figures skew similarly, if less starkly,

for disabled students: 27.7% of students in the closing schools are in special education, versus

14.2% of students in DCPS overall.  See id.

The D.C. Council will meet on May 22 to consider the Mayor's proposed budget, which

reflects the school closures.  While the Council (like any other legislative body) may alter

funding levels, see D.C. Code § 38-173(b), the District assured the Court during the preliminary-

injunction hearing that the Mayor's decision to proceed with the school consolidation is final.

The school-closure Plan is therefore ripe for judicial review.

B.  Procedural Background

Seeking to block implementation of the Plan, five Plaintiffs filed this suit in D.C.

Superior Court on March 29, 2013, naming Chancellor Henderson, Mayor Vincent Gray, and the

District of Columbia as Defendants.  (The Court will collectively refer to all Defendants as "the

District.")  Two Plaintiffs – Karlene Armstead and Ericka Black – are ANC Commissioners who

say they never received the legally required notice of the school closures.  See Compl., ¶¶ 2, 5,

65.  The other three Plaintiffs – Shannon Smith, Marlece Turner, and Brenda Williams – are

guardians of children who attend schools slated for closure.  See Mot., Exh. D (Aff. of Shannon

Smith), ¶¶ 1-2; Mot., Exh. E (Aff. of Marlece Turner), ¶ 1; Mot., Exh. G (Aff. of Brenda

Williams), ¶ 1.  All of the guardians' children are black or Hispanic and live east of the Park.

See Compl., ¶¶ 28, 30.  Two have serious disabilities that will allegedly make the disruptions

caused by the school closures particularly difficult.  See Turner Aff., ¶¶ 5, 9-10 (Asperger's and

ADHD); Williams Aff., ¶¶ 1-2, 7, 9 (unable to walk or talk and frequent seizures).  While the Complaint does not say so directly, both sides have assumed that Smith, Turner, and Williams sue on behalf of their children as next friends, and the Court will make the same assumption for purposes of this Opinion, although subsequent amendment should make this explicit.

In their Complaint, Plaintiffs allege that the District violated D.C. statutes requiring notice to ANC Commissioners and consideration of their views, the D.C. Sunshine Amendment, the Constitution's equal-protection guarantee (asserted under 42 U.S.C. § 1983), Title VI of the Civil Rights Act, the Individuals with Disabilities Education Act, the Americans with Disabilities Act, the Rehabilitation Act, and the D.C. Human Rights Act.  See Compl., ¶¶ 56-94.

Simultaneous with the filing of their Complaint, Plaintiffs moved for a temporary restraining order and a preliminary injunction.  The District removed the case to federal court on April 2, and the next day, the Court held a joint telephone call with the parties.  Because Plaintiffs did not need a decision until May 22, they agreed to withdraw their TRO motion and proceed solely with their Motion for a Preliminary Injunction.  The Court held a hearing on that Motion on May 10, and this Opinion follows five days later.

## II.    Legal Standard

A preliminary injunction "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. NRDC, Inc., 129 S. Ct. 365, 376 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id. at 374.  Before the Supreme Court's decision in Winter, courts weighed the preliminary-injunction factors on a sliding scale, allowing a weak showing on one factor to

be overcome by a strong showing on another.  See Davenport v. Int'l Bhd. of Teamsters, 166

F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit, however, has suggested, without deciding, that

Winter should be read to abandon the sliding-scale analysis in favor of a "more demanding

burden" requiring Plaintiffs to independently demonstrate both a likelihood of success on the

merits and irreparable harm.  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011); see also

Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).

        Whichever way Winter is read, it is clear that a failure to show a likelihood of success on

the merits is alone sufficient to defeat a preliminary-injunction motion.  In Arkansas Dairy Co-op

Ass'n v. USDA, 573 F.3d 815 (D.C. Cir. 2009), a case that postdates Winter, the court decided

that it "need not proceed to review the other three preliminary injunction factors" because the

plaintiff had "shown no likelihood of success on the merits."  Id. at 832; see also Apotex, Inc. v.

FDA, 449 F.3d 1249, 1253 (D.C. Cir. 2006) (pre-Winter case holding no need to address other

preliminary-injunction factors where plaintiff had little likelihood of succeeding on the merits);

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 304 (D.C. Cir. 2006) ("a

preliminary injunction will not issue" upon showing of irreparable harm unless plaintiffs also

satisfy other three preliminary-injunction factors; "[u]nsupported or undeveloped allegations of

government establishment, for example, while sufficient to make out irreparable injury, will not

withstand scrutiny concerning the movant's likelihood of success on the merits, thereby

defeating a request for preliminary injunction").  It follows that, upon finding that a plaintiff has

failed to show a likelihood of success on the merits, the Court may deny a motion for preliminary

injunction without analyzing the remaining factors.

### III.    Analysis

Mapping onto the two categories of Plaintiffs in this case are the two types of claims brought: the ANC Commissioners assert process-related claims, while the guardians of children who attend closing schools submit civil-rights claims.  As always, the Court must begin with jurisdiction – here, with questions about standing.  Because standing appears an insurmountable hurdle for the ANC Commissioners, the Court need look no further at their claims.  Instead, it may move straight to the guardians' civil-rights counts.  Grouping similar legal theories together, the Court will begin its merits analysis with the alleged violations of the Equal Protection Clause and Title VI.  Next, it will examine the IDEA, the ADA, and the Rehabilitation Act.  It will end with the DCHRA and the Sunshine Amendment.

Plaintiffs' opening brief provides only the barest sketch of their legal arguments, focusing instead on policy positions better directed to the government's other branches.  In their Reply, Plaintiffs double down on their Equal Protection Clause argument, explaining it more thoroughly, but almost completely ignore their other civil-rights claims.  Taking that emphasis as a signal of where Plaintiffs believe they are most likely to succeed on the merits, the Court pays special attention to this question and, conversely, declines to search out arguments Plaintiffs could have made in support of their other civil-rights causes of action.

### A.   Standing

#### 1.  *Legal Standard*

Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies."  U.S. Const. art. III, § 2; see also Allen v. Wright, 468 U.S. 737, 750 (1984) (discussing the case-or-controversy requirement).  "This limitation is no mere formality: it 'defines with respect to the Judicial Branch the idea of separation of powers on

which the Federal Government is founded.'" Dominguez v. UAL Corp., 666 F.3d 1359, 1361

(D.C. Cir. 2012) (quoting Allen, 468 U.S. at 750). Because "standing is an essential and

unchanging part of the case-or-controversy requirement of Article III," Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560 (1992), finding that a plaintiff has standing is a necessary "predicate

to any exercise of [the Court's] jurisdiction." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663

(D.C. Cir. 1996) (en banc).

    "Every plaintiff in federal court," consequently, "bears the burden of establishing the

three elements that make up the 'irreducible constitutional minimum' of Article III standing:

injury-in-fact, causation, and redressability." Dominguez, 666 F.3d at 1362 (quoting Lujan, 504

U.S. at 560-61). Standing for a procedural injury is "special," however, because a "person who

has been accorded a procedural right to protect his concrete interests can assert that right without

meeting all the normal standards for redressability and immediacy." Lujan, 504 U.S. at 572 n.7.

"A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has

to prove that if he had received the procedure the substantive result would have been altered. All

that is necessary is to show that the procedural step was connected to the substantive result."

Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 94-95 (D.C. Cir. 2002).

    In "considering whether a plaintiff has Article III standing, a federal court must assume

arguendo the merits of his or her legal claim." Parker v. District of Columbia, 478 F.3d 370, 377

(D.C. Cir. 2007), aff'd on other grounds sub nom. District of Columbia v. Heller, 554 U.S. 570

(2008). That assumption ensures that a court does not resolve the merits while analyzing the

standing question. See City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003).

2.   *ANC Claims*

The ANC Commissioners and their claims do not survive this standing filter.  By way of background: in the District's distinctively structured government, the city is divided into wards, the wards into Advisory Neighborhood Commissions, and the ANCs into single-member districts.  ANCs may comment on a vast array of actions proposed by the District government, and any concerns they raise must be given "great weight" during deliberations by governmental entities.  See D.C. Code §§ 1-309.10(a), (d)(3)(A).  To weigh in on a specific proposal, ANC Commissioners obviously need to know that it is under consideration.  Thus, at least 30 days before proposed actions, "written notice . . . shall be given by first-class mail to . . . the Commissioner representing a single-member district affected by said actions."  D.C. Code § 1-309.10(b).  While the statute requires written notice by first-class mail, actual notice cures a technical violation of the requirement, as long as the ANC has enough time to comment.  See Comm. for Washington's Riverfront Parks v. Thompson, 451 A.2d 1177, 1183 (D.C. 1982) ("[A]ctual notice to the affected ANC which allows meaningful participation in a proceeding is sufficient to cure merely technical violations of the thirty-day notice requirement of the ANC Act."); Shiflett v. D.C. Bd. of Appeals & Review, 431 A.2d 9, 11 (D.C. 1981); Kopff v. D.C. Alcoholic Beverage Control Bd., 381 A.2d 1372, 1382 (D.C. 1977).  Conceding it never provided formal notice (*i.e.*, by first-class mail) here, the District argues it did give the proper ANC Commissioners actual notice (*i.e.*, by e-mail and otherwise).  The Court need not resolve this question to decide the issue of standing.

Plaintiffs claim that the school closings cannot go forward because Armstead and Black never received sufficient notice of the proposal.  Before a court can invalidate an improperly noticed government action, however, a plaintiff with standing must sue about the defect.

Contrary to Plaintiffs' urgings, Armstead and Black possess no special powers from their official roles as ANC Commissioners because D.C. law bars such people from bringing suit in their official capacity.  See Kopff, 381 A.2d at 1376-77 ("In summary, ANCs 3-C and 3-F, as well as the Commissioners of each in their official rolls [sic], have no capacity to assert the claims in this petition for review and must be dismissed as parties.") (citing statute now codified at D.C. Code § 1-309.10(g)).  This means that an ANC or its Commissioners cannot simply rush to court every time they do not receive notice.  Instead, suits must be brought either by ANC Commissioners in their private capacities or by the residents the Commissioner represents.  See id. ("Our conclusion, however, does not mean that the ANCs' right to advise cannot be protected.  To the contrary, we hold that ANC area residents (including ANC Commissioners as individual citizens) have standing to initiate legal action to assert the rights of the ANC itself.").  The ANC claim here, therefore, requires either Armstead or Black to have standing in her personal capacity.

        In assessing such standing, the starting point is to recall that lack of notice is a procedural injury.  See N.B. ex rel. Peacock v. District of Columbia, 682 F.3d 77, 82-83 (D.C. Cir. 2012).  While a procedural injury relaxes the immediacy and redressability showings typically required for standing – e.g., neither Commissioner need show her ANC's input would have altered the DCPS Plan – a plaintiff must still show that the substantive result (here, implementation of the Plan) has caused her an injury in fact: "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right in vacuo – is insufficient to create Article III standing.  Only a 'person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'"  Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009) (emphasis in

original) (quoting Lujan, 504 U.S. at 572 n.7); see also Nat'l Ass'n of Home Builders v. EPA,

667 F.3d 6, 15-16 (D.C. Cir. 2011); Fla. Audubon Soc'y, 94 F.3d at 664-65.  Here, that means at

least one Commissioner Plaintiff must show that the school closures connected with the deficient

notice actually injured her.

    Employing this framework, it becomes manifest that Armstead and Black lack standing

to sue in their personal capacities for two independent reasons.  First, neither suffered a

procedural injury in the first place.  When the District considers an action, it need not inform

every ANC Commissioner; it must give notice only to those Commissioners "representing a

single-member district affected by said action[]."  D.C. Code § 1-309.10(b).  Although she had

recently been elected ANC Commissioner, Armstead had not yet taken office when DCPS

proposed the closures.  See Burney Decl., ¶¶ 8-10.  Because she was not a Commissioner at the

time and thus had no right to weigh in on the Plan, the District had no duty to give her notice,

and no procedural injury was thus inflicted upon her.  As to Black, the District has argued

(without drawing any protest from Plaintiffs) that the single-member districts "affected" by the

Plan are districts with schools proposed for closure within their borders.  From the District's

evidence, it appears that no such schools were in Black's single-member district.  See id., ¶ 7; E-

mail from Robinson to ANC Commissioners (November 2012 e-mail about closure proposal sent

to 20 ANC Commissioners – presumably those representing the 20 schools proposed for

closure).  So Black seems similarly unentitled to notice of the closures, which would mean that

she also suffered no procedural injury.

    Second, even if Armstead and Black should have been given notice, neither has averred

that she was concretely injured by the school closures.  In other words, neither here claims to

have a child in a closing school or gives any other reason that she herself was hurt by the

closures.  As "[t]he mere violation of a procedural requirement . . . does not permit any and all persons to sue to enforce the requirement," <u>Fla. Audubon Soc'y</u>, 94 F.3d at 664, Armstead and Black can press their claim no further.  <u>See</u> <u>United Transp. Union v. ICC</u>, 891 F.2d 908, 918 (D.C. Cir. 1989) ("[B]efore we find standing in procedural injury cases, we must ensure that there is some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing.  Without such a nexus, the procedural injury doctrine could swallow Article III standing requirements.") (citation omitted).  As standing is a necessary "predicate to any exercise of [the Court's] jurisdiction," <u>Fla. Audubon Soc'y</u>, 94 F.3d at 663, the Commissioners and their claims have no likelihood of success on the merits.

  3.  *Civil-Rights Claims*

  Unlike the Commissioners, Plaintiffs Smith, Turner, and Williams, as next friend for their respective children, each clearly do have standing to challenge the closure of the schools their children attend.  All have filed declarations describing disruptions and inconveniences their children will allegedly suffer as a result of the transfer, <u>see</u> Smith Aff., ¶ 5; Turner Aff., ¶¶ 9-10; Williams Aff., ¶¶ 2, 7-9, which suffice to provide Article III standing.  The District concedes that these Plaintiffs have standing, but argues that such standing extends only to the closure of their own schools, not to all of the schools in the Plan.  The Court agrees with Plaintiffs, however, that the civil-rights claims they bring allege that the whole Plan – instead of any individual school closure – is discriminatory, entitling them to challenge the Plan in its entirety.  When a law unconstitutionally discriminates, the entire law falls – not just its application to the plaintiffs with standing.  <u>See</u> Erwin Chemerinsky, <u>Constitutional Law</u> 721 (3d ed. 2006) (remedy for equal-protection violation is "simply invalidating the discriminatory law").  The same principle also governs Plaintiffs' other civil-rights claims.  This makes sense here, given that the District's

justifications for the Plan are no different for the three Plaintiffs' schools than for the others being closed.

As jurisdiction is established only for the non-Commissioner Plaintiffs, the Court can now proceed to the merits of their claims.

B. <u>Equal Protection Clause and Title VI</u>

The Court begins with Plaintiffs' primary cause of action – unconstitutional racial discrimination. While their suit under 42 U.S.C. § 1983 also alleges that the District's decision discriminates on the basis of disability and residence in violation of the Equal Protection Clause of the Fourteenth Amendment (which applies to the District through the Fifth Amendment Due Process Clause), <u>see</u> Compl., ¶ 87, they focus particularly on discrimination based on race. <u>See</u> Reply at 13-24. Plaintiffs also list a count under Title VI of the Civil Rights Act of 1964, alleging discrimination based on race, color, and national origin by the District, a recipient of federal funding. <u>See</u> 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

At the threshold, the District objects that Plaintiffs failed to exhaust their administrative remedies before bringing their Title VI claim. Title VI suits for individual claims of discrimination, however, need not be exhausted. <u>See</u> <u>Milbert v. Koop</u>, 830 F.2d 354, 356 (D.C. Cir. 1987) ("Title VI, which relates to the cutting off of funding of federal programs when certain prescribed discriminatory conduct occurs, does not contain exhaustion requirements similar to those of Title VII."); <u>cf.</u> <u>Cannon v. Univ. of Chi.</u>, 441 U.S. 677, 694, 706 n.41 (1979) (declining to require administrative exhaustion of claims under Title IX, which "was patterned

after Title VI"). Nor is it clear how Plaintiffs would exhaust such a grievance – the District points to no administrative process it runs for Title VI complaints. Exhaustion of this claim was thus not necessary.

What is necessary, however, for both constitutional and Title VI claims is a showing of intentional discrimination. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); Alexander v. Sandoval, 532 U.S. 275, 280 (2001) ("[I]t is similarly beyond dispute – and no party disagrees – that [42 U.S.C. § 2000d] prohibits only intentional discrimination."). Discriminatory intent "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (citation omitted); see also Arlington Heights, 429 U.S. at 265-66 (discriminatory intent need be only a "motivating factor in the decision").

Despite these precedents requiring intentional discrimination, Plaintiffs seem to rest their Complaint and Motion on disparate impact. See, e.g., Compl., ¶ 92 ("Any fair analysis of the facts in the instant situation clearly demonstrates the presence of a *prima facie* case of disparate impact."); Mot. at 2 ("On its face, the impact of the proposed closings treat students of color, those with disabilities and those who live in low income neighborhoods disproportionately and disparately."). While Plaintiffs point to Department of Education regulations prohibiting policies with a disparate impact, the Supreme Court has held that such regulations may not be enforced by a private actor. See Sandoval, 532 U.S. 275. Only in their Reply do Plaintiffs finally pivot to

discriminatory intent, arguing that the school closures here present a "clear pattern, unexplainable on grounds other than race." See Reply at 15-19.  This language does derive from the Supreme Court, which held that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." Arlington Heights, 429 U.S. at 266.  Yet the Court there went on to say, "But such cases are rare.  Absent a pattern as stark as that in Gomillion or Yick Wo, impact alone is not determinative, and the Court must look to other evidence." Id. (footnote omitted) (citing Gomillion v. Lightfoot, 364 U.S. 339 (1960); Yick Wo v. Hopkins, 118 U.S. 356 (1886)).

    The numbers here are as stark as those in Yick Wo (discriminating against laundries operated by those with Chinese ancestry) and Gomillion (racially discriminatory redrawing of city borders): despite the fact that 9.2% of DCPS students are white, only 2 number among the 3053 students at closing schools.  See Levy Aff., ¶ 16.  But unlike those two cases, the pattern here is clearly "[]explainable on grounds other than race."  Indeed, it is explained by the single, race-neutral justification for the school closings that DCPS has offered throughout: closing under-enrolled schools will save resources that can then be spread throughout the school district to benefit all students.  See generally Proposed Consolidation Plan; Final Consolidation Plan; see also Proposed Consolidation Plan at 36 (listing race-neutral criteria used to sort schools); Final Consolidation Plan at 1 (same); id. at 4-5 (explaining decisions school by school).  When faced with a similar claim just last week, the Sixth Circuit recognized that this exact explanation distinguishes the Supreme Court's precedents: "[T]he defendants in the present case, unlike those in Yick Wo and Gomillion, have offered a number of plausible nondiscriminatory explanations for their reform efforts, chief among them tackling the school under-utilization problem." Spurlock v. Fox, No. 12-5978, 2013 WL 1920918, at *17 (6th Cir. May 10, 2013).

16

This goal easily provides a rational basis for the school-closure decision.  Whether the goal is

wise and will ultimately be achieved are questions of policy beyond the reach of this Court.

Plaintiffs float several arguments why the reasons supporting the Plan are insufficiently

"compelling" to justify its disparate impact: moving students often has a detrimental effect on

their education, few school closures save significant money, and the District has invoked shifting

rationales.  See Reply at 19-22.  But in so arguing, Plaintiffs employ the wrong standard.  As

long as the Plan does not intentionally discriminate and is explainable on grounds other than

race, no compelling state interests are needed to sustain it.  See Washington v. Davis, 426 U.S.

229, 248 (1976) ("A rule that a statute designed to serve neutral ends is nevertheless invalid,

absent compelling justification, if in practice it benefits or burdens one race more than another[,]

would be far-reaching and would raise serious questions about, and perhaps invalidate, a whole

range of tax, welfare, public service, regulatory, and licensing statutes that may be more

burdensome to the poor and to the average black than to the more affluent white.").  At the end

of the day, Plaintiffs offer no evidence of intentional racial discrimination, and their efforts to

paint DCPS's rationales as pretextual are unavailing.

Although the statistics appear glaring, it is easy to see why the neutral criteria here have a

disparate racial effect.  As the Sixth Circuit recognized last week, "[M]any school districts that

are no longer segregated de jure remain segregated de facto due to private preferences reflected

in housing patterns."  Spurlock, 2013 WL 1920918, at *1; see also Parents Involved in Cmty.

Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 712 (2007) (describing de facto segregation in

Seattle).  Under-enrolled schools in the District are concentrated in areas of the city where the

number of school-age children has decreased and where charter schools have thrived – areas that

happen to be almost exclusively black and Hispanic.  Compare Proposed Consolidation Plan at

6-8 (showing charter-school enrollment and changes in population), and Reply, Exh. G (Map of

D.C. Charter School Attendance), with Reply, Exh. I (Map of DCPS Schools Slated for Closure

and Racial/Ethnic Make-Up of Affected Neighborhoods).  Whatever way DCPS attempts to fix

under-enrolled schools, therefore, the effects (good and ill) will be felt almost exclusively by

black and Hispanic children.

      Indeed, by ignoring the under-enrollment driving DCPS's decision and focusing only on

the decision's disparate effect on minorities, Plaintiffs have proffered a theory of discrimination

with no limit.  See Spurlock, 2013 WL 1920918, at *11 ("But to accept the general claim that

geography-based school-assignment policies are unconstitutional because they are really nothing

more than race-based policies in disguise would mean that any neighborhood-school policy

adopted in a community with racially identifiable housing patterns is unconstitutional.").  In

other words, under Plaintiffs' rationale, no school that is overwhelmingly black or Hispanic –

which the majority of D.C. schools are – could ever be closed without impermissible

discrimination.  Similarly, the schools Turner and Williams's children attend have utilization

rates of 21-25%.  See Proposed Consolidation Plan at 17, 21; see also Turner Aff., ¶ 1; Williams

Aff., ¶ 1.  If these rates are insufficient grounds for action, why should a 10% or 5% rate be any

different?  Under Plaintiffs' view, deserted schools in black and Hispanic parts of the city must

be left alone.  At the same time, the subsidization of such institutions would fall

disproportionately on the shoulders of other black and Hispanic children, who make up 82.2% of

public-school enrollment citywide.  See Levy Aff., ¶ 16.

      In aid of their cause, Plaintiffs enlist some of the Supreme Court's most exalted civil-

rights cases.  In Brown v. Board of Education of Topeka, 347 U.S. 483 (1954), the Court held

that schools segregated by law are inherently unequal, violating the Fourteenth Amendment's

Equal Protection Clause, and have no place in the field of public education.  In <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954), the Court extended <u>Brown</u>'s rule to the federal government, holding that "racial segregation in the public schools of the District of Columbia is a denial of the due process of law guaranteed by the Fifth Amendment to the Constitution."  <u>Id.</u> at 500.  And in <u>Griffin v. County School Board of Prince Edward County</u>, 377 U.S. 218 (1964), the Court crushed a Virginia county's ploy to evade integration, holding that the county could not close all of its public schools and then fund segregated, private schools.

In analogizing to those precedents here, Plaintiffs do not just miss the mark – they shoot in the wrong direction.  By their own account, the District seeks to close and transfer students out of some of the most segregated schools in the city, where well over 99% of the students are black or Hispanic.  Using <u>Brown</u>, <u>Bolling</u>, and <u>Griffin</u> to require the District to <u>maintain</u> *de facto* segregated schools would invert the holdings of those great cases.

As DCPS's publicly available data (which was discussed during the preliminary-injunction hearing) show, moreover, the closing schools contain a far lower proportion of children performing proficiently in reading and math than the ones into which the kids will be transferred.  <u>See</u> <u>Find a School</u>, DCPS, http://profiles.dcps.dc.gov/ (last visited May 15, 2013). For example, students from Marshall Elementary (23% math proficiency and 30% reading proficiency) will head to Langdon Educational Campus (56% and 57%).  Davis Elementary students (25% and 34%) will attend Plummer Elementary (56% and 45%).  And Plaintiff Smith's own children from Ferebee-Hope Elementary (22% and 19%) will move to Hendley Elementary (44% and 36%).

The backward-looking nature of Plaintiffs' proposed remedy illustrates the hollowness of their claims.  The solution cannot be to force children to languish in more segregated, worse-

performing, emptying schools.  Those, in fact, are the conditions that draw lawsuits.  See, e.g.,

Spurlock, 2013 WL 1920918, at *7 ("The decline in the number and percentage of black students

attending the relatively diverse and academically superior schools in the Hillwood Cluster is at

the heart of the present action.").

    To prevail on their constitutional and Civil Rights Act claims, Plaintiffs must show

intentional discrimination.  Above all, that means showing that Chancellor Henderson and Mayor

Gray closed the schools "at least in part 'because of,' not merely 'in spite of,' its adverse effects"

on blacks and Hispanics.  Feeney, 442 U.S. at 279.  Because Plaintiffs have given no valid

explanation for why the Court could reasonably find such a discriminatory intent here, they have

shown no likelihood of success on the merits of their Title VI and constitutional claims.[1]

    C.  IDEA, ADA, and Rehabilitation Act

    Plaintiffs next assert that the school closings violate three disability statutes: the

Individuals with Disabilities Education Act, the Americans with Disabilities Act of 1990, and the

Rehabilitation Act of 1973.  The Court takes each in turn.

    1.  *IDEA*

    Least suited to the situation of school closings is the IDEA.  At its core, this statute seeks

"to ensure that all children with disabilities are provided a free appropriate public education

which emphasizes special education and related services designed to meet their unique needs and

to assure that the rights of such children and their parents or guardians are protected."  Forest

Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 (2009) (internal quotation marks and brackets

omitted).  The free appropriate public education guaranteed by the statute must conform with the

---

[1] Also included in Plaintiffs' Equal Protection Clause claim are complaints about discrimination on the basis of disability and location.  See Compl., ¶ 87.  As with racial discrimination, they offer no indication that the disparate impact on disabled students reflects intentional discrimination.  And while the proposed school closings here (like all decisions a school district makes) intentionally discriminate on the basis of location, the resource savings and improved educational benefits that DCPS aims for provide a rational basis for its decision.

child's "individualized education program" – an annual written statement for each child with a

disability that includes the child's present levels of academic achievement, her goals for the next

year, and the school's plan to meet those goals.  20 U.S.C. §§ 1401(9)(D), 1414(d)(1)(A).  The

child must be placed in a school "as close as possible to the child's home," with the expectation

that generally "the child is educated in the school that he or she would attend if nondisabled."  34

C.F.R. §§ 300.116(b)(3), (c).  In addition, "children with disabilities and their parents are

guaranteed procedural safeguards," allowing them to participate in writing in the individualized

education program and to bring administrative and then judicial challenges if anything goes

awry.  20 U.S.C. § 1415.

     As a preliminary matter, before bringing suit under the IDEA, a plaintiff must exhaust

administrative remedies.  See 20 U.S.C. § 1415(i)(2)(A).  It appears Plaintiffs here have failed to

do so.  They allege neither that they filed a complaint with DCPS nor that they pursued a

hearing.  Both are administrative prerequisites.  See 20 U.S.C. §§ 1415(b)(6), (f).

     Perhaps they failed to file an administrative complaint because they could not fathom

what IDEA-related grievances would allow them to block the school closures.  In their two

sentences explaining the alleged IDEA violation, Plaintiffs assert that the District (1) left the

parents out of the decision to close schools and transfer the students, and (2) failed to identify

receiving special-education programs to meet the needs of students.  See Mot. at 18.  In the

context of a statute focused on individualized education and process, Plaintiffs' generalized

complaints fall short.  Yet even putting that problem aside, any relief that the IDEA could offer

for those problems would be specific to the child.  Parents can complain if they believe their

children are receiving an inadequate education, see 20 U.S.C. § 1415(b)(6); deficient education

plans can be revised to meet new circumstances, see 20 U.S.C. § 1414(d)(4)(A); and if the school

cannot provide a free and adequate public education, then the child's parents may be able to get

reimbursement for the cost of private education.  See Forest Grove Sch. Dist., 557 U.S. at 232-

33.  None of these solutions, however, involves forcing doors at dramatically under-enrolled

schools to remain open.  Between their failure to exhaust and the disconnect with the relief

sought, Plaintiffs have shown no likelihood of success on their IDEA claim.

　　　　2.  *ADA*

　　　　Title II of the ADA requires that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.  "To prove a violation of Title II, a party must therefore establish: (1) that he

is a 'qualified individual' with a disability; (2) that he was excluded from participation in a

public entity's services, programs or activities or was otherwise discriminated against by a public

entity; and (3) that such exclusion or discrimination was due to his disability."  Mary Jo C. v.

N.Y. State & Local Ret. Sys., 707 F.3d 144, 153 (2d Cir. 2013).  Because the claim here does not

mirror an IDEA claim, see 20 U.S.C. § 1415(*l*), no exhaustion is required.  See 42 U.S.C.

§ 12133; 29 U.S.C. § 794a(a)(2).

　　　　To make out an ADA claim, a qualified individual with a disability must at least allege

the denial of "meaningful access to the benefit" in question.  Alexander v. Choate, 469 U.S. 287,

301 (1985).  One could imagine the first step to a viable ADA claim here if, for example, the

closing schools offered services or programs that the new schools do not.  Yet Plaintiffs here do

not make any such allegation because it appears that they will continue to receive the same

benefits in the new schools.  While the Court does not minimize the disruption some disabled

children and their families may face in adapting to a new school environment, there is no denial

of any benefit here.

Instead, the sole ADA theory that Plaintiffs promote is that the school closings "will have

a disproportionately adverse effect on students with disabilities" because there are nearly twice

as many special-education students at the schools selected for closure as in DCPS as a whole.

Compl., ¶¶ 70-71; see also Mot. at 17.  In other words, the disparate-impact argument again.  Just

as with race, however, disparate impact alone does not show discrimination "by reason of"

disability.  The Supreme Court explained why while discussing section 504 of the Rehabilitation

Act, a statute worded nearly identically to § 12132:

> [T]he position urged by respondents – that we interpret § 504 to
> reach all action disparately affecting the handicapped – is also
> troubling.  Because the handicapped typically are not similarly
> situated to the nonhandicapped, respondents' position would in
> essence require each recipient of federal funds first to evaluate the
> effect on the handicapped of every proposed action that might
> touch the interests of the handicapped, and then to consider
> alternatives for achieving the same objectives with less severe
> disadvantage to the handicapped.  The formalization and policing
> of this process could lead to a wholly unwieldy administrative and
> adjudicative burden.  Had Congress intended § 504 to be a
> National Environmental Policy Act for the handicapped, requiring
> the preparation of "Handicapped Impact Statements" before any
> action was taken by a grantee that affected the handicapped, we
> would expect some indication of that purpose in the statute or its
> legislative history.  Yet there is nothing to suggest that such was
> Congress' purpose.

Choate, 469 U.S. at 297-99 (citation and footnote omitted); see also Hunsaker v. Contra Coasta

County, 149 F.3d 1041 (9th Cir. 1998) (same rule for § 12132); Am. Council of Blind v.

Paulson, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) ("courts have tended to construe section 504

in pari materia with Title II of the ADA, 42 U.S.C. § 12132").

Since Plaintiffs allege nothing more than disparate impact, and the Supreme Court has

"reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases

under § 504" (and thus § 12132), <u>Choate</u>, 469 U.S. at 299, their ADA claim is unlikely to succeed on the merits.

        3.   *Rehabilitation Act*

     The flaws of their IDEA and ADA claims doom Plaintiffs' Rehabilitation Act count as well.  Section 504 of that statute, much like Title II of the ADA, directs that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  Mirroring the IDEA, regulations promulgated to enforce section 504 of the Rehabilitation Act require "[a] recipient that operates a public elementary or secondary education program or activity" to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."  34 C.F.R. § 104.33(a); <u>see also</u> 34 C.F.R. § 104.1 (regulations in Part 104 effectuate section 504).  A claim brought under section 504 that seeks relief that is also available under the IDEA, however, must be "exhausted to the same extent as would be required had the action been brought under" the IDEA.  20 U.S.C. § 1415(*l*).

     Plaintiffs base their Rehabilitation Act challenge on the District's "failure to maintain a free and appropriate education in Plaintiff's neighborhood schools slated for closure."  Mot. at 18.  The exhaustion and merits deficiencies of the IDEA claim thus apply equally to this Rehabilitation Act cause of action.  <u>See</u> Section III.C.1, *supra*.  To the extent Plaintiffs venture beyond the IDEA, the Rehabilitation Act count fails for the same reasons as the ADA one.  <u>See</u> Section III.C.2, *supra*.  Conclusory statements that the "treatment of special needs students rises to the level of discrimination based solely on the plaintiffs' disabilities," Compl., ¶ 77 – because

of the "relevant and unnecessary burdens thrust upon plaintiffs by closing these schools," or the "bad faith" and "gross departure of accepted standards," id. – offer no help.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Papasan v. Allain, 478 U.S. 265, 286 (1986) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Plaintiffs have thus shown no likelihood of success on the Rehabilitation Act claim either.

    D.  <u>D.C. Human Rights Act</u>

    With the DCHRA, Plaintiffs finally find the statute they have been seeking all along – a law where their bare showing of disparate impact forces the District to justify the school closings.  But here, too, Plaintiffs ultimately fall short.  This conclusion also suggests that, even if Plaintiffs had successfully alleged discrimination under Title VI or the ADA or (aside from claims of intentional racial discrimination triggering strict scrutiny) the Equal Protection Clause, success on those claims would remain improbable.

    The DCHRA states in part: "Except as otherwise provided for by District law or when otherwise lawfully and reasonably permitted, it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived: race, . . . disability, . . . or place of residence . . . ."  D.C. Code § 2-1402.73.  The Act's "effects clause" broadens protections in the District beyond those created by federal law: "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice."  D.C. Code § 2-1402.68.  Under that effects clause, "despite the absence of any intention to discriminate, practices are unlawful if they bear

disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ., 536 A.2d 1, 29 (D.C. 1987) (*en banc*); see also Jackson v. D.C. Bd. of Elections & Ethics, 999 A.2d 89, 119 n.56 (D.C. 2010) (*en banc*) (same); Esteños v. PAHO/WHO Fed. Credit Union, 952 A.2d 878, 887 (D.C. 2008). While the Court has found no effects-clause cases that consider whether an act with a disparate impact is "independently justified for some nondiscriminatory reason," the *en banc* D.C. Court of Appeals has explained that the clause imports "the concept of disparate impact discrimination developed by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424 (1971)." Gay Rights Coal., 536 A.2d at 29 (parallel citations omitted).

Unlike Arlington Heights, which considered disparate impact in the constitutional equal-protection context, Griggs concerned Title VII of the Civil Rights Act, which forbids employers from maintaining discriminatory employment practices. Specifically, the Griggs Court considered whether an employer could require employees to graduate from high school or pass a standardized general intelligence test, when neither requirement was "shown to be significantly related to successful job performance" and both requirements disqualified substantially more black applicants than white. 401 U.S. at 425-26. Finding that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation," the Court held that "[i]f an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." Id. at 431. To maintain an employment requirement with a disparate impact, "Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." Id. at 432.

According to Plaintiffs here, the effect of the school closings is discrimination on the basis of race, disability, and residency.  See Compl., ¶¶ 59-60.  At the outset, the Court doubts that forcibly transferring a student from one public school to another constitutes a denial of a "facility, service, program, or benefit" for purposes of the DCHRA.   Under the Plan, the District will continue to provide the student with a public education, and there is no reason to think that such education will be inferior to the one she currently receives.  Nor has any court applied the effects clause to a situation like the one here.  Cf. Boykin v. Gray, 895 F. Supp. 2d 199, 218 (D.D.C. 2012) (limiting § 2-1402.73 to selective denials of benefits explicitly based on protected characteristic so as not to "subject an unimaginable number of routine policy decisions to litigation").

   If the closure of a school does constitute a sufficient denial of a benefit and the effects clause does apply with full force, however, the numbers bear out Plaintiffs' claim of disparate impact: While special-education students make up only 14.2% of the school district, they comprise 27.7% of the students in the closing schools.  See Levy Aff., ¶ 16.  Black and Hispanic students make up 82.2% of the overall school district, but 99.6% in the schools to be closed.  See id.  And because school assignments depend on the child's home address, the school closings disproportionately affect people who reside in specific areas of the city.  The school closings, therefore, obviously bear disproportionately on black and Hispanic students, students with disabilities, and students who reside east of the Park.

The game is not over, however.  The burden then shifts to the District to show that the school closings are "independently justified for some nondiscriminatory reason."  Gay Rights Coal., 536 A.2d at 29.  This showing is evidently analogous to a showing, in the Title VII context, that an employment requirement has "a manifest relationship to the employment in

question." <u>Griggs</u>, 401 U.S. at 432.  Plaintiffs do not (and could not) question that certain DCPS

schools are significantly under-enrolled, thanks to a decline in the number of children living in

the city and an increase in the number of charter schools.  <u>See</u> <u>Proposed Consolidation Plan</u> at 6-

9.  Those falling populations, moreover, are distributed unevenly across the city.  For example,

the student population in Ward 3 – which lies entirely west of the Park – has grown, and its

schools exceed capacity; Ward 8, on the other hand – at the southern tip of the city – has lost

thousands of students, and its middle schools are at about 40% of capacity.  <u>See</u> <u>id.</u> at 6-7.  The

schools attended by Plaintiffs' children use 54%, 25%, and 21% of their building space.  <u>See</u> <u>id.</u>

at 17, 20-21; <u>see also</u> Smith Aff., ¶ 2 (Ferebee-Hope Elementary School); Turner Aff., ¶ 1

(MacFarland Middle School); Williams Aff., ¶ 1 (Sharpe Health Elementary School).

By closing under-enrolled schools, DCPS aims to save money and improve education.

As the District explains, maintaining under-enrolled and small schools means unnecessarily

paying for under-utilized facilities and staff – two half-full schools means two gyms, two heating

bills, and two principals.  <u>See</u> <u>Final Consolidation Plan</u> at 1.  Small schools, moreover, cannot

provide many of the benefits that require economies of scale, such as art and music teachers,

physical education, and full-time librarians.  <u>See</u> <u>id.</u>  The District has estimated that closing these

schools will save $8.5 million.  <u>See</u> <u>id.</u> at 7 (broken down by school).  While Plaintiffs question

the District's analysis of the benefits, its projections appear realistic and sensible.  In any event,

it is not the place of this Court to reassess the wisdom of the District's policy decisions.  Because

the cost savings and resource allocation here independently justify the school closures, the

District meets its burden under the D.C. Human Rights Act.

E.  <u>Sunshine Amendment</u>

Plaintiffs' Complaint also tosses in a vague claim that the District "failed and continue[s] to fail to comply with the provisions of the Sunshine Amendment in the D.C. Self-Government Act which mandates transparency in local government decision-making, requiring that all such decisions be done in open, public meetings.  The decisions regarding the school closures were done in the dark."  Compl., ¶ 67.  Because Plaintiffs provide no facts to support that conclusory allegation (either in their Complaint or briefs), and because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," <u>Iqbal</u>, 556 U.S. at 678, the Court need not consider the alleged violations of the Sunshine Amendment in deciding this Motion.

\*   \*   \*   \*

Because Plaintiffs have shown no likelihood of success on the merits of their suit, the Court need not review the other three preliminary-injunction factors.  <u>See</u> <u>Ark. Dairy Co-op Ass'n</u>, 573 F.3d at 832.  If the Court were to reach the other prongs, however, on balance they help the District.  Even assuming that every Equal Protection Clause violation constitutes an irreparable injury, <u>see</u> <u>Mills v. District of Columbia</u>, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) (plurality opinion)), the balance-of-equities and public-interest prongs tilt against Plaintiffs.  In this case, three guardians of school children – proceeding individually rather than as a class – seek to hold up DCPS's restructuring of its school system.  Most school closures are supposed to happen in two months. A preliminary injunction would wreak havoc by forcing everyone to simultaneously prepare for two contingencies.  Schools (both closing and receiving) need to know whether they will have

students in the fall and, if so, who and how many.  Teachers and staff need to know if and where they will have jobs.  Families need to know where their children will attend school.  The costs of an injunction also weigh in the District's favor.  DCPS estimates that the school closings will save $8.5 million, which works out to a reallocation of almost $200 for every student in the system.

On Plaintiffs' side of the scale, by contrast, the harms are hard to spot.  DCPS's data show that the Plan will reassign students to schools with significantly higher test scores and slightly more diversity.  See generally Find a School, DCPS, http://profiles.dcps.dc.gov/ (last visited May 15, 2013) (profiles for consolidating schools and receiving schools listed in Final Consolidation Plan at 4-5, 7).  Head to head, both reading- and math-proficiency scores rise – often significantly – for 9 of the 11 closings schools with data available.  Racial diversity is hardly robust in the receiving schools, but at least a handful of them have a nontrivial number of white students (as opposed to the total of two white students in all closing schools combined), and more have significant Hispanic populations.  While test scores remain low and segregation remains high in absolute terms at even the receiving schools, the school closings at least move those numbers in the right direction.  Although Plaintiffs undoubtedly value their neighborhood schools, their injury seems slight given that their children – along with thousands of others – are moving to better performing, more integrated schools.

In sum, Plaintiffs' inability to show any likelihood of success on the merits alone precludes a preliminary injunction here.  When coupled with the other factors just mentioned, denial of the Motion is the only appropriate course.

**IV.     Conclusion**

For the aforementioned reasons, the Court will deny Plaintiffs' Motion for a Preliminary

Injunction.  A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>May 15, 2013</u>