**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHANNON MARIE SMITH, *et al.*,

      Plaintiffs,

         v.

KAYA HENDERSON, Chancellor of the
District of Columbia Public Schools, *et al.*,

      Defendants.

Civil Action No. 13-420 (JEB)

## MEMORANDUM OPINION

This fall, when District of Columbia students returned to their classrooms, the doors of thirteen public school buildings remained closed, the windows dark. Two more schools will be shut down at the end of the school year. The closures are a result of the waning student population in each of the fifteen schools: By 2013, most of those schools were half full, and in five schools only a quarter of the seats remained occupied. The population drain can largely be explained by the emigration of District students to charter schools, publicly funded and privately operated schools of choice scattered throughout the city. Between the rise of charter schools and changing population patterns, D.C. Public Schools in certain neighborhoods have been emptied of their occupants. Reacting to this sea change, DCPS has implemented a school-reorganization plan that aims to maximize resources and improve education by closing under-enrolled schools, reassigning students to higher-performing schools, and reallocating the cost savings to other schools throughout the District.

Understandably, parents are upset to see their neighborhood schools shuttered and their children transferred to schools farther from their homes. As a result, a small group of parents

and guardians, along with several Advisory Neighborhood Commissioners, are suing the District,

its Mayor, and DCPS Chancellor Kaya Henderson. Plaintiffs claim that the school closures

discriminate against poor, minority, and disabled students and were enacted without sufficient

community input, thus violating a host of constitutional, federal, and state provisions. Plaintiffs

contend that similarly under-enrolled schools in affluent white neighborhoods were kept open

and nursed back to health in the 1970s, and that the District's policy regarding under-enrolled

schools has therefore been applied differently based on race and income.

When they filed this suit last March, Plaintiffs also moved for a preliminary injunction,

hoping to forestall the District's implementation of its school-reorganization plan. After lengthy

briefing and an impassioned hearing, this Court ultimately denied the motion. It held that the

Commissioners lacked standing and the parents and guardians were unlikely to succeed on the

merits of their suit. See Smith v. Henderson (Smith I), No. 13-420, 2013 WL 2099804 (D.D.C.

May 15, 2013). Having lost that battle, Plaintiffs filed an Amended Complaint, hoping to

remedy some of the deficiencies in their earlier effort. See ECF No.16.

Defendants, believing that this new pleading is still infirm, now move to dismiss the case.

They argue that, even if the facts laid out in the Amended Complaint are true, it still fails to

make out a case. The Court agrees with the District on the bulk of Plaintiffs' claims.

Nevertheless, the parents and guardians have alleged sufficient facts to state claims of

discrimination under the three civil-rights provisions at the heart of their case: the Equal

Protection Clause, Title VI, and the D.C. Human Rights Act. The District next urges the Court

to proceed to summary judgment – that is, to consider the evidence on both sides and to find that

no reasonable jury could side with Plaintiffs. Because the parties have not advanced through the

full course of discovery, however, there is little evidence to be considered. Rather than jumping

to summary judgment, then, the Court will allow Plaintiffs time to gather facts and the case to follow an ordinary course. Whether the parents and guardians can ultimately produce enough evidence to prove intentional or unjustified discrimination in the school closings remains a question for another day.

I.      **Background**

The Court set forth the facts of this case in some detail in its Opinion regarding Plaintiffs' request for a preliminary injunction. <u>See</u> <u>Smith I</u>, 2013 WL 2099804. Because circumstances have not changed materially since that time, the Court will recite the basic facts of this case – which are largely uncontested – only briefly here, considering the allegations in the Amended Complaint and any public documents already submitted, and emphasizing the new information alleged by Plaintiffs.

A. <u>Factual Background</u>

The District of Columbia Public Schools runs the District's local public-school system. <u>See</u> D.C. Code §§ 38-171 to -172. Kaya Henderson, the Chancellor of DCPS, acts as chief executive officer. <u>See</u> D.C. Code § 38-174(a). In addition to DCPS schools – sometimes called "neighborhood schools" because school assignment is based on a child's address – children in the District have the option of attending publicly funded charter schools in various locations across the city. <u>See</u> District of Columbia School Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321, 1321-107 (1996). In part because of the growth of charter schools and in part because of changing population patterns, many DCPS schools are now only partially full – particularly in certain neighborhoods. <u>See</u> <u>Smith I</u>, 2013 WL 2099804, at *1.

As a result of the increase in under-enrolled schools, Chancellor Henderson sought advice from consulting companies on how to use District resources more efficiently. After

receiving at least two reports – both of which suggested shutting under-performing or under-enrolled schools – Henderson proposed closing twenty of those DCPS buildings over the course of the 2013-14 and 2014-15 school years. See id. at *2; see also Opp., Exh. A (IFF Report) at 6. The majority of the schools slated to be closed operated at half capacity, and five schools had utilization rates under 25%. See Smith I, 2013 WL 2099804, at *2. DCPS explained that closing these under-enrolled schools would allow it to spend less money per pupil on non-instructional resources like overhead, while putting more students in modern facilities and giving them access to programs and staff that can be justified only for large schools. See id.

All of the schools slated to be closed were in majority-minority neighborhoods east of Rock Creek Park, in Wards 2, 4, 5, 6, 7, and 8. See id. The District, like many cities, is divided geographically by race and income. East of the Park, residents are generally poorer and overwhelmingly black and Hispanic; west of the Park, residents are wealthier and mostly white. The proposal suggested no school closings in Ward 3, which is more white, more affluent, and west of the Park, or in Ward 1, which is east of the Park. See id. ("building-utilization rate is 74% in Ward 1 and 109% in Ward 3").

To gather feedback on its proposal, DCPS (i) convened community meetings throughout the city regarding the proposal, drawing over 780 participants; (ii) e-mailed ANC Commissioners, along with some Commissioners-Elect, with schools slated for closure in their districts; and (iii) sent a summary of the proposal home with every child attending a school on the closure list. See id. The City Council also held two hearings on the closures. See id.

In the end, DCPS made various changes to its initial plan based on community feedback, including keeping open five schools originally proposed for closure. See id. DCPS estimated that savings from the revised proposal would total $8.5 million and anticipated that those funds

would be re-invested in schools throughout the city.  See id.  Plaintiffs argue that similar benefits

projected from DCPS closures in 2008 never materialized, and that the projected benefits from

this proposal are similarly overblown.  See id.  DCPS also published proposals for how the

empty school buildings might be used.  The District estimated that most schools would be

retained in DCPS inventory, but suggested that some might be used by charter schools.  See

Mot., Exh. B (DCPS Proposed Consolidations and Reorganization) at 26.  Plaintiffs claim that,

since then, the District has entered into long-term leases with one or more charter schools for the

use of the school buildings.  See Opp. at 9 n.4.

        All fifteen schools on the final closure list lie east of the Park – meaning the students are

disproportionately black and Latino.  See Smith I, 2013 WL 2099804, at *3.  In DCPS schools as

a whole, 69% of students are black; 16% are Hispanic; 4% are Asian, other, or unknown; and

11% are white.  See Facts & Statistics, D.C. Public Schools, http://dc.gov/DCPS/About+DCPS/

Who+We+Are/Facts+and+Statistics (last visited Oct. 9, 2013).  In the schools slated for closure,

by contrast, 93.7% of students are black; 5.9% are Hispanic; 0.4% are Asian, other, or unknown;

and less than 0.1% (2 out of 3053) are white.  See Smith I, 2013 WL 2099804, at *3.  The

closing schools also contain a disproportionate number of children with special needs: 27.7% of

students in those schools are in special education, versus 14.2% of students in DCPS overall.

See id.

        Plaintiffs claim that this disparate impact is intentional, either because it is stark enough

to be inexplicable on grounds other than race or disability, or because it was motivated by

discriminatory animus.  See Opp. at 26-34.  To support that allegation, Plaintiffs point to under-

enrolled schools in Ward 3 circa the 1970s.  See id. at 10-11.  They claim that those schools,

which were more affluent and white, were rehabilitated when they were under enrolled by busing

students in from schools east of the Park.  See id.  By contrast, east-of-the-Park schools are now being shut down rather than rehabilitated.

      B.  <u>Procedural Background</u>

Five Plaintiffs filed this suit against Chancellor Henderson, Mayor Vincent Gray, and the District of Columbia as Defendants.  Two of the original Plaintiffs – Karlene Armstead and Ericka Black – are ANC Commissioners who say they never received the legally required notice of the school closures.  <u>See</u> <u>Smith I</u>, 2013 WL 2099804, at *3.  The other three original Plaintiffs – Shannon Smith, Marlece Turner, and Brenda Williams – are parents or guardians of children who attend schools slated for closure.  <u>See</u> <u>id.</u>  All of the guardians' children are black or Hispanic and live east of the Park, and two have serious disabilities.  <u>See</u> <u>id.</u>  In the Amended Complaint, two additional ANC Commissioners – Keith Kone and Phomika "Pho" Palmer – were added as Plaintiffs.  <u>See</u> Am. Compl., ¶¶ 5-6.

In their original Complaint, Plaintiffs alleged that the District violated D.C. statutes requiring notice to ANC Commissioners and consideration of their views, the D.C. Sunshine Amendment, the Constitution's equal-protection guarantee (asserted under 42 U.S.C. § 1983), Title VI of the Civil Rights Act, the Individuals with Disabilities Education Act, the Americans with Disabilities Act, the Rehabilitation Act, and the D.C. Human Rights Act.  <u>See</u> <u>Smith I</u>, 2013 WL 2099804, at *3.  In their Amended Complaint, Plaintiffs retain their original counts and add allegations of breach of contract and fraudulent misrepresentation.  <u>See</u> Am. Compl., ¶¶ 103-09.

Although the Court already considered the validity of many of these claims in <u>Smith I</u>, it will now examine them in the context of Defendants' Motion To Dismiss, or, in the Alternative, for Summary Judgment.

II.     **Legal Standard**

A.  Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and she must thus be given every favorable inference that may be drawn from the allegations of fact.  See Sparrow, 216 F.3d at 1114.

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 54, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).  Plaintiffs must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).  Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 556

(citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 555.

B. <u>Summary Judgment</u>

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006). The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." <u>Taxpayers Watchdog, Inc., v. Stanley</u>, 819 F.2d 294, 297 (D.C. Cir. 1987).

In general, "summary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" <u>Convertino v. U.S. Dep't of Justice</u>, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting <u>Anderson</u>, 477 U.S. at 257). If a Plaintiff requests time for additional discovery, that request "should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" <u>Id.</u> (quoting <u>Berkeley v. Home Ins. Co.</u>, 68 F.3d 1409, 1414 (D.C. Cir.1995)).

The Court first considers whether any of Plaintiffs' claims survive scrutiny under Rule 12(b)(6). It will then address whether any remaining claims should be subject to summary judgment.

**III.    Analysis**

Before examining the merits of any claim, courts must begin with questions of jurisdiction. <u>See</u> <u>Fla. Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 663 (D.C. Cir. 1996) (*en banc*). Specifically, the first question that arises here is whether Plaintiffs have standing to bring their suit.

A.  Standing

1.  *Legal Standard*

Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies."  U.S. Const. art. III, § 2; see also Allen v. Wright, 468 U.S. 737, 750 (1984) (discussing the case-or-controversy requirement).  Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), finding that a plaintiff has standing is a necessary "predicate to any exercise of [the Court's] jurisdiction."  Fla. Audubon Soc'y, 94 F.3d at 663.

"Every plaintiff in federal court," consequently, "bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability."  Dominguez v. UAL Corp., 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting Lujan, 504 U.S. at 560-61).  Standing for a procedural injury is "special" because a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  Lujan, 504 U.S. at 572 n.7.  "A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.  All that is necessary is to show that the procedural step was connected to the substantive result."  Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 94-95 (D.C. Cir. 2002).  Plaintiffs must nonetheless demonstrate more than a mere procedural injury; there must also be an actual injury connected to the relevant procedural flaw.  See United Transp. Union v. ICC, 891 F.2d 908, 918 (D.C. Cir. 1989) ("[B]efore we find standing in procedural injury cases, we must ensure that there is some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III

standing. Without such a nexus, the procedural injury doctrine could swallow Article III standing requirements.") (citation omitted).

In "considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." Parker v. District of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd on other grounds sub nom. District of Columbia v. Heller, 554 U.S. 570 (2008).

The Court will look separately at the standing of the ANC Commissioners and the children's guardians.

### 2. *ANC Claims*

The Court previously found that the Commissioners listed in the original Complaint did not have standing. See Smith I, 2013 WL 2099804, at *6-7. Plaintiffs, in an attempt to cure, have added two others in their Amended Complaint, so the Court will revisit the issue in full.

ANC Commissioners play a distinct role in the District government, giving voice to the concerns of small neighborhoods within the city. The District government is structured in layers: The city is first divided into wards, the wards into Advisory Neighborhood Commissions, and the ANCs into single-member districts. At least 30 days before proposed governmental actions, "written notice" must "be given by first-class mail to . . . the Commissioner representing a single-member district affected by said actions." D.C. Code § 1-309.10(b). Any comments made by an ANC Commissioner on a government proposal must be given "great weight." See D.C. Code § 1-309.10(a), (d)(3)(A). Although the statute requires written notice by first-class mail, actual notice will also satisfy the demands of the law, as long as the relevant Commissioner has enough time to comment. See Comm. for Washington's Riverfront Parks v. Thompson, 451 A.2d 1177, 1183 (D.C. 1982) ("[A]ctual notice to the affected ANC which allows meaningful

participation in a proceeding is sufficient to cure merely technical violations of the thirty-day notice requirement of the ANC Act."); Kopff v. D.C. Alcoholic Beverage Control Bd., 381 A.2d 1372, 1382 (D.C. 1977).

Plaintiffs claim that ANC Commissioners Armstead, Black, Palmer, and Kone never received legally required notice; hence, they say, the school closures were procedurally flawed. Before the Court can address this claim, some party must have standing to make the argument. The initial problem for Plaintiffs here is that, under D.C. law, ANC Commissioners cannot bring suit in their official capacity. See Kopff, 381 A.2d at 1376-77 ("In summary, ANCs 3-C and 3-F, as well as the Commissioners of each in their official rolls [sic], have no capacity to assert the claims in this petition for review and must be dismissed as parties."). According to the D.C. Code, "[t]he Commission" does not – and by extension Commissioners do not – "have the power to initiate a legal action in the courts of the District of Columbia or in the federal courts." D.C. Code § 1-309.10(g). A Commissioner, however, may "bring[] suit as a citizen." Id. If ANC Commissioners want to sue because they did not receive notice, then, they must sue as individual D.C. residents – not in their capacity as Commissioners. Alternatively, a resident of one of the Commissioners' districts could also sue based on the fact that her Commissioner had no opportunity to comment on the proposal, but that resident would also need to allege some injury based on the lack of notice. See Kopff, 381 A.2d at 1376-77 ("Our conclusion, however, does not mean that the ANCs' right to advise cannot be protected. To the contrary, we hold that ANC area residents (including ANC Commissioners as individual citizens) have standing to initiate legal action to assert the rights of the ANC itself."). The question moving forward, then, is whether any of the Commissioners or any of the other Plaintiffs was injured by the lack of notice.

Here, neither the Commissioners nor any of the other Plaintiffs have alleged sufficient injury based on lack of notice to the ANCs. To begin with, at least three of the four Commissioners were not even <u>entitled</u> to notice of the school closings. Palmer and Armistead were both Commissioners-<u>Elect</u> when the school closings were proposed. <u>See</u> Am. Compl., ¶¶ 2, 5. The District need give notice only to those sitting Commissioners "representing a single-member district affected by said action[]" – not to those sitting Commissioners plus some additional number of Commissioners-Elect. D.C. Code § 1-309.10(b). In addition, Black has not alleged that any school proposed for closure fell within the boundaries of her single-member district, 7D06, and public records reveal that no such school exists. <u>See</u> Am. Compl., ¶ 7; Mot., Exh. E (DCPS Consolidation and Reorganization Plan) at 4-5; Exh. F (Ward 7D ANC List) at 1; Exh. G (List of School Ward 7 Closings by ANC) at 2. Black, then, was not entitled to notice because her district was not "affected" by the proposed closures. D.C. Code § 1-309.10(b).

In addition, even were the Commissioners entitled to notice, none of the four alleges concrete injury based on the school closings. Because the Commissioners cannot sue in their official capacity, they must pursue suit just as any other District resident would. As the Court has just explained, <u>see</u> Section III.A.1, *supra*, like any citizen suing over government action, the Commissioners must profess some substantive injury. <u>See</u> <u>United Transp. Union</u>, 891 F.2d at 918. None, however, has suffered such a concrete injury – a fact that Plaintiffs openly acknowledge. <u>See</u> Opp. at 8-9. Not Kone nor Black nor Armistead nor Palmer claims to have a child attending any of the closing schools, or to be employed in one of the schools, or even to have a child who would someday attend a closing school in their district. None of the ANC Commissioners, accordingly, has standing to sue.

In addition, none of the <u>other</u> Plaintiffs has alleged any injury based on the lack of notice to the ANCs. Because "ANC area residents" may "have standing to initiate legal action to assert the rights of the ANC itself," <u>Kopff</u>, 381 A.2d at 1376-77, the ANC claims could still go forward if one of the next-friend Plaintiffs had a child enrolled in a closing school in one of the relevant ANC districts. Only one Commissioner (Kone), however, has alleged the facts necessary to show that he was even legally entitled to notice. None of the next-friend Plaintiffs has a child enrolled in a school in Kone's district, 7C07. As none of the Plaintiffs has standing to sue based on lack of notice to the ANCs, the ANC-related claims in Count One of the Amended Complaint and the Commissioners themselves as Plaintiffs must be dismissed without prejudice on jurisdictional grounds.

One final note: Plaintiffs complain that requiring a concrete injury in this case creates a "Hollywood Casting" profile – that is, Plaintiffs argue that it is too onerous to insist that they must be sitting ANCs with a school closing in their district and a child (or some other concrete stake) in that school in order to have standing. But that is not what the Court (or the law) requires. To complain about (i) lack of notice and (ii) school closings, a Plaintiff must simply be injured by (i) the lack of notice and (ii) the school closings. It does not matter if that Plaintiff is an ANC Commissioner or not. Here, some Plaintiffs claim to be injured by the lack of notice and some claim to be injured by the school closings, but no Plaintiff has been injured by the combination of those two events. As the Court explains shortly, claims regarding the closings will be examined on their merits, but claims of lack of notice cannot stand without injury. Insisting on concrete injury before a claim is brought in federal court is not Hollywood casting. It is simply the "irreducible constitutional minimum" necessary for a case to proceed. <u>Dominguez</u>, 666 F.3d at 1362 (quoting <u>Lujan</u>, 504 U.S. at 560-61).

### 3. *Civil-Rights Claims*

Unlike the Commissioners, Plaintiffs Smith, Turner, and Williams, as next friends for their respective children, each have standing to challenge the closure of the schools their children attend. As this Court previously noted, each Plaintiff has described disruptions and inconveniences her children will allegedly suffer as a result of the transfer. See Smith I, 2013 WL 2099804, at *8. As that suffices to provide Article III standing, the Court may now proceed to the merits of their claims.

### B. Disability Statutes

Plaintiffs first contend that the school closings violate three separate disability statutes: the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990. All three claims fall short, some for lack of exhaustion and others for failure to state a claim under Rule 12(b)(6).

### 1. *IDEA*

IDEA seeks "to ensure that all children with disabilities are provided a free appropriate public education which emphasizes special education and related services designed to meet their unique needs and to assure that the rights of such children and their parents or guardians are protected." Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 (2009) (internal quotation marks and brackets omitted). The guarantee of a "free appropriate public education" lies at the heart of the act, and this requirement is met by conforming with a child's "individualized education program" or IEP – a plan designed with individual goals and instructional tactics to meet that particular student's special needs. 20 U.S.C. §§ 1401(9)(D), 1414(d)(1)(A). The child must be placed in a school "as close as possible to the child's home," with the expectation that generally

"the child is educated in the school that he or she would attend if nondisabled." 34 C.F.R.

§ 300.116(b)(3), (c). In addition, "children with disabilities and their parents are guaranteed

procedural safeguards," allowing them to participate in writing and revising the IEP. 20 U.S.C.

§ 1415.

Before bringing suit under IDEA, however, a plaintiff must exhaust administrative

remedies. See 20 U.S.C. § 1415(i)(2)(A). Plaintiffs here have failed to do so. They allege

neither that they filed a complaint with DCPS nor that they pursued a hearing. Both are

administrative prerequisites. See 20 U.S.C. § 1415(b)(6), (f).

Plaintiffs counter that pursuing administrative remedies would be futile in this case

because no entity other than this Court can undo the harm caused by the school closures. See

Opp. at 38. But given the harms Plaintiffs allege under IDEA – that is, lack of compliance with

the students' IEPs and inappropriate classroom placement (or, to use IDEA terminology,

placement outside of the "least restrictive environment") – administrative appeal would not

necessarily have been futile in this case. At bottom, Plaintiffs misconstrue what IDEA

guarantees: They imagine that the statute might require students with special needs to return to

their former schools – for those schools to reopen specifically to serve those students, even

though "the school that he or she would attend if nondisabled" now lies somewhere else. That,

however, is not the type of claim IDEA supports. Parents or guardians may complain under

IDEA if they believe their children are receiving an inadequate education, see 20 U.S.C.

§ 1415(b)(6); if their child's IEP needs to be revised, see 20 U.S.C. § 1414(d)(4)(A); or if the

school cannot provide a free and adequate public education. See Forest Grove Sch. Dist., 557

U.S. at 232-33. Parents or guardians cannot demand, under IDEA, that a school closing to all

students be kept open.

Given the purpose of IDEA and the relief available under that statute, administrative remedies cannot be categorically declared futile here. If Plaintiffs could show that their children were not receiving "a free and appropriate education" or that their child's IEP was not being met, the District could be required to allocate additional resources to each child's new school to meet the requirements of the child's IEP, or the District could be forced to relocate the child to another operational school that possessed the requisite instructional resources. Plaintiffs, however, did not give the District that opportunity, and that omission is fatal to their claim. As no relief could be granted under these circumstances, Plaintiffs' IDEA claim must be dismissed for lack of exhaustion.

## 2. *Rehabilitation Act*

Section 504 of the Rehabilitation Act directs that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Section 504 regulations also require public schools to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a); see also 34 C.F.R. § 104.1 (regulations in Part 104 effectuate section 504).

The flaws of Plaintiffs' IDEA claim scuttle part of their Section 504 Rehabilitation Act count as well. A claim brought under Section 504 that seeks relief that is also available under IDEA must be "exhausted to the same extent as would be required had the action been brought under" IDEA. 20 U.S.C. § 1415(*l*). Here, Plaintiffs assert under Section 504 that their children are being denied a "free and appropriate education." That claim mirrors IDEA exactly.

Plaintiffs must, accordingly, exhaust their administrative remedies, which they have not done in this case.

That lack of exhaustion does not, however, terminate all of Plaintiffs' Rehabilitation Act claims. Plaintiffs make one additional allegation under Section 504: that the school closings disproportionately affect students with disabilities and thus "rise[] to the level of discrimination based solely on Plaintiffs' disabilities." Am. Compl., ¶ 85. Disparate impact alone, however, does not show discrimination "by reason of" disability, as Section 504 requires. The Supreme Court explained why in Alexander v. Choate, 469 U.S. 287 (1985):

> [T]he position urged by respondents – that we interpret § 504 to reach all action disparately affecting the handicapped – is also troubling. Because the handicapped typically are not similarly situated to the nonhandicapped, respondents' position would in essence require each recipient of federal funds first to evaluate the effect on the handicapped of every proposed action that might touch the interests of the handicapped, and then to consider alternatives for achieving the same objectives with less severe disadvantage to the handicapped. The formalization and policing of this process could lead to a wholly unwieldy administrative and adjudicative burden.

Id. at 298 (citation and footnote omitted).

In addition to disparate impact, Section 504 Plaintiffs must allege something more, such as intentional discrimination by the District, denial of some meaningful benefit, or failure to make a reasonable accommodation for students with special needs. See id. at 299-302. Plaintiffs here have not pled any facts to support a claim of intentional discrimination, nor have they suggested any reasonable accommodations that the District failed to make resulting in the denial of a meaningful benefit. Because Plaintiffs allege nothing more than disparate impact, and the Supreme Court has "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504," id. at 299, they have failed to state a claim on which relief can be granted.

3. *ADA*

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Like Section 504, then, the ADA requires Plaintiffs to show discrimination "by reason of" disability. Because the claim here does not mirror an IDEA claim, see 20 U.S.C. § 1415(*l*), no exhaustion is required. See 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2).

Plaintiffs allege that the school closings violate the ADA because they "will have a disproportionately adverse effect on students with disabilities." Am. Compl., ¶ 75. In other words, disparate impact again. This claim, of course, shares the same shortcomings as Plaintiffs' Section 504 claims: The two statutes use the same language and require a similar proffer of proof of discriminatory intent beyond disparate impact. See Hunsaker v. Contra Coasta County, 149 F.3d 1041, 1043 (9th Cir. 1998) (same rule for § 12132 as Section 504); Am. Council of Blind v. Paulson, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) ("courts have tended to construe section 504 *in pari materia* with Title II of the ADA, 42 U.S.C. § 12132"). Because Plaintiffs here allege nothing more than disparate impact, their ADA claim also fails.

C. D.C. Law Claims

Plaintiffs next allege certain counts under D.C. law: (i) breach of contract, (ii) fraudulent misrepresentation, and (iii) violation of the D.C. Sunshine Amendment. These claims are something of a stretch, and it will come as no surprise that none of the allegations clears the Rule 12(b)(6) hurdle.

1.  *Breach of Contract*

To state a claim for breach of contract, a party must allege the existence of "(1) a valid

contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of

that duty; and (4) damages caused by breach." Tsintolas Realty Co. v. Mendez, 984 A.2d 181,

187 (D.C. 2009).

Here, Plaintiffs allege that DCPS has "publically [*sic*] pledged, orally and in writing, to

preserve the schools slated for closing and to keep them in the DCPS Inventory Stock." Am.

Compl., ¶ 104. Plaintiffs claim that they relied on those promises, and that the promises were

broken. Id., ¶ 105.

That bare recitation of the elements of a breach-of-contract claim does not pass muster

under Rule 12(b)(6). See Iqbal, 129 S. Ct. at 1949. Plaintiffs do not, for example, allege any

facts that point to the formation of a contract – that is, they do not claim that DCPS's statement

was an offer, or that the offer was accepted, or what would constitute consideration. Even if

Plaintiffs mean to rely on promissory estoppel, which does not require explicit acceptance or

consideration, there must still "be a promise which reasonably leads the promisee to rely on it to

his detriment, with injustice otherwise not being avoidable." Bender v. Design Store Corp., 404

A.2d 194, 196 (D.C. 1979) (internal quotation marks omitted). Here, Plaintiffs have not alleged

any facts that support the argument that the District made a promise that parents could

reasonably rely on, as opposed to a mere statement of intent or government policy. Indeed, the

public records Plaintiffs seem to refer to as establishing a "promise" – including a document

labeled "Building Reuse Preliminary Thoughts" – merely state that the District tentatively

planned to retain some schools in its inventory in case the student population in certain

neighborhoods grew, while leasing some buildings to charters and seeking out other public or

private partnerships to make use of the facilities in the meanwhile. See DCPS Proposed Consolidation and Reorganization at 26, 37. Plaintiffs have hardly alleged facts to show that allowing these buildings to be leased, as the District warned they may be, would cause an "injustice." Bender, 404 A.2d at 196. In other words, they have alleged no duty created via contract, either express or implied. Finally, although Plaintiffs claim that they "stand to lose significantly" because some of the school sites were leased, they nowhere describe how they were damaged by those leases. As a result, the breach-of-contract count must be dismissed.

### 2. *Fraudulent Misrepresentation*

To state a claim of fraudulent misrepresentation, Plaintiffs must allege "(1) a false representation, (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." D'Ambrosio v. Colonnade Council of Unit Owners, 717 A.2d 356, 360-61 (D.C. 1998) (citing Bennett v. Kiggins, 377 A.2d 57, 59 (D.C.1977)).

In their pleadings, Plaintiffs simply state that "Defendants and their predecessors misled and deceived Plaintiffs and others and misrepresented their true intent when it came to the future of the schools closed and slated for closure." Am. Compl., ¶ 107. They complain that the closed buildings were supposed to remain in DCPS inventory, but that subsequent actions "belie those promises." Id., ¶ 104. Presumably this is a reference to the leasing of at least one building to a charter school, as outlined Plaintiff Williams's affidavit. See Williams Aff., ¶ 10. Plaintiffs then claim that the District "intended to induce and did induce Plaintiffs and others to rely on their acts and omissions" by remaining in DCPS schools. Am. Compl., ¶ 108.

Again, that bare recitation of the elements of the tort is not sufficient to state a claim. Plaintiffs offer no facts evincing a material misrepresentation. See Trudeau, 456 F.3d at 193.

They do not even explain why the representation was false – that is, why the temporary lease of a building would take it out of DCPS inventory. Nor do they offer any facts to support the assertion that the District knew its representations were false when they were made or that the District intended to deceive anyone. Even more notable, although Plaintiffs state that they relied on the representations by remaining in the District, they have not explained how the mere existence of the schools in DCPS's inventory (even if closed) induced them not to move. Because Plaintiffs failed to allege facts that would support a claim of fraudulent misrepresentation, this count must also be dismissed.

### 3. *Sunshine Act*

The D.C. Sunshine Act requires that "[n]o resolution, rule, act, regulation, or other official action shall be effective unless taken, made, or enacted at" an open, public meeting. D.C. Code § 1-207.42.

Plaintiffs' Amended Complaint claims that the District "failed and continue[s] to fail to comply with the provisions of the Sunshine Amendment in the D.C. Self-Government Act" and that "decisions regarding the school closures were done in the dark." Am. Compl., ¶ 72. The affidavits accompanying the Amended Complaint are similarly conclusory and vague; none mentions a failure to hold open, public meetings or specific decisions regarding schools made without public input. Because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim, Iqbal, 129 S. Ct. at 1949, this allegation can be dismissed under 12(b)(6).

Even if this claim were to go to summary judgment, moreover, the result would be the same. Public records show that numerous open, public meetings were indeed held regarding the plan. See, e.g., DCPS Proposed Consolidation and Reorganization at 27-28. Plaintiffs do not

appear to contest the fact that these meetings happened.  As a result, no reasonable jury could find a violation of the Sunshine Act, and no additional amount of discovery is likely to produce a contrary result.

D.  Equal Protection Clause and Title VI

Having dismissed the majority of Plaintiffs' claims, the Court finally arrives at the issue that lies at the heart of Plaintiffs' case: racial discrimination.  Plaintiffs' claim under 42 U.S.C. § 1983 alleges that the District discriminated on the basis of disability, residence, and race in violation of the Equal Protection Clause of the Fourteenth Amendment, which applies to the District through the Fifth Amendment.  See Am. Compl., ¶ 95.  The principal focus in Plaintiffs' factual and legal allegations, however, is discrimination based on race.  See Opp. at 1-3, 28-34. Plaintiffs also bring a claim under Title VI of the Civil Rights Act of 1964, which protects against discrimination based on race, color, and national origin by the District, which receives federal funding.  See 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

Both the Equal Protection Clause and Title VI claims, it must be emphasized, require a showing of intentional discrimination.  See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); Alexander v. Sandoval, 532 U.S. 275, 280 (2001) ("[I]t is similarly beyond dispute – and no party disagrees – that [42 U.S.C. § 2000d] prohibits only intentional discrimination.").  Proving intentional

discrimination is notoriously difficult, absent direct evidence of a discriminatory rationale. After all, discriminatory intent "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (citation omitted); see also Arlington Heights, 429 U.S. at 265-66 (discriminatory intent need be only a "motivating factor in the decision"). Run-of-the-mill disparate impact does not clear this hurdle. See Arlington Heights, 429 U.S. at 264-65.

The Supreme Court has outlined three possible approaches to proving intentional discrimination as required by the Equal Protection Clause and Title VI. First, a plaintiff may proffer a law or policy that explicitly classifies citizens on the basis of race. See Hunt v. Cromartie, 526 U.S. 541, 546 (1999). Second, a plaintiff may claim that a facially neutral law or policy has been applied differently on the basis of race. See Yick Wo. v. Hopkins, 118 U.S. 356, 373-74 (1886). Finally, a plaintiff may show that a facially neutral law or policy that is applied evenhandedly is, in fact, motivated by discriminatory intent and has a racially discriminatory impact. See Arlington Heights, 429 U.S. at 265-66; Gomillion v. Lightfoot, 364 U.S. 339 (1960).

Here, the first approach cannot succeed, since no law or policy explicitly classifies on the basis of race. As a result, Plaintiffs must prove either that a policy has been applied in a discriminatory manner or that it was promulgated with discriminatory intent. The majority of Plaintiffs' original Complaint alleged simply that the school-closure plan had a disproportionate impact on black families and disabled students. That, of course, does not rise to a cause of action under the Equal Protection Clause or Title VI.

Plaintiffs' Amended Complaint and Opposition to the Motion to Dismiss, however, do contain legal and factual allegations that track the holdings of Yick Wo and Gomillion.  In other words, Plaintiffs do argue first that the District's facially neutral school-closure policy has been applied differently on the basis of race, and they do offer facts to bolster that conclusion.  See Yick Wo, 118 U.S. at 373-74.  Plaintiffs' reasoning runs along the following lines: The District claims to have a policy of closing under-enrolled schools because schools as small as Plaintiffs' schools are inefficient and provide students with fewer instructional resources.  Although that reasoning – or "policy" – is being used to shut down black schools east of the Park now, similar reasoning was not applied in the 1970s when white schools west of the Park were under-enrolled. Instead, to preserve neighborhood schools, students were bused in from other parts of the city. See Opp. at 1-3, 28-34.  The policy is therefore applied differently on the basis of race.  Plaintiffs also claim, along the lines of Gomillion, that the decision to close schools must have been motivated by discriminatory intent because the closures over the last several decades establish "a clear pattern, unexplainable on grounds other than race."  Arlington Heights, 429 U.S. at 266.

These theories, of course, may well ultimately be too slender a reed on which to hang Plaintiffs' case.  It may, for example, prove problematic to call the District's 40-year, sporadic history of school closures a "policy"; it may be that circumstances differ drastically between the 1970s – an era when busing students long distances was common – and the present; and it may be that race-neutral reasons do in fact undergird the District's differing treatment of school closures between the 1970s and today.  Finally, as the Court noted in its earlier ruling, harmful discrimination may be hard to find where students are being transferred to more integrated, better performing schools.  See Smith I, 2013 WL 2099804, at *11, *18.

24

When evaluating a Motion to Dismiss, however, the Court "must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" <u>Sparrow</u>, 216 F.3d at 1113. A plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely." <u>Twombly</u>, 550 U.S. at 555. Here, examining only Plaintiffs' Amended Complaint and accompanying declarations, and giving Plaintiffs the full benefit of all inferences that can be drawn in their favor, it appears that they have stated a claim on which relief can be granted. The reed may be slender, but it stands against the District's Motion to Dismiss. If circumstances are as dire as Plaintiffs claim – that is, if under-enrolled white schools have consistently been treated differently from under-enrolled black schools, if the pattern is as stark as that in <u>Yick Wo</u> or <u>Gomillion</u>, and if there is absolutely no race-neutral justification for the difference – then Plaintiffs may have a case. Under ordinary circumstances, then, Plaintiffs' pleadings would open the doors of discovery and allow them to proceed with their suit.

The District, however, urges the Court not to venture down that road and instead to grant summary judgment prior to full discovery. <u>See</u> Mot. at 7-8. It contends that Plaintiffs "cannot produce any evidence" to support the essential elements of their claims, including the claim that the District intentionally discriminated under the Equal Protection Clause or Title VI. <u>See id.</u> at 8, 21.

Although that may later prove to be the case – indeed, Plaintiffs' lack of success on their preliminary injunction may foreshadow the ultimate result here – considering a summary judgment motion at this stage would be premature. A case generally does not proceed to summary judgment "unless all parties have 'had a full opportunity to conduct discovery.'" <u>Convertino</u>, 684 F.3d at 99 (quoting <u>Anderson</u>, 477 U.S. at 257). In this case, a discovery schedule has not yet been set. Plaintiffs, moreover, have filed a Rule 56(d) motion requesting

that the Court defer summary judgment until they have had an opportunity to uncover additional facts to support their claim. Such a motion "requesting time for additional discovery should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" Id. (quoting Berkeley, 68 F.3d at 1414); see also Resolution Trust Corp. v. N. Bridge Assocs., 22 F.3d 1198, 1203 (1st Cir. 1994) ("Consistent with the salutary purposes underlying Rule 56[(d)], district courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter.").

To postpone summary judgment and continue discovery, a plaintiff may submit a Rule 56(d) affidavit or declaration that (1) outlines the particular facts he intends to discover and describe why those facts are necessary; (2) explains why he could not produce the facts; and (3) shows that the information is in fact discoverable. See Convertino, 684 F.3d at 99-100. Plaintiffs here have done just that. They seek, at a minimum, more information regarding under-enrolled schools east and west of Rock Creek Park so that the treatment of the two can be adequately compared. That information, of course, resides in the District's records and may (or may not) further Plaintiffs' claim that the District's approach to school closures is applied differently on the basis of race. Having submitted a sufficient Rule 56(d) declaration, Plaintiffs should receive an opportunity to conduct discovery.

Out of an abundance of caution and giving the benefit of all possible inferences to the Plaintiffs, then, the Equal Protection and Title VI claims pass muster under Rule 12(b)(6) and entitle the Plaintiffs to discovery in this case. That said, however, the Court is not in the business of sanctioning a fishing expedition into decades of DCPS files. Only targeted discovery will garner approval.

E.  D.C. Human Rights Act

The D.C. Human Rights Act, like Title VI and the Equal Protection Clause, protects against racial discrimination, among other things.  The DCHRA states in part: "Except as otherwise provided for by District law or when otherwise lawfully and reasonably permitted, it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived: race, . . . disability, . . . or place of residence . . . ."  D.C. Code § 2-1402.73.  The Act's "effects clause" prohibits unjustified disparate impact, in addition to intentional discrimination: "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice."  D.C. Code § 2-1402.68; see also Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ., 536 A.2d 1, 29 (D.C. 1987) (*en banc*) ("despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason").  A defendant may protect against such a disparate-impact claim by showing that her decision was justified by a neutral, nondiscriminatory reason, as outlined in Griggs v. Duke Power Co., 401 U.S. 424 (1971).  See Gay Rights Coal., 536 A.2d at 29.

According to Plaintiffs here, the effect of the school closings is discrimination on the basis of race, disability, and residency.  See Am. Compl., ¶¶ 59-67.  Assuming, as Plaintiffs allege, that the school transfers have led to the denial of benefits and services, the numbers bear out Plaintiffs' claim of disparate impact: While special-education students make up only 14.2% of the school district, they comprise 27.7% of the students in the closing schools.  See Smith I, 2013 WL 2099804, at *3.  Black and Hispanic students similarly make up 85% of the overall

school district, but 99.6% in the schools to be closed.  See id.; Facts & Statistics, D.C. Public

Schools, http://dc.gov/DCPS/About+DCPS/Who+We+Are/Facts+and+Statistics (last visited

Oct. 9, 2013).  And because school assignments depend on the child's home address, the school

closings disproportionately affect people who reside in specific areas of the city.  The school

closings, therefore, obviously bear disproportionately on black and Hispanic students, students

with disabilities, and students who reside east of the Park.

        The District understandably takes great pains to show that, despite this disparate impact,

its actions were "independently justified for some nondiscriminatory reason."  Gay Rights Coal.,

536 A.2d at 29.  At the motion-to-dismiss stage, however, the Court cannot consider the

evidence the District proffers to counter Plaintiffs' factual claims.  Instead, in evaluating a

motion to dismiss under Rule 12(b)(6), the Court must treat the complaint's factual allegations as

true.  Here, it must credit Plaintiffs' claims that any efficiencies that might justify the closings

are, in fact, a mirage – just as Plaintiffs claim similar school closures in 2008 produced no gains

to justify the harm they allegedly caused.  See Am. Compl., ¶¶ 33, 35, 47-52.  Crediting that

account here, the Court finds that the Amended Complaint and accompanying declarations

"contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).

        As explained above, whether Plaintiffs' evidence would suffice to convince a reasonable

jury that they should prevail is not the question here.  Discovery has not yet formally

commenced, and Plaintiffs have submitted a declaration explaining why a period of discovery is

necessary to prove their case.  The Court, accordingly, declines to consider the case on summary

judgment at this time, but it will allow the District to renew its Motion for Summary Judgment at

the close of discovery.

F.   Defendants Gray and Henderson

At the end of their Motion to Dismiss, Defendants move to dismiss Gray and Henderson from the case entirely.  Defendants reason that a "suit for damages against municipal officials in their official capacities is . . . equivalent to a suit against the municipality itself," so suing Gray and Henderson in addition to the District is redundant.  Atchison v. District of Columbia, 73 F.3d 418, 424 (D.C. Cir. 1996) (internal citation omitted).  The pleadings make clear, however, that Gray and Henderson are being sued in their individual as well as official capacities, so their addition is not redundant.  See Am. Compl. at 2.  As individuals, Gray and Henderson are distinct from the District.  See Kentucky v. Graham, 473 U.S. 159, 165-67 (1985).  The Court, accordingly, will not dismiss them as Defendants at this time.

IV.   **Conclusion**

In the end, Plaintiffs have failed to allege facts that would sustain the majority of their counts.  The ANC claims fail for want of standing; the disability-related claims either have not been exhausted or fail because Plaintiffs have not demonstrated intentional discrimination; and Plaintiffs have not alleged facts that would support the essential elements of the majority of their D.C.-law claims.

Some issues at the heart of this case, however, remain open.  Plaintiffs may move forward with their civil-rights complaints under the Equal Protection Clause, Title VI, and the DCHRA.  Plaintiffs have set forth facts sufficient to open the door to discovery on those counts, and the Court will allow that process to play out before addressing summary judgment.

For the aforementioned reasons, the Court will GRANT IN PART and DENY IN PART Defendants' Motion To Dismiss, or, in the Alternative, for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: October 10, 2013