**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**SHANNON MARIE SMITH,** *et al.*,

    **Plaintiffs,**

       **v.**

**KAYA HENDERSON, Chancellor of the**
**District of Columbia Public Schools,** *et al.*,

    **Defendants.**

              **Civil Action No. 13-420 (JEB)**

---

## MEMORANDUM OPINION

A perusal of any newspaper reveals an indisputable truth: People hold strong and divergent views regarding the future of public education. Today's headlines capture rampant debates about everything from teachers' unions to charter schools to the new "Common Core" State Standards. Conversations about these issues are playing out in legislatures and local governments throughout the country. This fall in the District of Columbia, in fact, voters will consider many of these same questions when they head to the polls to elect their city's leaders, particularly since the new mayor will appoint the next D.C. Public Schools Chancellor.

Plaintiffs in this case – like most parents – care deeply about their children's education. Their sons, daughters, and grandchildren are unhappy about the recent closure of their neighborhood schools. And Plaintiffs and their children understandably want their old schools and familiar teachers back. Seeking some avenue by which they might reopen their neighborhood institutions, these parents and guardians turned to the courts. They sued the District and its officials, alleging that the closings were discriminatory; that they had a disparate impact on poor and minority children; and that reforms like charter schools and performance pay

1

for teachers will ultimately harm black students in the District.  Linking the closures to D.C.'s troubled history of segregated and underperforming schools, these parents cry foul.  They want the reforms to end.

The core problem here is that the parents' fight is one for the ballot box – not the courts.  Although Plaintiffs dislike charter schools, performance pay, and the increasing number of D.C. school closures, there is simply no real evidence that these policies are discriminatory.  As a result, federal courts have no authority to intervene in these sensitive policy choices, and judges should not be the ones to render the final verdict on charter schools, school turnarounds, and teacher evaluations.  Instead, those decisions must be made by the policymakers and experts who have, for better or worse, always controlled public education.  The Court, consequently, will grant the District's Motion for Summary Judgment and dismiss this case.

## I.    Background

Plaintiffs' case has a history before this Court.  Prior to the instant Motion, the Court evaluated their Motion for a Preliminary Injunction, see Smith v. Henderson (Smith I), 944 F. Supp. 2d 89 (D.D.C. 2013), and Defendants' Motion to Dismiss. See Smith v. Henderson (Smith II), 982 F. Supp. 2d 32 (D.D.C. 2013).  Although those Opinions outline some of the basic facts of this case, Plaintiffs' evidence has evolved over the course of discovery, and the standard for summary judgment, of course, is different.  The Court, therefore, revisits the relevant details of the school closures.

### A.  D.C. Schools and Desegregation

Plaintiffs' tale begins at the very beginning: with the city's earliest school-desegregation efforts.  As a result, the Court will (briefly) survey the history of desegregation, race, and D.C. Public Schools.

Until the Supreme Court's landmark ruling in <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954), D.C. schools were segregated by law.  After <u>Bolling</u>, school desegregation proceeded "slowly but steadily" throughout the 1950's.  <u>See</u> Judith Denton Jones, <u>Six School Complex: A Successful Innovation in Washington, D.C.'s Public Schools</u> (1987) (cited frequently by Plaintiffs).

In 1967, a D.C. District Court handed down a broad mandate to hasten desegregation in <u>Hobson v. Hansen</u>, 269 F. Supp. 401 (D.D.C. 1967).  There, the court found that – even after <u>Bolling</u> – per-pupil expenditures in D.C. were significantly lower for black students; that there was a sizable achievement gap between black and white students; and that black students were disproportionately "tracked" into low-level classes.  <u>Id.</u> at 406.  As a result, the court ordered the school system to end tracking and to begin busing students from black neighborhoods to white schools.  <u>Id.</u> at 517.

At the time <u>Hobson</u> was issued, the District had already experienced a wave of white flight to the suburbs.  <u>Id.</u> at 410.  By 1967, most white families that remained lived west of Rock Creek Park in the northwestern quadrant of the city.  <u>Id.</u>  Their children were concentrated in a bundle of schools in that same region.  <u>Id.</u> at 411-12.  The attrition of D.C.'s white population continued over the 1960's, leading to the closure of many schools in white neighborhoods.  <u>See</u> Jones, *supra*, at 18 ("many white families took their children out of public schools in response to desegregation"); <u>id.</u> at 21 ("Schools were being closed all over the city; several in Georgetown had already been closed . . . .") (internal quotation marks omitted).

Plaintiffs claim that, during the aftermath of white flight, underpopulated white schools were treated more charitably than low-enrollment black schools have been today.  In the early 1970's, schools in Ward 3, which is west of the Park, had largely been depopulated.  <u>Id.</u> at 21-22.

The city's solution of busing students in from Anacostia, which is east of the Park, was about to come to an end.  Id. at 24.  Several schools in the area had closed or were about to close.  Id. at 21 (schools closing in Georgetown); id. at 26-27 (Western High School phased out, Gordon Junior High School closed).  Parents at six small elementary schools, fearing closure, banded together in an attempt to keep their schools open.  In the end, they came up with a plan that involved the closing of two schools and their conversion into a middle school and a resource center, respectively.  Id. at 37-38.  Four of the original six schools were able to remain open.  Id.

With the end of massive busing programs, however, city schools largely resegregated. Partially, this is because few white children enroll in D.C. public schools.  Today, according to Plaintiffs' expert, only about 11% of DCPS students are white.  See Opp., Exh. B (Updated Affidavit of Mary Levy), ¶ 13.  The vast majority are students of color – especially east of the Park.  See Parents United for the D.C. Public Schools, Separate and Unequal: The State of the District of Columbia Public Schools Fifty Years After Brown and Bolling 8 (2005), available at http://goo.gl/o1XO08.

To this day, D.C. also suffers from a yawning achievement gap.  In 2011, for example, "D.C. public schools ha[d] the largest achievement gap between black and white students among the nation's major urban school systems."  Lyndsey Layton, D.C. Schools Have Largest Black-White Achievement Gap in Federal Study, Wash. Post, Dec. 7, 2011, available at http://goo.gl/U6Byan.

B.  School Reform

In 2007, then-Mayor Adrian Fenty brought in Michelle Rhee to lead DCPS, promising to turn around the school system.  See Harry Jaffe, Can Michelle Rhee Save DC Schools?, Washingtonian, Sept. 2007, available at http://goo.gl/wIIxzk.  While schools had previously been

run by an elected school board, Rhee was DCPS's first Chancellor, appointed by the Mayor to take the helm of D.C. public education.  Id.; D.C. Code § 38-174(a).  In her time at DCPS, Rhee engineered a teacher-evaluation system that focused on student achievement and arranged for commensurate performance bonuses for teachers.  See Stephanie Simon, Radical Washington D.C. Teacher-Evaluation Plan Worked, Study Says, Politico, Oct. 17, 2013, available at http://goo.gl/Mn9Tup.  She also closed 23 under-enrolled neighborhood schools as the proportion of students in charter schools – which are publicly funded but privately run schools of choice – rose to about 40%.  See Sarah Childress, After Michelle Rhee: What Happened Next in D.C.'s Schools, Frontline, Jan. 8, 2013, available at http://goo.gl/HCPeSL.  Rhee's tenure in D.C. was undoubtedly controversial.  When she left office after Fenty's defeat at the polls, she was considered a scourge of D.C. public education by some and a hero by many others.  See id. The current Chancellor, Kaya Henderson, was Rhee's deputy and has continued many of her policies, much to Plaintiffs' chagrin.  See id.  This includes the use of rigorous teacher evaluations and performance bonuses, as well as a cooperative attitude toward charter schools.

    C.  Current School Closings

Partially as a result of changing demographics and partially due to the rise of charter schools, Chancellor Henderson inherited several schools that were under-enrolled.  She also knew that several schools lacked the academic programming that she believed all D.C. students should receive.  For instance, Henderson hoped all elementary schools could offer students 45 minutes per week of art, music, physical education, library, and a foreign language, but not all schools provided those offerings.  Mot., Exh. B (Deposition of Kaya Henderson) at 134:16-135:5.  The funding simply was not there.

Henderson thus sought advice from consulting companies and from her staff on how to use District resources more efficiently.  When the consultants recommended closing schools, the Chancellor convened a working group to determine which, if any, to close.  That group considered several criteria, including "student enrollment" in each school, "building capacity," "whether the facility itself has been recently renovated or modernized," and "programming" at schools "in that area."  Mot., Exh. D (Deposition of Lisa Ruda) at 22:12-23:12.

In the end, Henderson proposed closing twenty DCPS buildings over the course of the 2013-14 and 2014-15 school years.  See ECF No. 18-2 (Office of Chancellor, DCPS, DCPS Proposed Consolidations and Reorganization: Better Schools for All Students ("Proposed Consolidation Plan") (Nov. 15, 2012)) at 16.  The majority of the schools slated to be closed operated at half capacity, and five schools were under 25% full.  See id. at 17-22.  DCPS explained that closing these under-enrolled schools would allow it to spend less money per pupil on overhead, while putting more students in modern facilities and giving them access to programs and staff that can be justified only for large schools.  See id. at 11-14.

All of the schools to be closed sat in majority-minority, lower-income neighborhoods east of Rock Creek Park, in Wards 2, 4, 5, 6, 7, and 8.  See id. at 16.  Some of those schools had been drained of their students by the increasing popularity of charter schools.  For example, around 50% of children attend charter schools in Wards 1, 5, and 7, and about 40% attend charters in Wards 4, 6, and 8.  Id. at 8.  Henderson's proposal suggested no school closings in Ward 3, which is more white, more affluent, and west of the Park, or in Ward 1, which also contains several whiter, wealthier neighborhoods.  See id. at 23.  The District claimed that this was because facilities were being used efficiently in those Wards, with the building-utilization rate at 74% in Ward 1 and 109% in Ward 3.  Id. at 23.

To gather feedback on its proposal, DCPS (i) convened community meetings throughout the city regarding the proposal, drawing 780 participants; (ii) called and held office hours with Advisory Neighborhood Commissioners; and (iii) launched an online forum for those who could not make the meetings.  See id. at 27-28; Office of Chancellor, DCPS, Better Schools for All Students: DCPS' Consolidation and Reorganization Plan ("Final Consolidation Plan") 2-3 (Jan. 2013), available at http://goo.gl/XA8VSy.  The City Council also held two hearings on the closures.  See Final Consolidation Plan at 2-3.

In the end, DCPS made various changes to its initial plan based on community feedback, including keeping open five schools originally proposed for closure.  See id. at 4-5.  Plaintiffs claim in their brief that the five schools DCPS preserved contained more white students than the schools that were closed, although they provide no citation to support that proposition.  See Opp. at 29 (DCPS "intentionally removed from the initial closure list the only two schools with significant numbers of white students.");  id. at 9 n.8 (providing statistics but no source).

DCPS estimated that savings from the revised proposal would total $8.5 million and anticipated that those funds would be re-invested in schools throughout the city.  See Final Consolidation Plan at 6.  Plaintiffs argue that similar benefits projected from Rhee's closures in 2008 never materialized and that the projected benefits from this proposal would thus likely turn out to be overblown.  See Opp., Exh. F (Office of the D.C. Auditor, Audit of the Closure and Consolidation of 23 D.C. Public Schools (Sept. 6, 2012)) at 4.  Nevertheless, Chancellor Henderson confirms that cost savings from the closures did indeed materialize and that the extra funding has been used to "ensur[e] a consistent level of . . . programmatic offers at all our elementary schools," so that each school now has a librarian as well as art, music, gym, and foreign languages.  Henderson Depo. at 134:16-135:5.

DCPS also published proposals for how the empty school buildings might be used.  The District estimated that most schools would be retained in DCPS inventory, but suggested that some might be used by charter schools.  See Proposed Consolidation Plan at 26.  Plaintiffs thus claim that the closings were undertaken to open up space for charter schools, rather than for the benefit of DCPS students. See, e.g., Opp. at 4.

All fifteen schools on the final closure list lie east of the Park, meaning the students are disproportionately black and Latino.  In DCPS schools as a whole, according to Plaintiffs' expert, 69% of students are black; 16% are Hispanic; 4% are Asian, other, or unknown; and 11% are white.  See Levy Aff., ¶ 13.  In the closed schools, by contrast, 93% of students were black; 6.6% were Hispanic; and fewer than 0.2% (six students) were white.  Id.

Plaintiffs claim that this disparity is intentional, either because it is stark enough to be inexplicable on grounds other than race, or because it was motivated by discriminatory animus.

D.  Procedural Background

Five Plaintiffs originally filed this suit against Chancellor Henderson, Mayor Vincent Gray, and the District of Columbia as Defendants.  The case was removed from Superior Court in April 2013, and Plaintiffs' Motion for a Preliminary Injunction was denied in May of that year.  See Smith I, 944 F. Supp. 2d 89.  Two of the original Plaintiffs – Karlene Armstead and Ericka Black – and two Plaintiffs who were later added to the Complaint – Keith Kone and Phomika "Pho" Palmer – were ANC Commissioners. The other three original Plaintiffs – Shannon Smith, Marlece Turner, and Brenda Williams – are parents or guardians of children who attended closed schools.  See id. at 95.  All of the guardians' children are black or Hispanic and live east of the Park.  See id.

In their original Complaint, Plaintiffs alleged that the District violated D.C. statutes requiring notice to ANC Commissioners of the school closures, the D.C. Sunshine Amendment, the Constitution's equal-protection guarantee (asserted under 42 U.S.C. § 1983), Title VI of the Civil Rights Act, the Individuals with Disabilities Education Act, the Americans with Disabilities Act, the Rehabilitation Act, and the D.C. Human Rights Act.  See id.  In their Amended Complaint, Plaintiffs added two additional state-law claims.  See Am. Compl., ¶¶ 103-09.

The Court ruled on Defendants' Motion to Dismiss in October 2013, ultimately dismissing the ANC Commissioners as Plaintiffs and the lion's share of Plaintiffs' claims.  See Smith II, 982 F. Supp. 2d 32.  What remains are Plaintiffs' Equal Protection, Title VI, and DCHRA claims alleging discrimination.  Defendants now move for summary judgment, contending that there is no evidence that they discriminated against Plaintiffs and their children.

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

B.  Motion to Strike

Although courts typically view evidence in the light most favorable to the non-moving party, Defendants here argue that some of Plaintiffs' evidence should not be considered at all. That is because the evidence was not disclosed during discovery.  See Fed. R. Civ. P. 37(c). Broadly speaking, this evidence falls into three categories: (i) affidavits from experts and other witnesses whose identities were not disclosed; (ii) publicly available reports from policy groups; and (iii) some updated affidavits from Plaintiffs' witness Mary Levy.

According to the Federal Rules, "If a party fails to provide information or identify a witness as required by [the Rules], the party is not allowed to use that information or witness to

supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Local rules echo that requirement. See LCvR 26.2(a) ("A party that without substantial justification fails to disclose information . . . or to amend a prior response to discovery . . . , is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."). Here, Plaintiffs appear to admit that they did not timely identify several witnesses and that they never furnished the District with the relevant reports. See Opp. to Mot. to Strike at 13.

For the Court to consider the evidence at issue, then, Plaintiffs must show that the failure "was substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). Generally, "[t]he harm from the failure to disclose a witness flows from the unfair surprise hindering the prejudiced party's ability to examine and contest that witness' evidence." Elion v. Jackson, 544 F. Supp. 2d 1, 6 (D.D.C. 2008). "If the court" accepts "eleventh-hour declarations," then the District "would effectively be deprived of the opportunity to depose [Plaintiffs'] new witnesses." United States ex rel. Purcell v. MWI Corp., 824 F. Supp. 2d 12, 19 (D.D.C. 2011). The District would also have to unexpectedly gather rebuttal evidence at a moment's notice, which could cause substantial harm to its case. Id.

Considering first the affidavits supplied by "surprise" witnesses and experts, the Court finds that their late disclosure was neither "substantially justified" nor "harmless." Plaintiffs claim that their slew of additional experts is justified because they just now "learned that Defendants' 'only'" purported "purpose[] for closing the schools w[as] 'improving DCPS resource allocation and . . . educational experiences for DCPS students." Opp. to Mot. to Strike at 10. Put plainly, this statement is absurd. Improving efficiency and programming has always

been the District's stated reason for closing schools.  <u>See</u> Proposed Consolidation Plan at 5-15.
Plaintiffs' new expert testimony, moreover, is not "harmless," since Plaintiffs have robbed the
District of the opportunity to depose or otherwise rebut the new evidence prior to summary
judgment.  To be sure, DCPS would not be <u>severely</u> prejudiced if the affidavits were admitted,
since the Court would reach the same decision even if it considered the experts' arguments.  But
in the interest of fairness, the Court will exclude those affidavits, except for one that was
proffered earlier in this litigation.  <u>See</u> Opp., Exhs. C, W, X; <u>but see</u> Opp., Exh. S (same
affidavit submitted to Court in ECF No. 8-19).

Moving to the next two categories of materials, the Court finds that these yield a different
result.  The reports to which Defendants object are publicly available and hence could easily be
the subject of judicial notice.  <u>See</u> <u>Kaempe v. Myers</u>, 367 F.3d 958, 965 (D.C. Cir. 2004)
(public documents subject to notice); Opp., Exhs. E, G, H, K, T, U (public reports); <u>but see</u>
Opp., Exh. V (not obviously publicly available and hence excluded).  Considering them would,
therefore, be harmless.  Similarly, regarding the updated Levy affidavits, DCPS already knew
that she would be testifying at trial and had the chance to depose her.  The new information
contained in those affidavits appears largely to incorporate updated statistics that the District
itself only recently made available.  <u>See</u> Opp., Exhs. B, R.  The integration of this information
into updated or additional affidavits is therefore both justified and harmless.

Having resolved that question, the Court proceeds to the merits.

**III.    Analysis**

To support what remains of their case of discrimination, the parents advance a number of
theories.  First, they claim that under-enrolled schools in white neighborhoods have never been
closed – or, at least, that the District made a greater effort to save those schools back in the

1970's.  Next, they maintain that the reasons given for the closures are a façade.  Instead of wanting to improve the resources allocated to all DCPS schools, as Henderson and her staff claimed, Plaintiffs contend that schools were closed to meet two objectives: to fund teacher bonuses – which disproportionately go to whiter schools – and to make room for more charters. Both of these initiatives, the parents assert, are discriminatory and impermissible.

In analyzing Plaintiffs' claims, the Court begins by considering its authority to resolve certain policy disputes raised by the parents and then proceeds to separate analyses of Plaintiffs' federal and local causes of action.

A.  Policy Questions

As a preliminary matter, the Court notes that many of Plaintiffs' arguments cannot be properly addressed or resolved by a federal judge.  That is because the contentions are political rather than legal.  For example, portions of the briefing boil down to the following syllogism: (1) Charter schools and performance pay for teachers are bad policies that Plaintiffs dislike; (2) The District "illigetimate[ly]" closed neighborhood schools to support charter schools and performance pay; (3) Therefore, the closures should not be allowed.  Opp. at 40.  Taking another tack, Plaintiffs also contend that school closures are generally bad for kids and do not really save money; therefore, they say, the Court should re-open the closed schools.

As a matter of policy, there is sharp disagreement on those issues.  Some studies tend to show that charter schools, if well managed, can be incredibly successful, and many major urban districts have embraced this reform.  See, e.g., The Boston Foundation, Informing the Debate: Comparing Boston's Charter, Pilot and Traditional Schools 9 (Jan. 2009) (Boston charter schools produce positive results); CREDO, National Charter School Study 36-37 (2013) (charter schools have positive impact for children living in poverty); Christina Clark Tuttle, et al., Student

Characteristics and Achievement in 22 KIPP Middle Schools at xi (2010) (KIPP schools had significant, positive impact on student achievement).  Other studies cast doubt on the efficacy of charters.  See Diane Ravitch, The Myth of Charter Schools, N.Y. Rev. of Books, Nov. 11, 2010, available at http://goo.gl/lDYktL (among charter schools "17 percent were superior to a matched traditional public school; 37 percent were worse than the public school; and the remaining 46 percent had academic gains no different from that of a similar public school").  The same is true of performance pay correlated to student achievement.  Compare Victor Lavy, Performance Pay and Teachers' Effort, Productivity, and Grading Ethics, Am. Econ. Rev. 3-4, Dec. 2009, (performance pay works), with Steven Glazerman & Allison Seifullah, An Evaluation of the Chicago Teacher Advancement Program (Chicago TAP) After Four Years xiv (Mar. 2012) (bonuses do not necessarily impact achievement).  School closures, too, receive mixed reviews. They have been embraced, for example, by the federal Department of Education as one of four "turnaround" models for failing schools.  See School Improvement Grants, 75 Fed. Reg. 66,363, 66,366 (Oct. 28, 2010).  They have also been panned by certain critics.  See Opp., Exh. U (CReATE, Research Brief on School Closures (Mar. 2013)) at 1 (school closures cause lower test scores and higher dropout rates).

    For any policymaker, whether to embrace these reforms is a difficult question that requires expert judgment.  For courts, it is simply an impossible – indeed, an impermissible – question to answer.  "[C]ontroversies which revolve around policy choices and value determinations," are, after all, generally "committed" to the people's representatives "for resolution."  Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986).  Judges are "particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to

formulate . . . policies or develop standards for matters not legal in nature.'" Id. (quoting United States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1379 (D.C. Cir. 1981)).

Whether charter schools, performance pay, and school turnarounds are worthwhile policy tools is a question for school superintendents and state legislatures.  There is no governable legal standard for assessing the promise of those reforms.  Careers in the education sector will likely be launched and shattered on the success or failure of those movements.  It is not for courts to say whether, in the faraway future, researchers will finally concur on whether these initiatives succeeded or failed.  Instead, the only question for the Court to address is whether these reforms are <u>illegal</u> – in other words, are they inherently discriminatory or discriminatory as applied to Plaintiffs' children?  Answering that question, as it turns out, is a tough hill for Plaintiffs to climb.

B.  Equal Protection and Title VI

Plaintiffs' Amended Complaint alleges, under 42 U.S.C. § 1983, that the District's school closures discriminated against their children on the basis of disability, residence, and race in violation of the Equal Protection component of the Fifth Amendment.  See Am. Compl., ¶ 95; Bolling, 347 U.S. 497.  Plaintiffs' briefing, however, advances only claims of racial discrimination, so the Court will treat the disability and residence arguments as conceded. Plaintiffs also brought suit under Title VI of the Civil Rights Act of 1964, which protects against discrimination based on race, color, and national origin in District schools.  See 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

Both Equal Protection and Title VI claims require a showing of <u>intentional</u> discrimination.  <u>See</u> <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 264-65 (1977) ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . .  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); <u>Alexander v. Sandoval</u>, 532 U.S. 275, 280 (2001) ("[I]t is similarly beyond dispute – and no party disagrees – that [42 U.S.C. § 2000d] prohibits only intentional discrimination.").  Proving intentional discrimination is notoriously difficult, absent direct evidence of a discriminatory rationale.  After all, discriminatory intent "implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  <u>Pers. Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979) (citation omitted); <u>see also</u> <u>Arlington Heights</u>, 429 U.S. at 265-66 (discriminatory intent need be only a "motivating factor in the decision").  Run-of-the-mill disparate impact – that is, the fact that a policy disproportionately hurts a certain group – does not clear this hurdle.  <u>See</u> <u>Arlington Heights</u>, 429 U.S. at 264-65.

Because the school-closure plan is race neutral on its face, Plaintiffs must prove either that the District's plan has been applied differently depending on students' race, <u>see</u> <u>Yick Wo. v. Hopkins</u>, 118 U.S. 356, 373-74 (1886), or that it was actually motivated by discriminatory animus and has achieved its discriminatory goal.  <u>See</u> <u>Arlington Heights</u>, 429 U.S. at 265-66; <u>Gomillion v. Lightfoot</u>, 364 U.S. 339, 346-47 (1960).

To repeat, the parents advance three main arguments as to why the closings were, in fact, discriminatory.  First, they assert that, since the 1970's, the District's school-closure policy has been applied differently to white schools, which have been kept open, than to black schools,

which have been closed when under-enrolled.  Second, they contend that the school closures were intended to fund performance bonuses for teachers in disproportionately white schools, and hence the closings themselves were discriminatory.  Third, they posit that the closings were undertaken to create more room for charter schools, which they also view as discriminatory.  The Court addresses each theory in turn.

### 1. *Discriminatory Application of Closures*

Plaintiffs first argue that the District has applied its school-closure policy in a discriminatory manner.  That is, even if DCPS does have a policy of closing under-enrolled schools, that policy is only actually applied to black schools.  Black students, as a result, are intentionally made to suffer as white students escape unscathed.  According to Plaintiffs, "DCPS has historically protected schools west of the Park," which are disproportionately white.  Opp. at 8.  The parents claim that "no Ward 3 school was closed" in the 1970's, even when schools were severely under-enrolled.  Id.  By contrast, Chancellor Rhee recently closed 23 schools east of the Park, and Chancellor Henderson has now closed 15 additional schools in those same neighborhoods.  Clearly, Plaintiffs state, this shows a consistent pattern of discrimination from the 1970's to today.

The problems with this argument are manifold.  To begin with, comparing District governance in the 1970's with the state of DCPS today is not a terribly productive exercise.  Kaya Henderson – the relevant decisionmaker in this case – was so young in the early 1970's that she was not yet eligible to attend public school, let alone run a district.  More importantly, at that time, DCPS was overseen by an elected school board and did not even have a Chancellor, who is appointed by the Mayor.  Cf., e.g., Shelby County v. Holder, 133 S. Ct. 2612, 2629 (2013) (criticizing the use of "40-year-old facts having no logical relation to the present day" in

the civil-rights context); <u>Parents Involved in Community Schools v. Seattle School Dist. No. 1</u>,

551 U.S. 701, 736-37 (2007) (opinion of Roberts, C.J.) (observing the difference between

policies in place during desegregation and today's thorny policy problems of *de facto*

segregation).  Plaintiffs, moreover, present no evidence of any actual policy – formal or informal

– that began in the 1970's and somehow survived to this day.  Today's school-closure criteria

may well differ from whatever rubric was applied in the 1970's.  On this record, no reasonable

jury could find any useful connection between the events of the 1970's and today's school

closings.

Even if the 1970's closures <u>could</u> meaningfully be linked those closures in 2013, the

District's actions cannot be construed as intentionally discriminatory.  To make out an Equal

Protection case, Plaintiffs need to show "a clear pattern" of discrimination, "unexplainable on

grounds other than race."  <u>Arlington Heights</u>, 429 U.S. at 266.  This they cannot do.  Comparison

to the relevant Supreme Court opinions outlining intentionally discriminatory treatment

illustrates the point.  In <u>Yick Wo</u>, "uncontradicted" evidence "show[ed] that all Chinese

applications" to lawfully run urban laundromats were "in fact, denied, and those of Caucasians"

– who operated exactly the same sort of laundries – were "granted."  118 U.S. at 361.  Thus,

whites were free to pursue their livelihood unmolested, while Asians in the same profession were

arrested and harassed.  In <u>Gomillion</u>, a city's boundaries were redrawn "to remove from the city

all save only four or five of its 400 Negro voters while not removing a single white voter or

resident."  364 U.S. at 341.  The inference of discrimination thus was inescapable.

In the District, by contrast, it appears that significant numbers of both white and black

schools have been closed when their facilities were under-utilized.  Although Plaintiffs claim that

"no Ward 3 school was closed" in the 1970's, their own historical sources flatly contradict this

account.  Ward 3 parents banded together in the 1970's, after all, precisely because "'[s]chools were being closed all over the city'" – including in Ward 3 – "'and several in Georgetown had already been closed.'"  Jones, *supra*, at 21.  And of the six schools with which white parents were most concerned, two were actually shuttered.  Id. at 37-38.  The historic treatment of white schools and the current treatment of black schools, in other words, is not so different.

No one is denying that the racial disparities in the recent closings are striking.  In the closed schools, after all, a startling 93% of students were black and fewer than 0.2% (six students) were white.  See Levy Aff., ¶ 13.  But here, the disparity appears to be caused by the location of the under-enrolled schools, not by intentional discrimination.  In the 1970's, there were many under-enrolled schools west of the Park, in whiter neighborhoods; now, they lie to the east.  There is no evidence that schools west of the Park would be treated differently if they once again became under-enrolled.  While it is indeed regrettable that our city schools have become so segregated, it is residential segregation, along with changing population patterns, that is largely to blame for the disparities in the closures.

Similarly, in Yick Wo and Gomillion "no reason for" the disparate treatment "was shown, and the conclusion" could not "be resisted, that no reason for it exist[ed] except hostility to" race.  Yick Wo, 118 U.S. at 374.  Here, by contrast, the record is replete with compelling, race-neutral reasons for the District's actions.  As DCPS noted when it announced the closures, "Too many of our schools are under-enrolled. As a result, we spend too much on maintaining small schools rather than investing in quality programs for students."  Final Consolidation Plan at 1.  A majority of the schools slated for closure were between 9% and 55% full.  See Proposed Consolidation Plan at 17-22.  In determining which schools to close, the District looked at four factors: "1. Student enrollment and population changes in the community; 2. Building utilization

rates; 3. The building condition and its modernization status; and 4. The availability of 'receiving schools' to offer students an improved experience."  Final Consolidation Plan at 1.  None of those factors deals with race, and each makes sense in the context of increasing efficiency and providing all DCPS students with an improved educational experience.  Plaintiffs, moreover, offer no evidence that the schools slated for closure failed to meet these criteria, or that any Ward 3 school would have fit the bill better.  In fact, overall, Ward 3 schools – which are disproportionately white – are now <u>over-enrolled</u>.  <u>See</u> Proposed Consolidation Plan at 23. Viewing the closure criteria as a pretext for discrimination is therefore implausible as a matter of law.

On top of that, now that the schools have closed, the District has indeed used the money saved to meet at least one of its stated goals: ensuring that "[a]ll schools can offer robust programming."  Final Consolidation Plan at 1.  Although Plaintiffs feared that these closings – like the last round of closures – would save no money at all, that does not appear to be the case. According to Henderson, some of the savings have been used to guarantee "that every elementary school is offering the four core subject areas, social studies, science, math and English language arts, and at least 45 minutes a week of art, music, P.E., library, and foreign language instruction."  Henderson Depo. at 134:19-135:5.  No reasonable jury would view those changes as a threadbare façade for racial discrimination.

In its last Opinion, the Court wondered if Plaintiffs' theory of differential treatment would prove "too slender a reed on which to hang" its case.  <u>See</u> <u>Smith II</u>, 982 F. Supp. 2d at 50. Given the overwhelming and uncontroverted evidence produced by the District showing that its decision was race neutral, the thin reed supporting Plaintiffs' case has indeed snapped.  On the current record, no reasonable jury could infer intentional discrimination in the school closures.

### 2.   *Performance Pay and Other Resources*

Perhaps sensing the weakness of their argument-in-chief, Plaintiffs rally around another theory in their most recent filings.  They now claim that the schools were closed to help fund performance bonuses for highly effective teachers.  Because those bonuses are disproportionately awarded to teachers at white schools, Plaintiffs contend that the closings were discriminatory. See Opp., Exh. R (Second Affidavit of Mary Levy), ¶ 21.  This is a convoluted argument, to say the least.

To begin with, the proposition that schools were closed to fund teacher bonuses is not supported by any evidence properly on the record.[1]  Even if the Court were to look to the one (now-stricken) affidavit touching on this theory, it alleges only that closures were discussed in 2009-10 as one possible method for funding performance incentives.  See Opp., Exh. W (Affidavit of Marni Barron), ¶ 12.  The witness does not and cannot say that, several years later and with an entirely different Chancellor, the District actually closed schools for this purpose.

In any event, even if schools were closed to fund teacher bonuses, Plaintiffs would still not prevail.  Despite the fact that performance bonuses are disproportionately awarded to teachers at white schools, Plaintiffs have not shown that this is a result of intentional discrimination.  By all accounts, these bonuses are awarded to teachers based on race-neutral performance metrics.  See, e.g., DCPS, IMPACTplus for Teachers 1-5, available at http://goo.gl/pqiyZf.  This is not to say that the District should be proud of the fact that its best teachers work mostly in whiter, more affluent schools.  Still, Plaintiffs' argument relies entirely on disparate impact, which is not enough to make out an Equal Protection claim.  See Arlington Heights, 429 U.S. at 264-65.  Indeed, this claim piggybacks disparate impact – in terms of

---

[1] Plaintiffs cite, by Bates-stamp, one e-mail on the subject sent by DCPS employee Peter Weber.  But that e-mail was not submitted as an exhibit to their Opposition, and the Court cannot locate it.

performance pay – on top of disparate impact – in terms of the school closures.  No reasonable

jury could find intentional discrimination based on that attenuated logic.

Along the same lines, Plaintiffs contend that other resources – like traditionally certified

teachers and upgraded facilities – are also disproportionately concentrated west of the Park.  See,

e.g., Opp., Exh. T (Dep't of Educ., Data Snapshot: Teacher Equity (Mar. 2014)) at 12; Exh. G

(21st Century School Fund, DCPS Overall Spending on New and Completely Modernized

Schools (Jan. 2011)) at 1-2.  This, they say, has driven students out of schools east of the Park,

resulting in school closures.  Again, this is a disparate-impact argument.  Plaintiffs present no

link between decisions to spend money renovating schools and racial animus – as opposed to

basing those determinations on, say, the age of the facilities.  Similarly, alternative-certification

teachers, like Teach For America corps members, may be disproportionately drawn to low-

income schools east of the Park, pursuant to TFA's mission to close the achievement gap.

Finally, the lawsuit challenges the closings as discriminatory, not the conditions that led to the

closings.  In sum, as Plaintiffs proffer no link to intentional discrimination, their claims cannot

proceed.

### 3.  Charter Schools

Plaintiffs next claim that their neighborhood schools were closed to make room for

charters.  They offer no explanation as to why the expansion of charter schools is discriminatory,

except to say that it seems sinister that there are no charters in the whiter, more affluent Ward 3.

See Opp. at 11.  To be sure, the population of charter schools in D.C. is disproportionately black.

See D.C. Public Charter School Board, Facts About D.C. PCSB and Charter Schools 2 (Oct.

2013), available at http://tinyurl.com/onwvjtc.  But students who attend charters choose to go to

charters.  And they do so because, on average, charters are higher performing than DCPS

schools.  Id. at 3-4.  To argue that helping charters – which are, in D.C., higher-achieving schools

of choice – is somehow nefarious and discriminatory beggars belief.  That is not to say that most

parents, given the choice, would not pick a high-performing school next door over a high-

performing charter halfway across the city.  It is simply to acknowledge that the District cannot

be discriminating by attempting to provide all children with access to higher-achieving schools.

On top of that, Plaintiffs offer no real evidence that their schools were actually closed to make

way for charters – other than, somewhat ironically, complaints from charter schools that the

District was not providing them with enough space.  See Opp., Exh. O (E-mail from De'Shawn

Wright, D.C. Mayor's Office, to Terry Golden, Bailey Capital (July 11, 2012)).  Based on this

evidence, no reasonable jury could find an Equal Protection or Title VI violation here.

### 4.  Other Arguments

Plaintiffs offer a smattering of other arguments, including a stray remark by former

Chancellor Rhee and a host of contentions about how school closures harm rather than help

students.  The stray remark, as Defendants point out, is double hearsay: a report in a city paper

about an "anonymous" government official who allegedly heard Rhee offer to make more seats

available for white students.  See Opp. at 12.  As such, it is inadmissible.  See Fed. R. Evid. 802.

In terms of the impact of school closures, no one doubts that having their neighborhood school

shuttered and their favorite teachers dispersed can be traumatic for students.  The parents and

grandparents here have outlined in detail the negative impact that the closures have had on their

kids.  See, e.g., Opp., Exh. I (Affidavit of Marlece Turner); Exh. J (Affidavit of Shannon Marie

Smith).  Sensitive to this plight, the Court would simply note that overhauling a school system –

and D.C.'s has traditionally been one of the worst in the country – involves hard choices.  The

Chancellor has judged that some short-term discomfort for students in the closed schools is

necessary to provide a better education for D.C. children overall.  That decision is hers to make, as long as it is not based on race.  The Court must yield to the District's non-discriminatory policy choices.

Finally, Plaintiffs dredge up a litany of precedents addressing the immediate aftermath of *de jure* segregation, suggesting that the Court treat D.C. schools today like the Supreme Court treated districts in the wake of Brown v. Board of Education of Topeka, 347 U.S. 483 (1954). See, e.g., Griffin v. County School Board of Prince Edward County, 377 U.S. 218 (1964); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 20-21 (1971).  No one doubts that the pre-Bolling period of forced segregation has left long-lasting scars on the city and its schools.  But what policymakers are grappling with here is the current state of *de facto* segregation in the city. As a result, different standards apply.  See Parents Involved in Cmty. Schs., 551 U.S. at 735-36 (explaining the distinction between *de jure* and *de facto* segregation); Spurlock v. Fox, 716 F.3d 383, 386 (6th Cir. 2013) (same).  In addition, as the Court noted in its prior Opinion, it highly doubts that Brown and its progeny could properly be stretched to prevent the closure of highly segregated, largely deserted, under-performing schools and to keep minority children from being transferred to higher-performing, less segregated schools nearby.  See Smith I, 944 F. Supp. 2d at 102-03.  As a result, the appeal to Brown-era cases cannot save Plaintiffs' cause.

C.  D.C. Human Rights Act

The D.C. Human Rights Act, like Title VI and Equal Protection, guards against racial discrimination.  It also prohibits discrimination based on residence, among other things.  The DCHRA states in part: "Except as otherwise provided for by District law or when otherwise lawfully and reasonably permitted, it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or

benefit to any individual on the basis of an individual's actual or perceived: race, . . . disability, . . . or place of residence . . . ." D.C. Code § 2-1402.73. The Act's "effects clause" prohibits unjustified disparate impact, in addition to intentional discrimination: "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68; see also Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ., 536 A.2d 1, 29 (D.C. 1987) (*en banc*) ("despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason"). A defendant may protect against such a disparate-impact claim by showing that her decision was justified by a neutral, nondiscriminatory reason, as outlined in Griggs v. Duke Power Co., 401 U.S. 424 (1971). See Gay Rights Coal., 536 A.2d at 29.

According to Plaintiffs' Complaint, the effect of the school closings constitutes discrimination on the basis of race, disability, and residency. See Am. Compl., ¶¶ 59-67. In their Opposition, however, they do not attempt to defend their claims based on disability, choosing instead to move forward with only race- and residence-based charges. Assuming that the school transfers have led to the denial of benefits and services, the numbers bear out Plaintiffs' claim of disparate impact: Black and Hispanic students make up 85% of the overall school district, but 99.6% of students in the schools to be closed. See Levy Aff., ¶ 13. And because school assignments depend on a child's home address, the school closings disproportionately affect people who reside in specific areas of the city. The school closings, therefore, obviously bear disproportionately on students of color and students who reside east of the Park.

The District thus wisely relies on the argument that its actions were "independently justified for some nondiscriminatory reason." Gay Rights Coal., 536 A.2d at 29.  In other words, DCPS closed these schools to save much-needed money, which could then be spent to improve education for all District students.  Closing under-enrolled schools, moreover, was necessary to free up funding so that elementary schools could uniformly be equipped with the same basic programmatic offerings.  As discussed above, see supra, III.B.1, the District's evidence on this point is clear, compelling, and uncontroverted.  This is fairly remarkable, given that DCPS threw open its records to Plaintiffs and allowed them to depose some of its highest-ranking officials. The District answered "25 Interrogatories, 21 Requests for Admission, and 20 Requests for Production of Documents," which yielded "almost 20,000 pages of documents, including the Chancellor's hand-written notes from meetings."  Mot. at 3.  Plaintiffs questioned "DCPS Chief Financial Officer Deloras Shepherd . . .; DCPS Chief of Strategy Peter Weber; DCPS Chief of Staff Lisa Ruda; and DCPS Chancellor Kaya Henderson."  Id.  Despite all that, Plaintiffs came up empty handed.  Nothing in the record points to discrimination based on race or residence. Everything, instead, points to a neutral determination undertaken for the legitimate purpose of increasing efficiency and improving education for all students.  As a result, no reasonable jury could find for Plaintiffs under the DCHRA.

IV.     **Conclusion**

For the aforementioned reasons, the Court will GRANT Defendants' Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  July 18, 2014